**<u>Exhibit A</u>**

**U.S. Department of Justice**
Office of the Attorney General

# The Attorney General's
# First Step Act
# Section 3634 Annual Report

# December 2020



# Table of Contents

Introduction ........................................................................................1

Executive Summary .............................................................................1
    Publications Developed in Response to the FSA ...........................2
    FSA Resource Pages ...................................................................3

I.  A summary of the activities and accomplishments of the Attorney General in carrying out the First Step Act ...................................................4
    Developed a New Risk & Needs Assessment System .....................4
        Risk Assessment Process
        Needs Assessment Process
    Screened Inmates and Assigned Programming .............................7
    Application of the Fair Sentencing Act ........................................7
    New/Expanded Programs and Policies ........................................7
    Compassionate Release ............................................................8
    Good Conduct Time Changes .....................................................8
    Transfers Closer to Home .........................................................8
    Expanded the Use of Home Confinement ....................................9
        Report on Number of Offenders Not Transferred to Community Custody
    Drug Treatment .....................................................................10
    Reentry .................................................................................11
    Operational Policies and Guidance ...........................................11
    Proposal for FSA Improvements ...............................................13
        Purpose of the Legislative Proposal

II.  A summary and assessment of the types and effectiveness of the evidence-based recidivism reduction programs and productive activities in prisons operated by the Bureau of Prisons ...................................................17
    Evidence about Programs Shown to Reduce Recidivism ..............17
    Effectiveness of EBRRs and PAs ...............................................19
    Program Capacity ...................................................................19
        Gaps or Shortages in Capacity

III.  Rates of recidivism among individuals who have been released from Federal prison ...................................................................................21
        Recidivism Data Tables for Recidivism by Primary Offense of Conviction, Length of Sentence Imposed, Length of Sentence Served, BOP Facility (by Institution Security Classified Level), and PATTERN Risk Level

## IV.  The status of prison work programs at facilities operated by the Bureau of Prisons ................................................................................................25

Strategy to Expand the Availability of FPI Programs ....................25
An Assessment of the Feasibility of Expanding FPI Programs
Legal Authorities Useful or Necessary to Achieve FPI Expansion
*Expansion of Market for FPI to Various Public Entities*
*Require 15 Percent of Compensation be Set Aside for Reentry*
*Require GAO to Audit FPI as to Mandatory Source, Recidivism, etc.*

## V.  An assessment of the Bureau of Prisons' compliance with § 3621(h) .....29

Assessing Inmate Recidivism Risk Level and Needs .....................29
Recidivism Risk Level
Inmate Program Review
Inmate Needs Assessment
Review and Revalidation of PATTERN ...........................................34
Review and Revalidation Findings
BOP Inmate Programming ...........................................................36
BOP Partnerships ........................................................................37

## VI.  An assessment of progress made toward carrying out the purposes of FSA, including any savings ................................................................39

Establishment of FSA Time Credits ..............................................39
Expanding EBRR Program and PA Offerings ................................41
Identification for Returning Citizens .............................................41
Associated Savings .....................................................................44

## VII.  An assessment of budgetary savings .....................................................45

## VIII.  Statistics on inmates with Dyslexia .....................................................46

Dyslexia Screening Process .........................................................46
Prevalence of Dyslexia among BOP Inmates

## Appendix A.  Impact of the COVID-19 Pandemic on FSA Programming .....48

Data-Driven Impact Assessment
Qualitative Impact Assessment
Impact Categorization
Examples of the Impacts of COVID-19 at the Institutional-level

# Introduction

On December 21, 2018, President Donald J. Trump signed into law the First Step Act ("FSA" or "the Act") after it passed both houses of Congress with bipartisan support. Under Section 101 of the Act, now codified in 18 U.S.C. § 3634, the Attorney General is required to submit a report beginning two years after the date of enactment, and annually thereafter for a period of five years. The report is to be delivered to the Committees on the Judiciary of the Senate and the House of Representatives and the Subcommittees on Commerce, Justice, Science, and Related Agencies of the Committees on Appropriations of the Senate and the House of Representatives.

# Executive Summary

This initial report summarizes the activities and accomplishments of the Department of Justice ("the Department") and the Attorney General in carrying out the Act from December 21, 2018 through September 30, 2020. The report includes information in response to the items required under § 3634:

   I.  A summary of the activities and accomplishments of the Attorney General in carrying out the First Step Act.
  II.  A summary and assessment of the types and effectiveness of the evidence-based recidivism reduction programs and productive activities in prisons operated by the Bureau of Prisons.
 III.  Rates of recidivism among individuals released from Federal prison.
  IV.  The status of prison work programs at facilities operated by the Bureau of Prisons.
   V.  An assessment of the Bureau of Prisons' compliance with section 3621(h). Implementation of Risk and Needs Assessment System.
  VI.  An assessment of progress made toward carrying out the purposes of the Risk and Needs Assessment System, including any savings.
 VII.  An assessment of budgetary savings.
VIII.  Statistics on inmates with dyslexia.

Section I addresses the work done to create the new risk assessment tool and to enhance the Federal Bureau of Prisons' (BOP's) current needs assessment process. It also discusses FSA improvements to reentry, drug treatment, home confinement, and inmate placement closer to home, as well as changes made involving retroactive application of the Fair Sentencing Act, compassionate release, and good conduct time. Section I also covers the policies and guidance required to implement the FSA and proposes legislation to enhance the effectiveness of the FSA.

Section II discusses the programs and activities that, per the FSA, can be considered evidence-based recidivism reduction programs and productive activities.

Section III addresses the recidivism rates for inmates released from federal prison through September 26, 2020 as a result of the FSA. Such releases may result from retroactive application of the Fair Sentencing Act, compassionate release, good conduct time, or the FSA reauthorization of the Elderly Offender pilot program.

Section IV discusses work completed by the Federal Prison Industries (FPI, also known by its trade name UNICOR) under the FSA. This includes a strategy to expand the availability of such programs, an assessment of the feasibility of expanding such programs, and a discussion of the legal authorities that would be useful or necessary to achieve these expansions.

Section V explains the implementation of the risk and needs assessment system required by the FSA; the requirement and process for conducting inmate risk assessments; the ongoing review and revalidation of PATTERN; the enhancements made to the BOP's needs assessment; BOP programming; and BOP volunteer partnerships.

Section VI provides additional information about the Department's FSA activities and accomplishments, such as the establishment of FSA Time Credits, the expansion of evidence-based recidivism reduction programs and productive activities, and securing identification for returning citizens.

Section VII addresses budgetary savings seen under the FSA.

Section VIII discusses the prevalence of dyslexia among prisoners in BOP facilities and the incorporation of dyslexia screening and treatment.

Appendix A addresses the impact of COVID-19 on programming.

## Publications Developed in Response to the FSA

Additional information about the Department's diligent and robust implementation of the FSA can be found in the following reports and publications.

- Data Collected Under The First Step Act, 2019
- The First Step Act of 2018 Risk and Needs Assessment System – January 2020 Update
- The First Step Act of 2018 Risk and Needs Assessment System
- Stakeholder Statements Submitted to NIJ's September Listening Sessions
- Key Components of the Federal Bureau of Prisons' Current Needs Assessment System
- First Step Act Approved Programs Guide
- Stakeholder Statements Submitted in Response to NIJ's FSA Listening Sessions
- First Step Act: Best Practices for Academic and Vocational Education for Offenders

FSA Resource Pages

In an effort to inform the public about FSA activities, the BOP established an FSA Resource Page on its public website (https://www.bop.gov/inmates/fsa).

Reports and other pertinent FSA documents released by the Department in support of the implementation of the Act also are located on the National Institute of Justice (NIJ) public website (https://nij.ojp.gov/topics/articles/nijs-role-under-first-step-act#reports).

# I.   A summary of the activities and accomplishments of the Attorney General in carrying out the First Step Act.

Section I provides an overview of the Department's activities to implement the FSA over the 92 weeks since its enactment through the end of Fiscal Year (FY) 2020. Most of the work has focused on developing a new risk and needs assessment system to assess the recidivism risk level and specific needs of every BOP inmate. The Department selected expert external consultants to create the new risk assessment tool and to enhance the BOP's current needs assessment system, and worked closely with the Independent Review Committee (IRC), many of whose recommendations have helped shape this continuing work. The Department actively sought out expert and public input to ensure the systems developed appropriately took into consideration stakeholders' suggestions.

In addition, the Department worked to implement other elements of the FSA, including those relating to reentry, drug treatment, home confinement, and placing inmates closer to home. The Department also implemented and responded to changes the FSA made involving retroactive application of the Fair Sentencing Act, compassionate release, and good conduct time. Updates to the number of Fair Sentencing Act and compassionate release reductions are posted weekly to the BOP's website ([https://www.bop.gov](https://www.bop.gov)). The Department also created, updated, and made available to BOP staff the corresponding policies and guidance necessary to implement many of the FSA's requirements. Many of these policies are pending Union negotiation. New policies and guidance will be added, as needed, as implementation of the FSA continues.

Finally, the Department developed a proposal to enhance the FSA. The proposal would both enhance the effectiveness of the FSA by filling gaps in the existing FSA Time Credits exclusion list, set forth in 18 U.S.C. § 3632(d)(4)(D), which currently allows certain violent and dangerous offenders to receive time credits, and also make the exclusion list in Section 3632(d)(4)(D) consistent with the exclusion list in the Second Chance Act of 2007.

## Developed a New Risk & Needs Assessment System

### Risk Assessment Process

On July 19, 2019, prior to the statutory deadline, the Department released a risk assessment tool—the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN)—and a detailed description of planned enhancements to the BOP's current needs assessment system.

PATTERN achieved a high level of predictive performance across race, gender, and ethnicity, and exceeded what is commonly found for risk assessment tools in the United States. The Department nonetheless identified additional opportunities to enhance the system to better

recognize and address inmate needs, including by implementing new trauma and dyslexia screening tools.

Following the release of PATTERN, the Department began a 45-day comment period to solicit input from stakeholders, advocates, and the public on suggested improvements to PATTERN. The Department received nearly 200 comments and statements. The Department also hosted two listening sessions where it received statements from eight stakeholder organizations. Interested stakeholders also submitted eight sets of comments.

On November 19, 2019, the Attorney General met with the IRC to discuss proposed changes to PATTERN. The IRC provided recommended changes to PATTERN. The BOP and NIJ concurred with the majority of the Committee's changes, which the Attorney General then approved. The Department announced these enhancements to PATTERN in a January 2020 report. The changes were designed to increase PATTERN's fairness and transparency without significantly impacting its anticipated high level of predictability.

As described in the July 2019 report, the lowest raw score for the Minimum Risk Level Category was zero. After making the enhancements in PATTERN, raw scores were adjusted to ensure that inmates were accurately placed in the appropriate Risk Level Category (RLC) and the tool achieved the same high-level of predictive accuracy. Updated scoring information, using inmates released to U.S. communities under the FSA through September 26, 2020, is described below:

### Revised PATTERN RLC Score Range, Population Distribution, & Risk of Recidivism

| RLC | Raw Score | | Population in Each Risk Level Category | | | Risk of Recidivism | | |
|---|---|---|---|---|---|---|---|---|
| General | Male | Female | All | Male | Female | All | Male | Female |
| Minimum | < 11 | < 6 | 17% | 14% | 34% | 10% | 10% | 10% |
| Low | 11 − 30 | 6 − 31 | 29% | 26% | 44% | 31% | 31% | 34% |
| Medium | 31 − 43 | 32 − 49 | 19% | 20% | 16% | 55% | 54% | 58% |
| High | 44+ | 50+ | 34% | 40% | 6% | 75% | 75% | 75% |

| RLC | Raw Score | | Population in Each Risk Level Category | | | Risk of Violent Recidivism | | |
|---|---|---|---|---|---|---|---|---|
| Violent | Male | Female | All | Male | Female | All | Male | Female |
| Minimum | < 7 | < 3 | 20% | 14% | 51% | 1% | 1% | 1% |
| Low | 7 − 24 | 3 − 19 | 42% | 42% | 46% | 9% | 9% | 7% |
| Medium | 25 − 30 | 20 − 25 | 14% | 16% | 3% | 21% | 21% | 23% |
| High | 31+ | 26+ | 24% | 28% | 1% | 31% | 31% | 31% |

5

Due to the changes in PATTERN, a small percentage of inmates changed risk categories, with a majority receiving a lower risk classification. The BOP estimated the following effect on inmates:

| Decreased from MEDIUM to LOW | |
|---|---|
| Males | 9,162 |
| Females | 533 |

| Increased from LOW to MEDIUM | |
|---|---|
| Males | 4,430 |
| Females | 296 |

| Decreased from LOW to MINIMUM | |
|---|---|
| Males | 7,184 |
| Females | 436 |

| Increased from MINIMUM to LOW | |
|---|---|
| Males | 3,282 |
| Females | 1,145 |

The FSA requires the Department to review and revalidate PATTERN on an annual basis. Revalidating PATTERN will provide helpful information about how well the risk assessment tool performs in predicting the likelihood of recidivism for new cohorts of BOP inmates. To fulfill this requirement, the Department released a competitive funding opportunity (a Statement of Work) on February 10, 2020 and sought responses from qualified external, independent consultants to support the annual review and revalidation of PATTERN for up to five years.

Following an extensive peer review process, the Department selected two independent consultants, Dr. Rhys Hester and Dr. Ryan Labrecque, as the top candidates to perform this work. Dr. Hester, an Assistant Professor of Criminal Justice at Clemson University, and Dr. Labrecque, an Assistant Professor in the Department of Criminal Justice at the University of Central Florida, were selected because their submissions aligned with the Department's priorities by supporting research to reduce crime and ensure public safety. Their submissions proposed innovative analytic strategies to review and revalidate PATTERN and they demonstrated expertise, capabilities, and competencies.[1]

---

[1] To learn more about the annual review and revalidation of PATTERN, see page 34-35.

<u>Needs Assessment Process</u>

Before passage of the FSA, the BOP assessed inmate needs as part of the intake assessment, with reassessment occurring at least semi-annually throughout an inmate's incarceration term. Inmates with criminogenic or other needs meet with BOP staff to discuss assessment findings and are referred for appropriate programs based on these results. With the launch of the PATTERN risk assessment tool, the BOP began formalizing and enhancing the needs assessment system. This topic is described in more detail in Section V.

Additionally, the BOP engaged an independent and experienced research organization to assist in reviewing external programs for evidence demonstrating effectiveness in reducing recidivism. Additional details have been posted on BOP's website at the following links:

- https://www.bop.gov/inmates/fsa/docs/evidence_based_recidivism_reduction_programs.pdf

- https://www.bop.gov/inmates/fsa/docs/faqs_on_ebrr_expanded.pdf

## Screened Inmates and Assigned Programming

The BOP conducted risk and needs assessments for federal inmates and assigned evidence-based recidivism reduction programs by the January 15, 2020 FSA deadline. As of that date, PATTERN recidivism risk assessment levels of High, Medium, Low, or Minimum were assigned to all sentenced inmates at BOP designated facilities.

## Application of the Fair Sentencing Act

The FSA retroactively applied Sections 2 and 3 of the Fair Sentencing Act of 2010. As of September 28, 2020, the BOP had processed 3,434 Fair Sentencing Act / Retroactive Sentence Reduction orders and released 2,509 inmates.

## New/Expanded Programs and Policies

While the FSA did not come with appropriated funds in FY 2019, the Deputy Attorney General announced in July 2019 that the BOP had adjusted funding within its budget to cover a variety of targeted FSA activities, including:

- o Increasing Volunteer/Partnership Opportunities
- o Enhancing Medication Assisted Treatment
- o Providing English as a Second Language Workbooks and Textbooks
- o Expanding Education Programs and Programs for Women

- o  Providing Certifications for Vocational Training
- o  Increasing Vocational Training Opportunities
- o  Performing Evaluations for Evidence-Based Programs
- o  Developing a Needs Assessment System

## Compassionate Release

The BOP promulgated a policy with new notification and assistance procedures for "compassionate release" sentence reductions under 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g). BOP records show that between December 21, 2018, and September 30, 2020, approximately 1,700 inmates were released via compassionate release.

## Good Conduct Time Changes

Prior to the FSA, qualifying inmates earned up to 54 days of good conduct time for each year served and, in accordance with 18 U.S.C. § 3624(b), the BOP pro-rated the amount of good conduct time earned for the final year of service of sentence.

Pursuant to the FSA, qualifying inmates now earn up to 54 days of good conduct time for each year of sentence imposed by the court. This change took effect on July 19, 2019, as required by statute, and resulted in over 3,100 releases from BOP custody.

To ensure this transition went smoothly, the BOP created individualized release plans for every inmate due to be released and distributed reentry booklets to all institutions (with an emphasis on delivering to those inmates due for immediate release) in the second week of June 2019. The BOP also coordinated with the U.S. Probation and Pretrial Services office.

## Transfers Closer to Home

Since before passage of the FSA, the BOP has worked to place inmates within 500 miles of their release residence, as available and appropriate. The BOP calls these "nearer release transfers." Following passage of the FSA, the BOP updated its *Inmate Security Designation and Custody Classification* policy on September 4, 2019, to include the specific FSA language (https://www.bop.gov/policy/progstat/5100_008cn.pdf).

During Calendar Year (CY) 2019, the BOP conducted 1,684 nearer release transfers. From January to October 2020, there were 1,219 nearer release transfers. As of September 26, 2020, 80,648 inmates (70% of 115,812 inmates in typical[2] institutions with U.S. (not Territory) residences) were placed within 500 miles of their residence.

The following table shows inmate distance within legal residence by institution security level.

| Facility Security Level | Within 500 Miles of Legal Residence | Greater Than 500 Miles from Legal Residence | Total |
|---|---|---|---|
| Administrative | 9,888 | 3,801 | 13,689 |
| High | 8,401 | 9,956 | 18,357 |
| Medium | 35,303 | 12,021 | 47,324 |
| Low | 24,755 | 8,854 | 33,609 |
| Minimum | 2,301 | 532 | 2,833 |
| Total | 80,648 (70%) | 35,164 (30%) | 115,812 |

During the COVID-19 pandemic, the BOP canceled all nearer release transfers. This action was taken to facilitate moving a large number of inmates out of BOP Special Housing Units and into private correctional facilities, and to temporarily lower or set population caps at all BOP low- and minimum-security facilities in order to decrease COVID-19 exposure incidents in facilities where populations are unable to socially distance.

## Home Confinement

Due to the CARES Act and the COVID-19 pandemic, the BOP placed a tremendous number of inmates into home confinement. As a result, any data provided at this time would not accurately reflect the increased utilization of home confinement under the FSA. The BOP increased the home confinement population by approximately 200 percent from March to December 2, 2020 and transferred over 19,000 inmates through the home confinement program in this period.

### *Report on Number of Offenders Not Transferred to Community Custody*

Section 504 of the FSA amends 18 U.S.C. § 3624(c) to require the BOP to report on the number of offenders who were not transferred to community custody (Residential Reentry Center (RRC) or home confinement) prior to release. In deciding whether an inmate is eligible, the BOP considers such factors as:

- Inappropriate inmate behavior(s) (e.g., recent discipline).
- Inmate refusal of community placement.
- Lack of bed space at a RRC.

---

[2] A typical institution includes all BOP-managed and privately managed institutions. It does not include any community corrections facilities.

- Local restrictions precluding certain types of offenses from placement in an RRC or home confinement (e.g., sex offenders, arsonists, people who used their residence to manufacture methamphetamine, etc.).
- Inmates with detainers.
- Inmates who are not U.S. citizens.

The following table shows the number of inmates who were and were not placed in community custody prior to release during the previous two fisal years.

| Fiscal Year | Direct Releases to the Community[3] | Transfers to Community Prerelease Custody[4] |
|---|---|---|
| 2019 | 11,855 | 28,811 |
| 2020 | 10,505 | 32,226 |

## Drug Treatment

The BOP has a robust drug treatment strategy and offers a variety of drug treatment programs, including those that research has demonstrated are effective. Offenders who have an identified need receive an individualized treatment plan to address their needs. One of the most popular programs is the Residential Drug Abuse Program (RDAP), which ideally begins as the inmate nears release. In FY 2020, over 41,000 inmates participated in institution-based drug treatment programs:

- Drug Education: 14,666 participants
- Non-Residential Drug Abuse Program: 15,632 participants
- Residential Drug Abuse Program: 11,556 participants

The FSA requires the BOP to assess the availability of and the capacity to treat heroin and opioid abuse through evidence-based programs, including Medication Assisted Treatment (MAT). In the wake of the opioid crisis, this is an important treatment option for those suffering from opioid addition. Offenders are initially screened to assess for potential benefits of MAT program enrollment. Once identified, offenders undergo additional medical and psychological screening. If they volunteer to participate, they are provided an individualized treatment plan.

The FSA requires the BOP to expand MAT, and BOP's efforts in this area are ongoing. As of September 2020, the BOP had screened over 7,000 inmates, across 36 states, in 98 BOP institutions and 147 RRC locations. Of those screened, 409 have enrolled in MAT. The BOP is

---

[3] Sentence-related releases from institutions with no RRC/home confinement placement.

[4] Transfers from institutions to RRC/home confinement prior to release.

working to establish the internal infrastructure for all MAT-related services and medications, including obtaining approval from the U.S. Department of Health and Human Services and the Drug Enforcement Administration to allow BOP pharmacist practitioners to prescribe buprenorphine, one of three medications commonly used to treat opioid addiction. BOP's MAT framework also involves training staff in all divisions, developing clinical guidance for treatment standardization, and monitoring, tracking, and reporting on MAT services.

## Reentry

The Department supports efforts to help inmates as they transition from prison to the community. Some of the notable accomplishments in this area include:

- On September 29, 2020, the Department's Office of Justice Programs announced that more than $92 million in grants were made in FY 2020 to support offenders returning to their communities after confinement.

- The Department announced its "Ready to Work" initiative, through which the BOP connects employers directly to inmates seeking employment with the goal of providing every offender reentering his or her community an opportunity to secure employment.

Services and programs offered by BOP staff are supplemented by citizen volunteers, thereby supporting community reentry efforts and promoting institution safety. During FY 2019 (as of September 19, 2019), 5,939 individuals had volunteered 110,489 hours at various institutions. During FY 2020 (as of September 10, 2020), 5,978 volunteers and contractors had provided 157,752 hours at various institutions. The increase in volunteer hours can, in part, be attributed to staff efforts to increase partnerships, pre-COVID-19, and changes made to the BOP volunteer tracking system.

## Operational Policies and Guidance

In order to implement the Act successfully, the following FSA-related policies and guidance were issued:

- Policy guidance regarding release preparation and assisting inmates with obtaining identification.

- Policy guidance to enable BOP's employees to carry and store personal weapons under 18 U.S.C. § 4050.

- Guidance to field sites advising of changes in the law with regard to placing offenders within 500 driving miles of their release residence, as well as processing nearer release transfers, where appropriate.

- Procedures implementing the dyslexia-screening requirement, which will enable the BOP to identify those offenders within the BOP inmate population who have this learning disorder. The BOP also developed specific tracking codes for dyslexia to ensure that required reporting can occur.

- An updated advisory memo and training for federal prison facilities housing female inmates regarding the Act's requirements prohibiting the use of restraints on pregnant inmates absent extreme circumstances. (The BOP has prohibited this conduct since August 2014.) In concert, the U.S. Marshals Service (USMS) issued similar updated procedures and forms for USMS and its contracted private detention facilities.

- Guidance to Wardens about entering into partnerships with nonprofits and other private organizations, including faith-based, art, and community-based organizations; institutions of higher education; private vocational training entities; and industry-sponsored organizations. These partnerships will enable the BOP to expand the opportunities for evidence-based recidivism reduction programs and productive activities.

- Guidance to field sites about entering into partnerships with outside organizations to offer evidence-based recidivism reduction programs.

- Through its policies and contracts, the BOP continues to provide sanitary products and ensures they are available and accessible to female offenders.

- Draft policy detailing the instructions for manual coding of the PATTERN risk assessment. The *First Step Act of 2018 - Recidivism Risk Assessment* policy has been presented to the National Union, which has invoked negotiation. In the interim, all institution and Regional Office staff have been trained to use the PATTERN instrument to score inmates' risk of recidivism. BOP Central Office staff regularly review rosters to ensure inmate PATTERN scores are completed and updated during Program Reviews. Additionally, BOP information technology (IT) staff are currently automating the calculation of the risk score and incorporating that technology into the BOP's Insight system. The Insight system is used to conduct inmate program reviews.

- Policy pertaining to inmate risk for prison misconduct, Program Statement 5100.08 *Inmate Security Designation and Custody Classification*, which significantly informed the development of PATTERN. The BOP's Inmate Classification workgroup is currently reviewing an updated draft policy to replace PS 5100.08. The draft policy improves

predictive accuracy for serious misconduct and introduces FSA needs-based program participation measures into the serious prison misconduct risk assessment. A final policy is not expected for review by BOP Executive Staff until 2022.

- BOP and USMS policies comply with the Act's requirements that prohibit certain room confinement for juvenile offenders. The BOP does not house juveniles in its facilities.

- Specialized and comprehensive de-escalation training was provided to BOP employees and officers in accordance with Section 606 of the Act (including mental health awareness training regarding inmates with psychiatric disorders), and more than 31,000 BOP employees have already received the updated training.

- BOP's Federal Prison Industries has begun work to expand markets under the Act. More information on this work can be found in Section IV of this report.

## Proposal for FSA Improvements

The FSA aims to reduce recidivism by incentivizing inmate participation in recidivism reduction programming and productive activities. By successfully completing such programming and activities, inmates may earn time credits that can result in their earlier release from secure custody.

The FSA recognizes, however, that indiscriminately reducing prison time for convicted offenders may carry costs that override the other objectives of criminal sanctions, beyond rehabilitation. These objectives include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence to criminal conduct, and protecting the public from further crimes. *See* 18 U.S.C. § 3553(a)(2).

The FSA balances these interests by excluding inmates convicted of the serious crimes listed in 18 U.S.C. § 3632(d)(4)(D) from receiving FSA Time Credits. This list has some gaps in coverage, though. The shortfalls affect a number of areas, including violent offenses, civil rights offenses, sex offenses, offenses involving abuse of vulnerable victims, terrorism offenses, organized crime offenses, career offenders, and inchoate offenses. Additionally, this list of exclusions differs from the list of exclusions for the early-release program under the Second Chance Act of 2007, which itself was re-authorized in the FSA. That program allows certain elderly and terminally ill offenders to be released to home detention. *See* 34 U.S.C. § 60541(g).

To maintain consistency among the FSA early-release programs, the Department believes that amendments should be made to the Section 3632(d)(4)(D) exclusion list, and that the Section 3632(d)(4)(D) exclusion list, as amended, should replace the current set of disqualifying offenses under the Second Chance Act of 2007.

The proposed additions to the exclusion list are listed below. The Department believes that these additions fit with the goals of the First Step Act, are in line with the already existing exclusions provided in the Act, and that taken together, a unified list will make the Act more manageable, fair, and effective.

### General
- 18 U.S.C. § 2261A (stalking)[5]
- 21 U.S.C. § 848 (continuing criminal enterprise)

### Criminal Sexual Offenses
- 18 U.S.C. § 2422 (enticing or coercing a minor to engage in prostitution or criminal sexual activity)
- 18 U.S.C. § 2423 (transportation of minors with intent to engage in sexual activity/illicit sexual conduct)
- 18 U.S.C. § 2250 (failure to register as a sex offender, update registration, provide notice of international travel, or commission of a crime of violence while unregistered)
- 34 U.S.C. § 20911(5) (definition of "sex offense")[6]

### Civil Rights and Human Trafficking Offenses
- 18 U.S.C. § 242 (deprivation of rights under color of law)
- 18 U.S.C. § 249 (hate crimes)
- 18 U.S.C. § 1589 (forced labor)
- 18 U.S.C. § 1590 (human trafficking for the purpose of peonage, slavery, involuntary servitude, or forced labor)
- 18 U.S.C. § 1594(a) – (c) (attempt or conspiracy to commit human trafficking offense)

---

[5] The Department recommends exclusion of this offense as it protects a vulnerable population and addresses, among other things, defendants who cause, attempt to cause, or engage in conduct that reasonably would be expected to cause substantial emotional distress.

[6] 34 U.S.C. § 20911(5) delineates crimes of sexual assault, and crimes involving sexual abuse or exploitation of children, for purposes of the Sex Offender Registration and Notification Act. These are serious sex offenses for which federal law requires that the perpetrators register following release and that the public be warned about them through public website posting. The existing FSA list does not adequately cover these crimes. For example, a sex offender convicted under 18 U.S.C. §§ 2241 or 1591 for raping a child or for sex trafficking of children is ineligible for the time credits, but a sex offender convicted under 18 U.S.C. 2422(b) or 2423 for raping a child or for sex trafficking of children could receive time credits and secure early release from prison.

**Violent Crimes**
- 18 U.S.C. § 16 (crimes of violence)[7]
- 18 U.S.C. § 1951 (interference with commerce by threats or violence (Hobbs Act))
- 18 U.S.C. § 1952(a)(2) (commission of a violent crime to further unlawful activity)
- 18 U.S.C. § 1958 (use of interstate commerce in the commission of murder-for-hire)
- 18 U.S.C. § 1959 (violent crimes in aid of racketeering activity)
- 18 U.S.C. § 2113(d) (assault or jeopardizing the life of a person using a dangerous weapon or device during a bank robbery)
- 18 U.S.C. § 844(i) (using fire or explosives to damage or destroy buildings, vehicles, or other property used in or affecting interstate commerce)
- 18 U.S.C. § 1201 (kidnapping)
- 18 U.S.C. § 924(e) (career offenders (Armed Career Criminal Act))
- 18 U.S.C. § 113(a)(6) (assault within maritime and territorial jurisdiction resulting in serious bodily injury)
- 18 U.S.C. § 844(f)(2) (using fire or explosives against U.S. government property causing injury or substantial risk of injury to any person)
- 18 U.S.C. § 371 (conspiracy to commit offense or to defraud United States)[8]
- 18 U.S.C. § 373 (solicitation to commit a crime of violence)[9]

**National Security**
- 18 U.S.C. § 2332b(g)(b)(B) (federal crimes of terrorism)
- 18 U.S.C. §§ 2280 – 2281a (terrorism offenses in maritime jurisdiction)
- 49 U.S.C. § 46502 (aircraft piracy)
- 49 U.S.C. § 46505(b)(3) (placement of an incendiary device on an aircraft)
- 49 U.S.C. § 46505(c) (willful disregard of human life for conduct violating 18 U.S.C. 46505(b))

---

[7] 18 U.S.C. § 16 provides the general definition of crimes of violence under federal law. The Supreme Court has partially invalidated this provision on grounds of vagueness, but much of it remains in effect. The existing FSA exclusion list does not adequately cover crimes of violence, inequitably excluding some violent offenses from time credit eligibility while not excluding other analogous violent offenses. The Supreme Court has narrowed the interpretation of Section 16 such that it only includes offenses that have, as an element, the use, attempted use, or threatened use of physical force against the person or property of another. The Department would recommend including Section 16 in the list of excluded offenses and subsequently enumerating offenses that fall within the federal definition of "crime of violence" by legislative or other means (*see, e.g.*, Community Safety and Security Act of 2018, H.R. 6619, 115th Cong., § 2 (2018)).

[8] The existing FSA exclusion list does not include a general exclusion for inchoate offenses. The Department would recommend the inclusion of 18 U.S.C. § 371 in order to exclude conspiracy to commit a violent offense from time credit eligibility.

[9] The existing FSA exclusion list does not include a general exclusion for inchoate offenses. The Department would recommend the inclusion of 18 U.S.C. § 373 in order to exclude solicitation of the commission a violent offense from time credit eligibility.

- 49 U.S.C. § 46506 (application of certain criminal laws to acts on aircraft)[10]

---

[10] Certain serious offenses committed in the special aircraft jurisdiction of the United States can be punished under this section. Some predicate offenses are already included in the existing FSA exclusion list, such as assaults and homicides. These offenses, when committed aboard an aircraft, should also be excluded from time credit eligibility.

## II.    A summary and assessment of the types and effectiveness of the evidence-based recidivism reduction programs and productive activities in prisons operated by the Bureau of Prisons.

Section II discusses the programs and activities that, pursuant to the FSA, can be considered as evidence-based recidivism reduction programs (EBRRs) and productive activities (PAs). This report summarizes the Department's efforts to gather evidence supporting the approval of EBRRs and PAs, the capacity of each EBRR and PA, and any gaps or shortages in capacity.

### Evidence about Programs Shown to Reduce Recidivism

In 2019, the Office of the Deputy Attorney General (ODAG), the BOP, the NIJ, and the IRC reviewed all the programs offered at BOP facilities to determine which, under the FSA, could be considered EBRRs or PAs. The review started with already-established catalogs and directories of BOP programs. In addition, detailed information about the BOP's National and Model programs were provided for review.

In January 2020, the BOP published on its website a full list of the approved programs. FSA Time Credits (FTC) can only be earned for EBRR programs and PAs on the approved list, as those programs are assigned to address an inmate's need(s) and thus reduce his or her risk of recidivating and support successful reintegration. Inmates may still participate in other services, programs, and activities, but such participation will not result in the earning of time credits. The list of BOP's approved EBRRs and PAs, which will be updated as programs are added, is found at: https://www.bop.gov/inmates/fsa/docs/fsa_program_guide_202010.pdf.

The FSA not only requires the BOP to enhance existing programs but to expand the number of programs available to eligible inmates. To achieve this objective, the BOP recognizes that programs can come from different sources. The BOP relies on the expertise of its Reentry Services Division (RSD) to develop needed programs targeted toward the federal inmate population. Examples of these programs include the Residential Drug Abuse Program, the Female Integrated Treatment Program, and Life Connections, an intensive faith-based program. BOP institution staff also develop their own programs, which they may submit to the Community Reentry Affairs Branch for EBRR/PA consideration.

In addition, the BOP established a review process to consider externally submitted programs for potential inclusion on the approved EBRR/PA list. The MITRE Corporation, an independent, external, not-for-profit organization, was engaged to support the BOP's development and

execution of the review process. Through this collaboration, a framework has been established that assures fair and thorough consideration of each prospective program. MITRE reviews all external programs for evidence demonstrating effectiveness in reducing recidivism as well as additional criteria specific for BOP consideration. After MITRE's review is provided to BOP, the BOP will decide what programs are included on their approved list using the information from the independent reviews.



Figure 1: Dental Assistant Program at FCI Victorville

## Effectiveness of EBRRs and PAs

Before the Department finalized an initial set of programs that met the statutory criteria for EBRR programs and PAs, the BOP and the NIJ conducted a comprehensive review of the literature surrounding each program. The IRC provided a separate report on the subject.

The Department is now developing plans to evaluate its programs to determine, consistent with the FSA, which EBRR programs are the most effective at reducing recidivism and the type, amount, and intensity of programming that most effectively reduces the risk of recidivism.[11] For the purposes of assessing EBRR and PA programs, general recidivism is defined as a return to BOP custody or a rearrest within three years of release. Violent recidivism is defined as a rearrest for a suspected act of violence within three years of release from BOP custody.[12] Thus, sufficient time has not elapsed since the enactment of FSA and the implementation of PATTERN to conduct research on the inmates completing these programs.

## Program Capacity

Despite the BOP's efforts, COVID-19 has had a major impact on program delivery. BOP's first priority is the safety of its inmates. As a result, some programs were suspended and capacity in others reduced to allow for social distancing and to prevent spreading of the virus.

In 2020, the BOP created unique identifiers codes for every BOP program. These codes allow BOP to track inmates' program enrollment, participation, and completion. This information can then be compared to needs assessment information and used as a method for assessing capacity. Unfortunately, because of the global pandemic, the BOP has not been able to program as it would under normal conditions. As a result, we are unable to discuss capacity issues, but will be better suited to do so when this crisis abates.

Further detail on COVID-19's impact on BOP programming is provided in Appendix A.[13] This section of the report details program completions for the Literacy, Residential Drug Treatment, and Challenge programs, comparing completion numbers for January through August 2019 (pre-COVID-19) with completion numbers for January through August 2020 (during COVID-19).

---

[11] *See* 18 U.S.C. § 3631(b)(3).

[12] *See* page 50 of the July 2019 FSA report and pages 12 – 13 of the January 2020 FSA report for more information.

[13] *Impact of the COVID-19 Pandemic on FSA Programming* report can be found in Appendix A, page 48.

Gaps or Shortages in Providing EBBR Programs and PAs

The BOP assesses 12 broad need areas plus dyslexia, and programs are matched to each of these needs. As normal operations resume, the BOP will be able to accurately track whether inmates sign up for the programs that match their needs, and whether the programs are offered with enough capacity that inmates are able to complete them at the appropriate times during their sentences. While the BOP's current list of over 70 EBRR programs and PAs appears to address most areas of need, some improvements have been made even during the pandemic. For example, the BOP created better quality and more standardized materials that provide more consistent program delivery. Additionally, a more intensive program addressing criminal cognitions is in development to account for this highly prevalent need in BOP facilities.

## III.   Rates of recidivism among individuals who have been released from Federal prison.

Section III provides the recidivism rates for the 7,251 inmates released from federal prison as a result of the FSA, whether through retroactive application of the Fair Sentencing Act, compassionate release, good conduct time, or the FSA reauthorization of the Elderly Offender pilot program.

The FSA reporting requirements in § 3634 include providing data regarding recidivism rates, separated by the following categories:

A.  The primary offense of conviction;
B.  The length of the sentence imposed and served;
C.  The BOP facility or facilities in which the prisoner's sentence was served;
D.  The evidence-based recidivism reduction programming that the prisoner successfully completed (if any);
E.  The prisoner's assessed and reassessed risk of recidivism; and
F.  The productive activities that the prisoner successfully completed (if any).

Recidivism is defined as either a return to BOP custody or an arrest by federal, state, or local authorities.[14] Recidivism rates presented in this report are lower than traditional rates, a finding due at least in part to the brevity of the follow-up period.[15]

Traditionally, the observation period for BOP recidivism studies begins when the inmate has satisfied his or her sentence and is released from BOP custody. It is not unusual for inmates to be in community custody (a halfway house or home confinement) when they have satisfied their sentence. Normally, if an inmate commits a crime while in community custody, it is not treated as recidivism because the inmate has not yet satisfied his or her sentence and been released from BOP custody.

---

[14] For typical recidivism analysis, and consistent with other DOJ reports (e.g., those issued by the Bureau of Justice Statistics), recidivism is defined as (a) a new arrest in the U.S. by federal, state, or local authorities within 3 years of release or (b) a return to Federal prison within 3 years of release. This was reported on page 12 of *The First Step Act of 2018: Risk and Needs Assessment UPDATE* from January 2020.

[15] This population has been released for an average of only 10.5 months.

The following tables include the 7,251 inmates released from federal prison under the FSA through September 26, 2020. This data is based on four non-mutually exclusive groups of inmates released to U.S. communities:

- Inmates released due to retroactive application of the Fair Sentencing Act;
- Inmates who receive a compassionate release, also known as a Reduction in Sentence;
- Inmates who were released because of the expansion of good conduct time (GCT) under the FSA on July 19, 2019, when the new retroactive GCT calculation went into effect; and
- Inmates transferred to community custody under the FSA's reauthorization of the Elderly Offender pilot program.

## Recidivism Data Tables

Table for Item A. Recidivism by Primary Offense of Conviction

| Primary Offense of Conviction | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Drugs | 89.3% | 10.7% | 4,465 |
| Weapons/Explosives | 78.5% | 21.5% | 796 |
| Homicide/Aggravated Assault | 70.7% | 29.3% | 75 |
| Burglary/Larceny | 90.2% | 9.8% | 297 |
| Counterfeit/Embezzlement | 90.0% | 10.0% | 30 |
| Court/Corrections | 76.2% | 23.8% | 21 |
| Immigration | 88.9% | 11.1% | 54 |
| Fraud/Bribery/Extortion | 97.4% | 2.6% | 917 |
| Sex Offenses | 85.1% | 14.9% | 335 |
| National Security | 100% | 0.0% | 5 |
| Robbery | 84.7% | 15.3% | 190 |
| Miscellaneous | 95.2% | 4.8% | 42 |
| Continuing Criminal Enterprise | 100% | 0.0% | 24 |
| Number of Inmates | 6,433 (88.7%) | 818 (11.3%) | 7,251 |

Table for Item B. Recidivism by Length of Sentence Imposed

| Length of Sentence Imposed | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Up to 5 Years | 87.4% | 12.6% | 1,851 |
| 6-10 Years | 87.5% | 12.5% | 1,436 |
| 11-15 Years | 86.7% | 13.3% | 1,860 |
| Over 15 Years | 92.5% | 7.5% | 2,104 |
| Number of Inmates | 6,433 (88.7%) | 818 (11.3%) | 7,251 |

Table for Item B. Recidivism by Length of Sentence Served

| Length of Sentence Served | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Up to 5 Years | 89.1% | 10.9% | 2,275 |
| 6-10 Years | 87.4% | 12.6% | 1,620 |
| 11-15 Years | 86.9% | 13.1% | 1,972 |
| Over 15 Years | 92.2% | 7.8% | 1,384 |
| Number of Inmates | 6,433 (88.7%) | 818 (11.3%) | 7,251 |

Table for Item C. Recidivism by BOP Facility [16] (by Institution Security Classified Level) [17]

| Institution Classified Security Level | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Minimum | 96.8% | 3.2% | 2,679 |
| Low | 90.1% | 9.9% | 2,369 |
| Medium | 79.2% | 20.8% | 1,850 |
| High | 65.8% | 34.2% | 333 |
| Number of Inmates | 6,413 (88.7%) | 818 (11.3%) | 7,231 |

This year, there is no table for item D, which would cover inmates released by the BOP to supervised release due to having earned time credits for participation in and completion of EBRRs. To date, due to the COVID-19 pandemic resulting in decreased BOP programming, no such releases have occurred. However, the dramatic expansion of inmate community placements in 2020 pursuant to the CARES Act—over 19,000 placements since March 26, 2020—moved many inmates potentially eligible to earn and apply time credits to community custody earlier than they would have otherwise been eligible, independent of the time credit provisions of the First Step Act. Next year's report will include this table.

Table for Item E. Recidivism by PATTERN Risk Level[18]

| Most Recent PATTERN Assessment (before release) | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Minimum | 99.4% | 0.6% | 887 |
| Low | 98.2% | 1.8% | 707 |
| Medium | 96.8% | 3.2% | 439 |
| High | 95.5% | 4.5% | 490 |
| Number of Inmates | 2,469 (97.9%) | 54 (2.1%) | 2,523 |

This year, there is no table for item F, which would cover inmates released by the BOP to supervised release due to having earned time credits for participation in and completion of PAs. Due to the COVID-19 pandemic, no such releases have occurred. Next year's report should include this table.

---

[18] Most of this population was released before the development of the PATTERN.

# IV.   The status of prison work programs at facilities operated by the Bureau of Prisons.

Section IV discusses work completed by the Federal Prison Industries (FPI, also known by its trade name UNICOR) under the FSA. The items included below address a strategy to expand the availability of such programs, an assessment of the feasibility of expanding such programs, and a discussion of the legal authorities that would be useful or necessary to achieve these expansions.

## Strategy to Expand the Availability of FPI Programs

The BOP is implementing a three-part strategy to expand the availability of work programs for its inmate population through Federal Prison Industries (FPI).

The first part of the strategy consists of helping FPI recover from unprecedented disruptions to its operations due to the COVID-19 pandemic.[19] The disruptions began at the end of March 2020, when all FPI factories closed except those converted to the production of personal protective equipment (PPE) and two farm operations. Limited re-openings occurred between April and July 2020, but factory capacity operated at an average of 30 percent—well below breakeven. FPI operated at 60 percent of pre-pandemic levels by the end of September 2020 due to necessary COVID-19 operational restrictions. Consequently, while FPI had projected $27.5 million in earnings in its FY 2020 Operating Plan, its actual FY 2020 earnings were a loss of $3 million, representing a shortfall of $30.5 million.

As a self-sustaining government corporation that does not receive appropriations from the government, recovering from these COVID-19-related losses is necessary prior to expansion. The recovery, defined as reaching pre-pandemic operational levels, is anticipated to take six months to one year, though this estimate is dependent on improving pandemic conditions. This recovery will be driven by the exceptional efforts of FPI staff and inmate workers.

---

[19] Under challenging working conditions, FPI's efforts to support the public health response to COVID-19 included producing more than 1.6 million masks, 700,000 units of emergency water and milk, 16,000 face shields, 6,500 gallons of hand sanitizer, as well as thousands of blankets and 21,000 disposable gowns. FPI also produced contracted items designated by the Department of Defense as mission-critical to support the warfighter.

The second part of the FPI expansion strategy is to increase the use of the Business Development Group (BDG). The BDG is a business group within FPI that explores and acquires work opportunities for FPI that are authorized by the FSA, the repatriation authority under 18 U.S.C. § 1761(d) or the Prison Industry Enhancement Certification Program (PIECP) under 18

U.S.C. § 1761(c). BDG also identifies and secures prime and subcontracting roles on federal government contracts. From 2018 through September 2020, the BDG was integral in securing contract awards from federal agencies that added 775 inmate workers. In the next five years, FPI plans to leverage the BDG to increase revenues by 8 to 10 percent annually. This is expected to result in the activation of six FPI factories and hundreds of new inmate jobs annually once FPI has recovered from the impact of the COVID-19 pandemic.

The third part of the strategy is for FPI to expand contracting with third-party expert resources across business operations. To date, FPI has contracted with:

- An information technology service provider to develop a digital marketing strategy;

- A lead generator organization to identify businesses that can manufacture products at FPI factories under the repatriation and PIECP authorities;

- A procurement advisory firm to assist in securing federal government contracts for FPI, primarily in FPI's Clothing and Textiles Business Group; and

- A consulting group to assist FPI in increasing its sales in the federal government and commercial optic markets.

Additionally, FPI is using GovWin, a procurement intelligence database, to increase sales to government agencies and Salesforce customer relationship management software to optimize customer relationships.

## An Assessment of the Feasibility of Expanding FPI Programs

The First Step Act requires the BOP and the FPI to assess the feasibility of providing, by December 2023, at least 75 percent of eligible minimum- and low-risk offenders the opportunity to participate in FPI for at least 20 hours per week. The feasibility of meeting this goal is minimal to moderate and depends primarily on two factors: (1) the pace of operational recovery from the COVID-19 pandemic; and (2) the extent to which Congress provides additional authorities to support FPI in expanding inmate employment.

Regarding the first factor, the pace of recovery has been brisk, increasing from 30 percent operational capacity in the spring of 2020 to 60 percent operational capacity in late summer

2020. The outlook entering the fall and winter of 2020 is unclear due to the uncertainty of COVID-19.

As to the second factor, there are several authorities, which, if provided by Congress, would likely accelerate the FPI's ability to reach the stated expansion goal. As discussed below, these authorities would complement the FSA authorities, which provide only limited market opportunities for FPI in connection with state and local governments. These entities are often required to purchase from their state correctional industries or restrict purchasing products made with inmate labor.

Legal Authorities Useful or Necessary to Achieve FPI Expansion

The following legal authorities would be useful and likely necessary for FPI to achieve the goals described above. The Department would appreciate working with Congress to explore these and other possible authorities.

1.  Authorize the Department and its components to award contracts to FPI without conducting market research or using competitive procedures. This would enhance procurement efficiency and increase the volume of contracts awarded to FPI and inmate employment.

2.  Authorize waivers of procurement laws, regulations, and policies when FPI procures goods and services. This would increase acquisition efficiency, better enabling FPI to serve existing customers and attract new business.

*Expansion of Market for FPI to Various Public Entities*

While the new FSA authorities enable FPI to sell its products to state and local governments for certain uses, these market opportunities are limited because such public entities often are required to purchase from their own state correctional industries or have restrictions on purchasing products made with inmate labor. Despite these limitations, FPI is utilizing the expertise of several third-party resources across business operations to expand sales to state and local governments. This includes contracting with an information technology service provider to develop a digital marketing strategy, using GovWin, a procurement intelligence database, to increase sales to government agencies, and leveraging Salesforce customer relationship management software to optimize customer relationships.

*Require 15 Percent of Compensation Be Set Aside for Reentry*

FPI is collaborating with the BOP in the process of drafting an implementing regulation to be published in the Federal Register. This regulation, which is required under the FSA, will formalize the set aside of 15 percent of FPI compensation for reentry of releasing inmates. Currently, FPI is compiling cost analysis data that is necessary to prepare a draft regulation. The BOP and FPI expect the regulation to be issued within two years.

*Require GAO to Audit FPI as to Mandatory Source, Recidivism, etc.*

In July 2020, GAO published the results of its audit of FPI pursuant to the Act. The audit, entitled *Federal Prison Industries: Actions Needed to Evaluate Program Effectiveness*, made two recommendations:

1. The Director of the BOP should update BOP's program evaluation plan to set a new timeline for conducting an evaluation of FPI.

2. In order to help promote a meaningful program assessment, the Director of the BOP should develop a goal for FPI related to recidivism reduction and measure progress toward meeting that goal.

FPI is working to address the GAO audit recommendations. MITRE has begun an evaluation entitled, *Federal Prison Industries Participation and Recidivism among Bureau of Prisons Inmates*, to assess FPI program participation for recidivism reduction. The BOP also is reviewing its recidivism reduction goals.

# V.   An assessment of the Bureau of Prisons' compliance with section 3621(h) and implementation of Risk and Needs Assessment System.

Section V explains how the Department has complied with the requirements of § 3621(h), which addresses the implementation of a risk and needs assessment system and other topics. Specifically, this section discusses the process for conducting inmate risk assessments and the future work planned to review and revalidate PATTERN; the enhancements made to the BOP's needs assessment; BOP programming and the impact of COVID-19 on programming; and BOP volunteer partnerships.

## Assessing Inmate Recidivism Risk Level and Needs

Title 18 United States Code, Section 3632(a) states that the Department's new risk and needs assessments system will be used to, among other things:

> (1) Determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;
>
> (2) Assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner; and,
>
> (3) Determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs.[20]

The BOP is therefore responsible for assigning a recidivism risk level and conducting a needs assessment for all inmates, including newly committed inmates and current inmates. This objective is accomplished through the PATTERN instrument and a variety of needs assessment tools, which the BOP has worked to improve and refine by drawing on feedback from the IRC and stakeholders provided after July 2019. The additional requirements to reassess recidivism risk, reassign appropriate programming, and determine when an inmate is ready to transfer into prerelease custody are included in BOP procedures.

## Recidivism Risk Level

PATTERN is designed to predict the likelihood of general and violent recidivism for all BOP inmates three years post-release. PATTERN contains both static risk factors (e.g., age at time

---

[20] *See* 18 U.S.C. § 3632

of assessment and criminal history) and dynamic factors (e.g., participation in programs like education or drug treatment) that are associated with either an increase or a reduction in risk of recidivism. The PATTERN assessment tool provides predictive models or scales, developed and validated for males and females separately.

The recidivism risk assessment process starts at the BOP Designation and Sentence Computation Center (DSCC) in Grand Prairie, Texas, where trained staff enter data that affect each inmate's security and custody level classification data. This data is used in PATTERN by case management staff upon the inmate's arrival at his or her designated facility to assign each inmate an initial recidivism risk level of Minimum, Low, Medium, or High.

For more information about the PATTERN risk assessment, including the July 2019 system release and the subsequent modifications, please see the following reports:

- https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf

- https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf

Inmate Program Review

Within the first 28 days of incarceration, the inmate has an Initial Program Review with his or her Unit Management staff (consisting of the Unit Manager, Case Manager, and Correctional Counselor) to determine and assign any required programs (e.g., the GED program), with feedback from the Education and Psychology Departments. Before the Initial Program Review, the Unit Management staff determines the inmate's eligibility to earn FTC. As part of this review, the inmate is formally advised of his or her risk level under the FSA, as well as his or her eligibility to earn FTC. An inmate who believes his or her FSA eligibility is inaccurate may raise a concern with their Unit Management staff. If this does not resolve the issue, an inmate may seek a formal review using existing administrative remedy procedures.

Based on the review with the inmate, as well as input from assessments conducted by mental health and education staff, and based on information in the inmate's sentencing documentation, Unit Management staff will provide the inmate with an initial Needs Plan. The inmate reviews his or her individualized plan to ensure they understands what is required or recommended. An inmate's eligibility to earn FTC is noted on his or her Individualized Needs Plan.

Subsequently, a review of each inmate's recidivism risk score is conducted at his or her regularly scheduled Program Review. The FSA requires the BOP to reassess the recidivism risk of each prisoner periodically, based on factors that are dynamic and that can reasonably be

expected to change while in prison. At each Program Review, the inmate is advised of his or her risk level and eligibility to earn and use FTC under the FSA, including any changes since the last Program Review. Also during the Program Review, Unit Management staff will discuss the inmate's Individualized Needs Plan and ensure that he or she understand what programming is either required or recommended. Program Reviews are conducted every 180 days throughout the inmate's term of incarceration, or every 90 days once the inmate has less than a year to serve on his or her sentence.

Inmate Needs Assessment

Before the enactment of the FSA, the BOP conducted assessments to identify inmate needs and provide programs and services to prepare inmates for their eventual reentry to society. The BOP assessed needs and provided programming across a wide variety of areas including mental health, substance abuse, vocational/occupational training and education. For more details about these assessment areas, see the August 2019 report on the BOP's current needs assessment system: https://www.bop.gov/inmates/fsa/docs/bop_current_needs_assessment_tools.pdf.

After the FSA became law, the BOP committed to enhancing its needs assessment process to incorporate additional objective tools and data to improve the screening for and recording of inmate-individualized needs and to refine the EBRR program and PA assignment to address those needs.

Some of the initial activities BOP staff undertook to begin these enhancements included:

- Held discussions with the United States Probation and Pretrial Services about supplementing the Presentence Investigation Report with more detailed information about learning needs.

- Implemented an enhanced screening process for dyslexia.

- Continued evaluation of the effect of inmate programs on addressing inmate needs and on reducing recidivism risk by the BOP's Office of Research and Evaluation (ORE).

- Engaged an outside research contracting partner (MITRE Corporation) to assist program evaluation and the designing of an enhanced needs assessment tool.

- Published a standardized process and framework to review and analyze requests from external entities for program submissions that might qualify as evidence-based.

In addition, the BOP conducted research on prevailing best practices and tools in the area of needs assessment, particularly as they relate to corrections and recidivism. The research included consideration of existing assessment tools that may be available for BOP implementation. The BOP also coordinated and participated in meetings and briefings with various state and international correctional systems. Briefings included discussions with program staff, researchers, and correctional management regarding the available tools used for needs assessment and their effectiveness.

The BOP and NIJ published a paper, *First Step Act: Best Practices for Academic and Vocation Education for Offenders*, which identifies best practices relating to academic and vocational education for offenders in prisons, jails, and juvenile facilities. Released on July 25, 2019, the paper can be found at:
https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/253056.pdf.

Consistent with the Department's commitment to engaging in dialogue to improve the Risk and Needs Assessment System, the BOP and NIJ hosted a meeting in August 2019 that focused on needs assessments and their use in correctional settings. Invitees included research directors from Departments of Corrections, reentry and programming staff, researchers, and other relevant partners. The resulting report is located at:
https://www.rand.org/pubs/research_reports/RRA108-5.html. In addition, BOP, NIJ, IRC, and other Departmental staff traveled to Ottawa, Canada between September 16-19, 2019, to meet with the Correctional Service of Canada to review its needs assessment system.

In October 2019, the BOP hosted a three-day symposium on needs assessment. Invitees included (1) practitioners with expertise on needs assessment from state correctional systems that conduct assessments at all prisons in their system; (2) academic researchers with demonstrated experience working on needs assessment systems and an understanding of diversity issues in implementation; and (3) representatives from federal partners including the National Institute of Justice and the National Institute of Corrections. The symposium included presentations from the different corrections systems and discussions with researchers on how to apply the material gleaned from the corrections presentations.

The BOP selected 13 need areas based on the input and feedback provided during the needs assessment symposium. The symposium resulted in recommendations about which needs should be assessed, how to assess those needs, and ways the BOP could improve its overall needs assessment processes. The BOP needs assessment process addresses anger/hostility, antisocial peers, cognitions, dyslexia (as required by the FSA), education, family/parenting, finance/poverty, medical, mental health, recreation/leisure/fitness, substance abuse, trauma, and work.

The BOP included trauma in the list of 13 needs based on input from the symposium's participants. Specifically, the participants recommended that the BOP screen for trauma with the aim of providing programs that improve positive coping skills. As a result, the BOP added the Adverse Childhood Experience questionnaire to its existing screening process to help address the high rates of trauma and the associated impact of this trauma on the inmate population.

In the post-FSA enhanced needs assessment process, the BOP continues assessment of sentenced inmates at intake and throughout their terms of incarceration using different needs assessment instruments for each of the different needs. The needs assessment results are used to identify those in need of additional evaluation or assessment and to recommend an EBRR program or PA to meet a specific need.

Some examples of assessments are:

- Educational staff screen inmates for disabilities and use tests to determine recommended courses for those inmates that need literacy programming.

- The BOP has expanded current requirements for assessing and accommodating disabilities to ensure a strong screening process for dyslexia.

- A clinical or counseling psychologist interviews inmates requiring mental health treatment. The psychologist will then develop an appropriate treatment plan and communicate this plan to the inmate's case manager through the BOP Insight program.

- A Drug Treatment Specialist screens inmates requiring drug treatment. Each inmate is then interviewed by a Drug Treatment Coordinator (who is a clinical or counseling psychologist) to determine if the inmate should receive residential drug treatment.

Inmates' needs are reassessed and documented every six months, or every three months once the inmate is within a year of release. BOP staff then review and reassign an inmate to appropriate EBRR programs or PAs based on their needs. This process ensures that:

- All inmates at each risk level have a meaningful opportunity to reduce their classification during their period of incarceration;

- Programming is assigned to address the specific criminogenic needs of the inmate; and

- All inmates are able to successfully participate in such programs.

BOP staff meet individually with inmates and review their prior Needs Plan, document the inmate's progress, and update the Needs Plan. This assessment includes feedback solicited directly from relevant program areas including Health Services, Education, Religious Services, and Psychology. Unit Management staff determine if an inmate is successfully participating in assigned programs, has good work reviews, and is otherwise satisfying the terms of his or her sentence (such as payment of fines and restitution). Staff also assess the inmate's institution adjustment (e.g., whether they have engaged in misconduct) and any personal issues (e.g., lack of family contacts, etc.). If Unit Management staff determine additional programs are required or recommended, they will describe the programs(s) to the inmate and, in some cases, incentivize participation in them.

Inmates may choose to enroll in these programs or may decline to do so. As inmates successfully complete programs and succeed in addressing their assigned programming needs, their progress is captured in their BOP records. A collaborative process with the inmate throughout the needs assessment process is optimal. The inmate's Needs Plan is modified as the inmate addresses his or her needs by successfully completing programs or demonstrates new needs areas. If an inmate has no remaining needs to address, he or she can continue to participate in PAs in order to continue improving his or her reentry outcomes.

To access the detailed public reports that were prepared on needs assessment, please review the following:

- https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf

- https://www.bop.gov/inmates/fsa/docs/bop_current_needs_assessment_tools.pdf

- https://www.bop.gov/inmates/fsa/docs/fsa_needs_assessment.pdf

- https://www.bop.gov/inmates/fsa/docs/evidence_based_recidivism_reduction_programs.pdf

## Review and Revalidation of PATTERN

The FSA requires the Department to review and re-validate PATTERN on an annual basis. To address this mandate, the Department released a competitive funding opportunity on February 10, 2020, to hire external, independent consultants to review and revalidate PATTERN on an annual basis on new cohorts of BOP inmates for up to five years. The deadline for submitting submissions was April 24, 2020. Following an extensive peer review process and

consultation with the IRC about the finalist candidates, the Department selected two independent consultants, Dr. Rhys Hester and Dr. Ryan Labrecque, as the top candidates to perform this work.

Dr. Hester is an Assistant Professor of Criminal Justice at Clemson University. Dr. Labrecque is an Assistant Professor in the Department of Criminal Justice at the University of Central Florida. Drs. Hester and Labrecque were selected because their submissions aligned with DOJ's priorities by supporting research to reduce crime and ensure public safety, they proposed innovative analytic strategies to review and revalidate PATTERN, and they demonstrated expertise, capabilities, and competencies.

Drs. Hester and Labrecque are tasked with conducting analyses to review and revalidate PATTERN. A key issue they will address is how well PATTERN performs in predicting the likelihood of general and violent recidivism for BOP inmates. Simply put, how accurate is PATTERN in predicting criminal behavior for inmates after they have been released from BOP custody? The likelihood of an individual committing a general or violent crime when they leave prison is an important public safety outcome. By monitoring the performance of PATTERN on an annual basis, the Department and the BOP have an opportunity to amend the risk assessment tool, as needed, in order to improve its performance and more accurately address inmates criminogenic needs.

An annual revalidation timeline presents a potential research and theoretical challenge. PATTERN was developed using a seven-year dataset of BOP releases and validated as an effective predictor of recidivism over the inmates' subsequent three-year period in the community. In a research setting, data would be collected on a large sample of inmates released from custody for at least three years in order to re-validate a risk and needs assessment tool. Following this schedule, PATTERN and any new items would not be formally re-validated until after a large enough sample of offenders are released from BOP custody. To date, a large enough sample of inmates assessed with PATTERN has not been released from BOP custody. Until a large enough sample is released, the most appropriate and rigorous analytic plan will be developed to meet the annual FSA revalidation requirement. Results can serve as an interim estimate of PATTERN's predictive performance.

Like the developmental data set, the data used to revalidate PATTERN cannot be distributed because the data include arrest and conviction information provided directly to the Department by state and local jurisdictions, who have a significant interest in protecting their data. The retrieval, disclosure, and redistribution of that criminal history data is prohibited by the sharing agreements used to acquire the underlying data.[21] With that said, the release of results from the annual and review and revalidation of PATTERN is an important step in the Department's efforts to promote transparency about the use of the risk assessment system.

Over the next five years, Drs. Hester and Labrecque will collaborate with BOP's Office of Research and Evaluation to acquire necessary data and other relevant information for the annual review and revalidation of the risk assessment tool. The developers of PATTERN, Drs. Grant Duwe, Zachary Hamilton, and Alex Kigerl, and the IRC will serve as advisors to the consultants on an as-needed basis. As stated in the January 2020 FSA report, DOJ will continue to monitor the use and implementation of PATTERN, conduct the annual review and revalidation of the risk assessment tool, and consider any improvements and adjustments that should be made for future assessments as needed.

<u>Review and Revalidation Findings</u>

As required in Section 3631 of Title I of the FSA, NIJ's external contractors will complete the annual review and revalidation of PATTERN for at least the next five years. For Calendar Year 2020, the first review and validation analysis is underway. As specified in Section 3631(b)(4), results from the analysis will be accompanied by potential recommendations to the Attorney General of changes that may improve the risk assessment tool. Results from the initial review and revalidation of PATTERN will be reported and released by the Department in accordance with Section 3631.

While the predictive accuracy of PATTERN is high compared to similar risk assessment tools, the contractors with the assistance of the BOP are in the process of recommending a series of technical corrections and adjustments to PATTERN that will be reviewed and considered by the Department. These modifications are expected to improve how some of its items are measured and scored in practice. As the IRC has recommended, the Department expects to release the results of the revalidation of PATTERN in the near future, and will make sure that inmates receive the full benefit of any improvements indicated by the re-validation.

## BOP Inmate Programming

Under the FSA, the BOP must ensure that every inmate has the opportunity to participate in and complete the type and amount of EBRR programs or PAs they need. By statute, the BOP must provide appropriate EBRR programs and PAs for all inmates within two years of the completion of the initial risk and needs assessment. During this two-year period, inmates will receive priority access to EBRR programs and PAs based on their release date. Overall, the FSA requires that medium- and high-risk inmates receive priority for the EBRR programs and that low- and minimum-risk prisoners receive priority for PAs.

---

[21] *See* page 14 of the Department's report, *The First Step Act of 2018: Risk and Needs Assessment System – UPDATE* at https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

## BOP Partneroships

The BOP has a long history of working with external organizations to recruit community volunteers to assist with inmate services in 122 institutions nationwide. The BOP engages in both paid and non-paid partnerships to help instill hope, make meaningful connections, and provide encouragement that assists inmates in their personal growth and in returning to their communities as law-abiding citizens. The BOP defines a paid partnership as a contract between the government (BOP) and an external organization that delivers inmate programming and services for compensation. A non-paid partnership provides inmate programming and services on a voluntary basis. These partnerships have included such areas as faith-based, academic, vocational, wellness, mental health, and interpersonal skills. Community partners play a vital role in providing valuable mentorship, support, and educational opportunities to incarcerated persons.

Consistent with the goal to support and expand volunteer activities at all institutions, on June 25, 2019, the BOP provided guidance to all Wardens about the importance and use of partnerships under the FSA. Specifically, the Assistant Directors for the Office of General Counsel and Reentry Services Division issued guidance on collaboration with outside organizations pursuant to the FSA. This memorandum provided information on the FSA's statutory requirements, the BOP process for establishing partnerships, equitable treatment of similar organizations, and tracking of partnerships.

On September 19, 2019, voluntary partnerships were in place at all 122 institutions. During FY 2019, 5,939 individuals volunteered 110,489 hours at various institutions. During FY 2020 (as of September 10, 2020), 5,978 volunteers and contractors had provided 157,752 hours at various institutions. The increase in volunteer hours can, in part, be attributed to staff efforts to increase partnerships, pre-COVID-19, and changes made to the BOP volunteer tracking system.

As a life safety measure for the protection of inmates, staff, and community partners, on March 13, 2020, the BOP suspended social visitors and volunteers from entering institutions due to the global COVID-19 pandemic. Social visiting is slowly being restored as conditions permit. Once the pandemic ceases, the BOP anticipates an increase in the number of partnerships and volunteers.

The Life Connections Program (LCP) is an intensive residential, multi-faith-based reentry program and a strong example of a BOP partnership. LCP is open to inmates of all religious traditions as well as those with no faith affiliation. Partnerships with the community are an integral part of the program. Prior to the pandemic, LCP sites at five facilities utilized 40 contractors and 109 volunteers representing nine different faith traditions.
Contract partners provide religious services while community volunteers serve as mentors, assisting inmate participants in addressing topics ranging from reestablishing family

relationships to reconnecting with community resources and support. Even in the midst of COVID-19, the agency is expanding LCP to a sixth site for female offenders at FCI Aliceville, Alabama.

# VI.   An assessment of progress made toward carrying out the purposes of FSA, including any savings.

Section VI provides additional information about the Department's FSA activities and accomplishments, such as the establishment of FSA Time Credits, the expansion of EBRR programs and PAs, and securing identification for returning citizens. It also addresses the issue of any cost savings associated with the transfer of prisoners into prerelease custody or supervised release, and any decrease in recidivism that may be attributed to the Risk and Needs Assessment System or the increase in evidence-based recidivism reduction programs.

## Establishment of FSA Time Credits

The FSA directs that inmates, except for those deemed ineligible per the Act, receive the opportunity to earn time credits for the successful completion of EBRR programs or PAs.[22] A prisoner, as defined by the FSA, "*means a person sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons*."[23] An eligible prisoner or inmate who successfully completes an EBRR program or PA assigned based on the inmate's risk and needs assessment may earn FTC to apply toward prerelease custody or supervised release.

The number of FSA Time Credits eligible inmates can earn is determined by their risk classification level. Eligible inmates can earn 10 days of time credits for every 30 days of successful participation in EBRRs or PAs. Eligible inmates classified in the minimum or low risk categories and who have not increased their risk of recidivism over two assessments may receive five additional days of FSA Time Credit for every 30 days of successful participation in EBRRs or PAs. An inmate's risk assessment over time also affects his or her ability to use time credits to receive prerelease custody or early-supervised release.

Early in 2019, the BOP convened an internal FSA workgroup, made up of subject matter experts from all headquarter Divisions across the agency. Initially, the workgroup focused on ensuring that BOP-specific FSA requirements were addressed (including those requirements that were immediately effective), as appropriate. One of the major products the FSA workgroup collaborated on was a proposal for awarding FTC. The result was a draft BOP policy, *First Step Act 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. Section 3632(d)(4).*

---

[22] The FSA defines what qualifies as an EBRR or PA. *See* 18 U.S.C. §§ 3635(3), (5)
[23] *See* 18 U.S.C. § 3635(4).

The draft policy was provided to the Union, and negotiations on the implementing text began March 2-6, 2020. Subsequent negotiation sessions were delayed by the COVID-19 pandemic. Pursuant to the BOP's agreement with the Union, all negotiations must be conducted face-to-face. BOP's modified operation plans, consistent with Center for Disease Control guidance, limited BOP official staff travel to trips made in support of the COVID-19 pandemic response.

The draft policy also contains draft Federal Regulations covering the requirements for FTC set forth in the FSA. The Department has been working for several months on finalizing the BOP 1176 - FSA Time Credit Rule (RIN 1120-AB76). The BOP has proposed a federal rule to amend 28 C.F.R. part 523 to establish the procedures for earning, awarding, loss, and restoration of FTC. Specifically, an eligible inmate who completes an assigned EBRR program or PA on or after January 15, 2020, based on the inmate's risk and needs assessment, will be eligible to earn credits after the date that inmate's term of imprisonment commences. The time credits will only be earned while an inmate is in a BOP facility, and will not be earned if an inmate is in a Residential Reentry Center or on home confinement.

After successful completion of an EBRR program or PA, an eligible inmate may be awarded ten (or potentially 15) days of credits for every thirty "days" of participation. A "day" is a unit defined as one eight-hour period of a successfully completed EBRR or PA. Thus, 240 hours of programming would yield ten or 15 days of FTC. The proposed rule also establishes procedures for loss and possible restoration of FSA Time Credits in the event an inmate violates prison rules or the requirements/rules of an assigned program or activity. This proposed rule was published in the Federal Register on November 25, 2020 (https://www.federalregister.gov/documents/2020/11/25/2020-25597/fsa-time-credits), and will have a 60-day public comment period, ending January 25, 2021. The final rule will take into account comments received.

The final BOP policy will not go into effect until the regulation is finalized and the draft policy is negotiated and approved. However, to ensure maximum benefit to inmates in the interim, the BOP is operating with the assumption that the current iteration of the regulation will be adopted and integrated into agency policy, and as such is tracking relevant program completions and resultant FTC in accordance with that draft. Inmates are reviewed as they near release, and their case mangers review each individual to ensure that any FTC earned are considered in developing their transition and release plans, and ultimate release date.

At this time, BOP does not believe that anyone has been negatively impacted by the lack of a final rule regarding FTC. This is especially true because of the dramatic expansion of inmate community placements in 2020 pursuant to the CARES Act – over 19,000 placements since March 26, 2020. The increase in home confinement and, to a lesser extent, RRC placement moved many inmates potentially eligible to earn and apply time credits to community custody earlier than they would traditionally have been eligible for, regardless of the time credit provisions of the First Step Act. Nevertheless, BOP continues to monitor this situation and, in

the interim, will implement the rule as drafted, should it become necessary if individual situations arise before the rule is finalized.

In early 2020, after major aspects of the FSA had been implemented, the BOP FSA workgroup released most of its members, maintaining a small group of experts to address several FSA topics. The BOP developed and conducted an inmate survey to assist in determining which incentives and rewards for inmates would be offered "to participate in and complete evidence-based recidivism reduction programs," including consideration of phone and visitation privileges, transfer to an institution closer to an inmate's release residence (taking account of availability, security, and the recommendation of the warden where the inmate is currently held), and other increased privileges and time credits. As a result of inmate and Warden feedback, an incentives policy was drafted and is pending negotiation with the Union.

The BOP is in the midst of implementing IT system changes—specifically, automating the calculation of FTC and its impact on sentence computations. The changes will be finalized once the FTC policy is negotiated. Where policy is not affected, other IT system changes have already been completed. For example, the BOP has finalized changes to the FSA offense codes and PATTERN risk levels, and has created FSA assignment codes to account for the list of ineligible and eligible inmates who are or are not eligible to earn FTC.

## Expanding EBRR Program and PA Offerings

Section II, above, discusses the FSA's requirement that the BOP both enhance existing programs and expand the number of programs available to eligible inmates.

## Identification for Returning Citizens

In connection with the implementation of the FSA and consistent with its requirements concerning assisting inmates with obtaining reentry critical identification documents, guidance was issued to all BOP Wardens in December 2019. This memorandum, issued by the BOP's Assistant Directors for the Reentry Services and Correctional Programs Divisions, emphasized the importance of assisting all inmates in obtaining these crucial documents.

In addition, the BOP updated its policy to strengthen directives regarding assisting inmates in obtaining identification documents. An interim memorandum reminded staff of their responsibilities and resources in this area. The updated policy was submitted to the National Union. The BOP also distributed copies of the "Reentering the Community" handbook to all BOP institutions. These materials were provided to inmates prior to their projected release date or transfer to prerelease custody. The handbook contains reentry resources and helpful

checklists on what to complete before and after their return to the community. The final approved policy, *Assistance with Release Identifications*, was issued August 15, 2019: https://www.bop.gov/policy/progstat/5325_007_CN-1.pdf.



BOP Reentry Affairs Coordinators and Unit Management staff routinely assist the inmate population in obtaining documents, including driver's licenses or other official photo identification, birth certificates, and Social Security cards. Staff regularly work with local agencies to assist inmates with paperwork and other materials needed to request formal identification. Additionally, the Career Resource Centers located in BOP institutions are centralized places for the inmate population to obtain specific information regarding the steps necessary to obtain vital identification documents.

As of January 21, 2020, 16,013 inmates in BOP institutions had a copy of their birth certificate, 32,378 had a photo ID, and 43,197 had a Social Security card. Twenty-three minimum-security level institutions escorted eligible inmates to the local Department of Motor Vehicle (DMV)

offices to assist with obtaining a photo ID. Nine facilities have an agreement with their respective states to have a mobile DMV service the facility for driver's licenses and photo IDs. Additionally, a database of community resources is available for BOP staff to readily identify local and nationwide organizations offering various reentry services. While the BOP cannot compel states to allow inmates to obtain documentation when they are unable to appear in person, we continue to monitor state laws and work collaboratively with every jurisdiction on implementing the FSA mandates.

Beginning in early 2020 and throughout the COVID-19 crisis, the BOP has taken preventative measures to manage and respond to potential outbreaks, including, as described earlier in the report, modifying program activities to mitigate disease transmission. Despite the modified operations, preparing inmates for reentry remains a priority and continues to occur with appropriate screening, use of Personal Protective Equipment, and social distancing.

Thus, as part of the BOP's action plans to mitigate the spread of COVID-19, all escorts to local DMV offices and mobile DMV services were suspended during this time. Despite these challenges, as of November 6, 2020, 17,168 inmates have obtained a copy of their birth certificate, 33,163 inmates have obtained a photo ID, and 45,142 inmates have obtained a Social Security card. These totals include inmates in BOP institutions and in community-based facilities. Upon arrival to an RRC, it remains a priority for all inmates to obtain a driver's license, birth certificate, and social security card, recognizing the documents are necessary for employment and housing.

The BOP continues to maintain a national Memorandum of Understanding (MOU) with the Social Security Administration (SSA) that allows all BOP institutions to work with local SSA offices to obtain Social Security cards for the inmate population. The BOP also is collaborating with the Transportation Security Administration to have the BOP inmate ID added as an acceptable form of identification for air travel consistent with the enforcement of the REAL ID Act. The BOP also collaborated with the Department of Homeland Security (DHS) leading to the BOP inmate ID accepted as an ID for the DHS Form I-9, Employment Eligibility Verification. Until other forms of ID are obtained, inmates in the community may use their BOP inmate ID as one form of ID to verify their identity for employment. Lastly, the BOP and the USMS have drafted an MOU that asks the USMS to deliver identification documents in USMS' possession as the USMS transfers inmates to BOP facilities. These measures all support the BOP's commitment to assisting inmates in obtaining identification prior to release.

## Associated Savings

The Act requires the Department to assess any savings associated with:

1.  The transfer of prisoners into prerelease custody or supervised release under section 3624(g) [Prelease Custody or Supervised Release for Risk and Needs Assessment participants], including savings resulting from the avoidance or deferral of future construction, acquisition, and operations costs; and,

2.  Any decrease in recidivism that may be attributed to the System or the increase in evidence-based recidivism reduction programs.[24]

It is too soon to assess cost savings resulting from the FSA. To date, no inmates have been released from BOP custody using earned FSA Time Credits. Since the BOP bears the costs for inmates who have moved from an institution to home confinement or a Residential Reentry Center (RRC), there are no cost savings with such movement. The Department will address any changes to this item in the next report.

---

[24] *See* 18 U.S.C. § 3634(6).

## VII.   An assessment of budgetary savings.

Section VII addresses how budgetary savings seen under the FSA were handled, including:

A.   Savings resulting from the transfer of prisoners into prerelease custody including savings resulting from the avoidance or deferral of future construction, acquisition, or operations costs;

B.   Savings resulting from any decrease in recidivism that may be attributed to the implementation of the risk and needs assessment system or the increase in recidivism reduction programs and productive activities;

C.   A strategy to reinvest the savings in Federal, State, and local law enforcement activities; and expansions of recidivism reduction programs and productive activities in the BOP; and

D.   How the reduced expenditures on Federal corrections and the budgetary savings resulting are currently being used and will be used to-

(i) increase investment in law enforcement and crime prevention to combat gangs of national significance and high-level drug traffickers through the High Intensity Drug Trafficking Areas Program and other task forces;

(ii) hire, train, and equip law enforcement officers and prosecutors; and

(iii) promote crime reduction programs using evidence- based practices and strategic planning to help reduce crime and criminal recidivism.[25]

It is too soon to assess cost savings resulting from the FSA. To date, no inmates have been released from BOP custody using earned FSA Time Credits.[26] Since the BOP bears the costs for inmates who have moved from an institution to home confinement or to a Residential Reentry Center (RRC), there are no cost savings with such movement. Any budgetary savings that occur in outlying years will be addressed in future reports.

---

[25] *See* 18 U.S.C. § 3634(7).

[26] *See* the Establishment of Time Credits section under VI. An assessment of progress made toward carrying out the purposes of FSA, including any savings earlier in this report.

## VIII.  Statistics on Inmates with Dyslexia.

Section VIII addresses the prevalence of dyslexia among prisoners in BOP facilities and the incorporation of dyslexia screening and treatment.

According to BOP policy and consistent with FSA requirements, all inmates are pre-screened at the time an inmate's designation takes place and later assessed for disabilities once they arrive at an institution. Individualized accommodation procedures require institutions to convene interdisciplinary committees to ensure inmates have appropriate access to treatment, programs, and services. The BOP expanded its requirements for assessing and accommodating disabilities as part of the work of developing the Risk and Needs Assessment System. Psychologists and education experts within the agency consulted with external experts and reviewed studies on the prevalence of dyslexia in prison populations within the United States and worldwide.

### Dyslexia Screening Process

The FSA requires that tools used in dyslexia assessment be psychometrically valid, efficient, low cost, and readily available. The BOP dyslexia screening process accordingly consists of two steps that ensure a quality assessment allowing for a diagnosis.

The first step is the inmate screening. The FSA defines dyslexia as "an unexpected difficulty in reading for an individual who has the intelligence to be a much better reader, most commonly caused by a difficulty in the phonological processing (the appreciation of the individual sounds of spoken language), which affect the ability of an individual to speak, read, and spell."[27] Because experts in different disciplines may use other definitions, the BOP considered three additional diagnostic criteria to inform its process: the Specific Learning Disorder, the Specific Learning Disability, and the International Dyslexia Association's definition of dyslexia.

Based on these requirements, BOP staff developed the *Screening Checklist for Dyslexia*. This checklist consists of three sections with questions related to historical information (e.g., past diagnosis of a learning disorder), processing skills, and perceptual problems. The 30-question checklist is read aloud to the inmate at the time of intake processing by education staff. A threshold score is set that indicates the possible presence of dyslexia. If this threshold is reached or additional information that suggests dyslexia is obtained at any time during the screening, the inmate proceeds to the second step of the assessment process.

---

[27] *See* 18 U.S.C. § 3635(1).

The second step requires the BOP Special Learning Needs teacher to administer both batteries of the *Woodcock-Johnson IV Tests of Achievement and Oral Language*, following the guidance provided by its authors. This information is used to determine whether the criteria for dyslexia are met; if so, the inmate will receive appropriate, individually-determined accommodations. This action may include assistance (e.g., tutors, extended time) with existing programming or specialized programming designed to treat dyslexia, such as courses on phonics.

The FSA directs the Attorney General to incorporate programs designed to treat dyslexia into the BOP EBRR programs or PAs. Additionally, the Act calls for "the appropriate use of audio technology for program course materials with an understanding of dyslexia." The BOP currently has the Bureau Literacy Program (reading, math, and writing skills leading to a high school equivalency) and Hooked on Phonics (aids in combatting dyslexia) on the approved EBRR/PA list to address a diagnosed dyslexia need. This approach meets the FSA requirement to determine the appropriate use of audio technology for program course materials with an understanding of dyslexia.

Prevalence of Dyslexia among BOP Inmates

Under the FSA, the Department is tasked to report on the prevalence of dyslexia among inmates in BOP prisons.[28] Currently, the BOP Education Branch staff use screening tools to identify inmates with characteristics of dyslexia. As of October 2, 2020, 4,249 inmates were identified, using an initial screening tool, for further dyslexia testing. There are currently 13 inmates participating in a dyslexia mitigation program.

The Act requires the Department to report on any change in the effectiveness of dyslexia mitigation programs among such prisoners that may be attributed to the incorporation of dyslexia screening and of dyslexia treatment into the evidence-based recidivism reduction programs. There has not been sufficient time to determine whether this program has been effective.

---

[28] 18 U.S.C. § 3634(8)

# Appendix A.

# Impact of the COVID-19 Pandemic on FSA Programming

*Data-Driven Impact Assessment*

There are a number of challenges to gathering data about FSA program participation in light of the impact of COVID-19. Specifically:

- Consistent with the FSA, the BOP released the list of approved EBRR programs and PAs in January 2020 as all inmates received their initial risk and needs assessments under the FSA Risk and Needs Assessment System.

- All of these approved programs existed prior to the initial implementation of the system and the approved list's publication. However, prior to the FSA, participation in the vast majority of these programs were not tracked in a systematic hour-by-hour method, as is now occurring under the FSA.

- With the implementation of FSA, the BOP shifted to a needs-based approach. In other words, the BOP had always allowed any inmate with interest to enroll in most programs. Following passage of the FSA, participation is prioritized for those inmates with an identified need for a program.

- Although COVID-19 has had an impact on BOP programming, it is difficult to identify precisely which differences in programming are tied to COVID-19.[29] FSA also allows eligible inmates to earn time credits towards early placement in prerelease custody. Some of the highest risk/need prisoners are not eligible for these credits due to their offense histories. The impact of the highest risk prisoners' non-participation in programs is not yet known.

Inmate participation in three BOP programs (the Bureau Literacy Program, Residential Drug Treatment, and Challenge) was systematically tracked prior to January 2020 when all inmates received their initial post-FSA needs assessments. A few other programs were also tracked, but changes recently made to those curricula make comparison difficult. Those programs that were systematically tracked prior to an inmate's initial assessment are among the most intensive BOP programs. Because these programs have strict admission criteria, enrollment was always need-based.

---

[29] COVID-19 related impacts could include staff illness, inmate illness, precautions taken to prevent staff or inmate illness, limited movement/transfer of inmates for programming, and fear.

The Bureau Literacy Program is designed to assist every inmate who does not have a high school diploma or high school equivalency credential. The literacy curricula consist of an Adult Basic Education and General Education Development (GED) to accommodate all academic levels. This program addresses the Dyslexia and Education needs.



Figure 2: GED Literacy Program at FPC Bryan

The Residential Drug Treatment is operated as a Modified Therapeutic Community. The community is the catalyst for change and focuses on the inmate as a whole person with overall lifestyle change needs, not simply abstinence from drug use. The program addresses the Antisocial Peers, Cognitions, Substance Abuse, and Mental Health needs.

The Challenge Program is a cognitive-behavioral, residential treatment program developed for male inmates in the United States Penitentiary settings. It provides treatment to high security inmates with substance abuse problems and/or mental illnesses. This program addresses the Antisocial Peers, Cognitions, Mental Health, and Substance Abuse needs.

The following chart compares the total number of program completions for the Literacy, Residential Drug Treatment, and Challenge programs.

| Program | Completions January – August 2019 | Completions January – August 2020 | Noted Comparisons[30] |
|---|---|---|---|
| Bureau Literacy | 2,144 | 985 | In 2020, there were 1,159 fewer completions. |
| Residential Drug Treatment | 4,453 | 3,819 | In 2020, there were 634 fewer completions. |
| Challenge | 267 | 216 | In 2020, there were 51 fewer completions. |

*Qualitative Impact Assessment*

Outside data-driven approaches, anecdotes, and case study information may also provide insight into the impact of COVID-19 on BOP programming.

*Categorizing the Impacts of COVID-19 on different BOP Programming*

The BOP's efforts, consistent with CDC guidelines, to prioritize the life and safety of inmates necessarily affected programming. Based on discussions with staff members and program monitoring, the BOP has identified three categories of impact to programming.

- **Low Impact:** Minimal modifications were required and programming continued largely unabated.

- **Moderate Impact:** Programs may have stopped for a period of days or weeks but then quickly resumed.

- **High Impact:** Programs were interrupted for a month or more or did not occur with any consistency across sites.

---

[30] While the BOP cannot prove the drop in completions is directly related to the COVID-19 pandemic, this is the most likely explanation. Programming was significantly impacted, as the agency had to prioritize life safety of staff and inmates.

**Low Impact:**  No FSA programs fell into this category. Services such as religious worship, crisis intervention, and medical care remained available to all inmates throughout the pandemic.

**Moderate Impact:**  Programs where inmates are housed together, such as residential programs, were modestly impacted by the pandemic. Because the inmates in these programs live in the same space, programing continued within the unit after an initial period of disruption. These programs include Brave, Challenge, Federal Prison Industries, Female Integrated Treatment, Life Connections, Mental Health Step Down, Residential Drug Abuse Treatment (RDAP), and Sex Offender Treatment Program – Residential, Skills, and Stages.

**High Impact:**  Most programs were significantly affected by COVID-19, including some that have been shut down entirely since the outbreak began. Highly impacted programs often require inmates to interact across housing units, allowing the potential for the pandemic to spread. They also may involve physical activity or the sharing of items (such as tools used in vocational training programs). Even with delivery of programs taking place at facilities with low infection rates, the need for social distancing required a reduction in capacity. In some instances, staff delivering these programs became unavailable due to illness, deployment to other locations, or a temporary change in responsibilities.

Highly impacted programs include Anger Management, Assert Yourself, Basic Cognitive Skills, Literacy Program, Cognitive Processing Therapy, Criminal Thinking, Dialectical Behavior Therapy, Emotional Self-Regulation, Foundation, Illness Management & Recovery, National Parenting from Prison, Non-Residential Drug Abuse, Occupational Education, Resolve, Seeking Safety, Seeking Strength, Sex Offender Treatment Program – Non-Residential, Social Skills Training, Threshold, and all PAs.

As described in the series of BOP memos regarding Pandemic Operational Phases, the BOP has been working to resume program delivery, particularly for EBRR programs.

The table below displays the impact of COVID-19 on EBRR programs.

| EBRR Program | Low Impact from COVID-19 | Moderate Impact from COVID-19 | High Impact from COVID-19 |
|---|---|---|---|
| Anger Management | | | X |
| Assert Yourself for Female Offenders | | | X |
| Basic Cognitive Skills | | | X |
| Brave | | X | |

51

| EBRR Program | Low Impact from COVID-19 | Moderate Impact from COVID-19 | High Impact from COVID-19 |
|---|---|---|---|
| Bureau Literacy Program | | | X |
| Challenge | | X | |
| Cognitive Processing Therapy | | | X |
| Criminal Thinking | | | X |
| Dialectical Behavior Therapy | | | X |
| Emotional Self-Regulation | | | X |
| Federal Prison Industries | | X | |
| Female Integrated Treatment | | X | |
| Foundation | | | X |
| Illness Management and Recovery | | | X |
| Life Connections | | X | |
| Mental Health Step Down Program | | X | |
| National Parenting from Prison Program | | | X |
| Non-Residential Drug Abuse Program | | | X |
| Occupational Education Programs | | | X |
| Residential Drug Treatment (RDAP) | | X | |
| Resolve Program | | | X |
| Seeking Safety | | | X |
| Seeking Strength | | | X |
| Sex Offender Treatment Program Non-Residential | | | X |

| EBRR Program | Low Impact from COVID-19 | Moderate Impact from COVID-19 | High Impact from COVID-19 |
|---|---|---|---|
| Sex Offender Treatment Program Residential | | X | |
| Skills Program | | X | |
| Social Skills Training | | | X |
| Stages Program | | X | |
| Threshold Program | | | X |

*Examples of the Impacts of COVID-19 at the Institutional-level*

The examples below illustrate the different challenges arising from COVID-19 and the necessary responses affecting institutions in varying geographic regions, security levels, and physical site structure.



**USP Big Sandy** is a male, high security facility with an adjacent minimum-security satellite camp. There are roughly 1,250 inmates at the high security penitentiary and 30 inmates at the camp. There are two residential treatment programs at Big Sandy: the Residential Drug Abuse Program (RDAP) and the Challenge Program.

All housing at Big Sandy is arranged in two-person cells, which allows for effective containment and social distancing. Big Sandy did not experience any widespread outbreak of COVID-19 cases. There were a handful of positive inmate cases which were attributed to new arrivals. Likewise, there have been only minimal staff illnesses associated with COVID-19.

During modified operations beginning in March 2020 and continuing to present, programming staff were used to assist with correctional duties and correctional posts. However, once programming was able to resume, the augmentation ceased. Residential programming is taking place at full capacity. Non-residential programming was able to resume by September 2020. Group size is limited to 6-8 participants. Since the inmates must be selected from the same housing unit, capacity and variety are limited.



**FMC Lexington** is an administrative security level medical center for male inmates with an adjacent minimum-security satellite camp for female inmates. There are currently approximately 1,100 inmates at the medical center and another 150 inmates at the camp. Lexington's residential programs include a traditional RDAP, a Dual Diagnosis RDAP, and a specialized mental health unit.

Housing at Lexington includes a variety of types. There are two-person cells, one-person cells, and dormitory-style open bays. The residential treatment units have a blend of all of these types. Lexington was impacted greatly by positive COVID-19 cases in both staff and inmates. Challenges due to COVID-19 required staff to be moved to cover correctional posts, and staff were assigned to different shifts.

During the nationwide modified operations beginning in March 2020 and continuing to present, crisis services were delivered individually in lieu of programs. Residential programs have been able to arrange to have specific moves to education where the group rooms are larger to allow for better social distancing. GED classes resumed by September 2020. Programs such as culinary arts, an occupational training program, are not being held due to safety reasons.



**FCC Lompoc** is a prison complex that houses male inmates and consists of a medium security institution, a low security institution and a minimum-security satellite camp. Lompoc is situated approximately 150 miles north of Los Angeles and 53 miles north of Santa Barbara, in the heart of California's Central Coast.

The low security institution has a 96 bed Residential Drug Abuse Program (RDAP) that is housed on one unit that is an open bay barracks style setup. From the start of the pandemic, the complex was immediately hit hard by a COVID-19 outbreak, and each facility was placed on a modified quarantine lockdown. Since the RDAP program is on one unit, they were able to continue some limited treatment programming on the housing unit in an effort to allow inmates that were in advanced stages of the program to finish. RDAP programming was limited due to a shortage of staff.

Non-residential programs had to be immediately discontinued because inmates could not meet in groups due to the modified quarantine measures. In addition, some staff were not able to work or were performing other functions.



**FCI/FSL Danbury** is made up of a low security male institution, a female satellite low security institution, and a female camp. Offenders in all units live in open bay style housing. Towards the end of March, the institution experienced a significant COVID-19 outbreak both with inmates and staff. Approximately 100 inmates and 65 staff were diagnosed with the illness. As a result, all programming was suspended from March 30, 2020 to June 22, 2020.

During the height of the pandemic, staff in the residential programs were sick, which necessitated program suspensions. Other programs were also heavily impacted. Resolve, a non-residential EBRR program was shut down from March 30- September 15, 2020. Even when the staff were well, they focused on general crisis work related to COVID-19. During this time, inmates were not allowed to have contact with inmates from other housing units in an attempt to contain the spread of COVID-19. Therefore, group programming with offenders from multiple units was unable to be held. Some non-residential programs resumed in August 2020 with reduced capacity.



**FCI Allenwood** is a medium security institution for male inmates. It has cells with doors that facilitate the ability to provide social distance from fellow inmates and staff members.

RDAP programming was suspended in early April due to institution protocols in response to the pandemic. Inmates were not allowed to move around the compound in order to prevent spread of the virus. RDAP treatment services resumed in late July and outpatient groups in September. Groups are smaller than groups held before COVID-19 and are held on individual housing units so as to minimize interactions between inmates from different housing units. All programming at the institution was suspended again in mid-September due to an outbreak of COVID-19 cases at the institution. Treatment staff are assisting with other vital functions related to COVID-19.



**LCSI Elkton** is a low security institution with cubicle-style housing units. The facility offers RDAP. Elkton was one of the institutions most severely affected by the initial COVID-19 outbreak in the spring. The Ohio National Guard provided medical assistance to the institution to help treat the large number of inmates affected by the virus. All programming at the institution was suspended between late April and early August 2020.

During the response to the outbreak between April and August, program staff were assigned to other critical roles related to COVID-19, and numerous staff members at the institution tested positive for the virus. Drug treatment staff were able to use provisions in existing policy and cell-side programming to expedite completion of the program for some inmates. RDAP programming resumed in August with modifications including no daily community meeting, smaller treatment groups, and programming throughout the entire inmate work day. Non-residential programming resumed recently with programming primarily taking place in smaller groups in the housing units to minimize the interactions between inmates from different housing units.