**Exhibit C**

**U.S. Department of Justice**

Office of the Attorney General

# First Step Act Annual Report

# April 2023



# Table of Contents

Introduction..................................................................................................................4

Executive Summary .......................................................................................................4

I.    An Assessment of Bureau of Prisons' Implementation of the Risk and Needs Assessment System and Compliance with 18 U.S.C. § 3621(h) ...............................................8

    A.    Implementation and Validation of Risk and Needs Assessment Tools.................................8

        1.    Implementation of the Risk Assessment Tool (PATTERN) and Revalidation Efforts......8

        2.    Implementation of the Needs Assessment Tool  (SPARC-13) and Revalidation Efforts 11

    B. Implementation of the Risk and Needs Assessment System Through Scoring, Referral to Programs and Ongoing Engagement, and Time Credits ...............................................15

        1.    PATTERN Risk Assessments ...................................................................................16

        2.    Time Credits Eligibility by PATTERN classification.................................................16

        3.    Implementation of the Time Credits Rule ...............................................................17

        4.    FSA Audit Activities.................................................................................................19

II.   A Summary and Assessment of the Types and Effectiveness of the Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) in Prisons Operated by the Bureau of Prisons ...............................................................................................20

    A.    Approved EBRR Programs and Activities ...............................................................20

    B.    FSA Program Participation ..................................................................................21

    C.    FSA Program Capacities.......................................................................................23

    D.    FSA Program Evaluations.....................................................................................24

    E.    Partnerships with Volunteers ...............................................................................26

    F.    Partnerships with Federal, State, Local, and Tribal Agencies.................................28

III.    BOP's Additional FSA Implementation Activities.................................................30

    A.    BOP Efforts to Assist with Identification...............................................................30

    B.    Transfers Closer to Home ....................................................................................30

    C.    Elderly and Terminally Ill Pilot Program...............................................................31

    D.    Home Confinement .............................................................................................32

    E.    Drug Treatment..................................................................................................35

    F.    FSA Staffing Resources .......................................................................................36

    G.    Retroactive Application of the FSA to Crack-Cocaine Offenders ..........................38

    H.    Compassionate Release ......................................................................................39

IV. The Rates of Recidivism Among Individuals Who Have Been Released from Federal Prisons ................................................................................................................................... 40

   A.   Recidivism Data Tables ............................................................................................. 41

V. The Status of Prison Work Programs at Facilities Operated by the Bureau of Prisons .......... 44

VI. The Operational Policies and Guidance Issued ........................................................... 47

VII. An Assessment of Progress Made Towards Carrying Out the Purposes of the FSA, Including Any Savings ........................................................................................................ 50

VIII. An Assessment of Budgetary Savings ...................................................................... 52

IX. Statistics on Incarcerated Individuals with Dyslexia ................................................... 53

3

# Introduction

The First Step Act of 2018 ("First Step Act," "FSA," or "Act") was the culmination of a bipartisan effort to improve criminal justice outcomes and reduce the size of the federal prison population, while maintaining public safety. Under Section 101 of the Act, now codified in 18 U.S.C. § 3634, the Attorney General is required to submit a report beginning two years after the date of enactment, and annually thereafter for a period of five years. The Department of Justice (the Department) submitted its last such report to Congress in April 2022.[1] This is the third Annual Report submitted pursuant to Section 3634.

# Executive Summary

This Report reflects the ongoing efforts of the Department, including the Federal Bureau of Prisons (BOP), to realize the goals of the First Step Act and summarizes the Department's activities in that respect since the publication of the last annual Report, in April 2022. The Report includes information responsive to the requirements of Section 3634, including:

  I. An Assessment of the BOP's Implementation of the Risk and Needs Assessment System and Compliance with 18 U.S.C. § 3621(h).
  II. A Summary and Assessment of the Types and Effectiveness of the Evidence-Based Recidivism Reduction Programs and Productive Activities in Prisons Operated by the Bureau of Prisons.
  III. BOP's Additional FSA Implementation Activities
  IV. The Rates of Recidivism Among Individuals Who Have Been Released from Federal Prisons.
  V. The Status of Prison Work Programs at Facilities Operated by the Bureau of Prisons.
  VI. The Operational Policies and Guidance Issued.
  VII. An Assessment of Progress Made Towards Carrying Out the Purposes of the FSA, Including Any Savings.
  VIII. An Assessment of Budgetary Savings.
  IX. Statistics on Incarcerated Individuals with Dyslexia.

Below is a brief summary of significant activities since the last Report, which include:

- **Maximizing the availability of time credits**: In November 2022, the BOP finalized a new policy for awarding earned time credits, which informs incarcerated individuals and staff of the process for earning, documenting, applying, forfeiting, and restoring time credits pursuant to the statute.  Through the new policy, the BOP Director exercised her discretion to make several changes to how the BOP calculates time credits, including to increase the availability of time credits for individuals who participate in evidenced-based programming or productive activities, consistent with the First Step Act.  Likewise, in August 2022, the Bureau began automatically calculating credits for individuals, which promotes consistency, allows the BOP to provide accurate calculations on a routine basis, and allows individuals in custody to track their time credits and prepare for prerelease from custody.

---

[1] *See* U.S. Department of Justice (USDOJ), *The Attorney General's First Step Act Section 3634 Annual Report* (April 2022), https://www.ojp.gov/first-step-act-annual-report-april-2022.

- **Enhance the use of home confinement and prerelease custody**.  Consistent with the FSA's emphasis on transitioning individuals to a community setting, the Department has expanded the use of home confinement for individuals who do not pose a danger to the community.  As of January 28, 2023, 13,501 individuals have been released from Residential Reentry Centers (RRCs), home confinement (HC), and secure facilities pursuant to credits earned under the First Step Act.  On April 4, 2023, the Department also issued a final rule granting discretion to the Director of the Bureau of Prisons to allow individuals placed in home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act to remain in home confinement after the expiration of the covered emergency period. The final rule provides the Bureau the discretion and flexibility to impose proportional and escalating sanctions for individuals who commit infractions, including returning them to prison. It also allows the Bureau to move individuals into RRCs when needed, including instances when the home residence is no longer viable or due to either minor accountability issues or non-significant disciplinary issues. Consistent with the final rule, the Director of the Bureau of Prisons also instructed that any individual placed on home confinement under the CARES Act will remain on home confinement under the CARES Act for the remainder of their sentence, provided that they are compliant with the rules and regulations of community placement. Since the enactment of the CARES Act on March 26, 2020, the Bureau of Prisons has placed more than 12,000 individuals in home confinement under CARES Act authority. Of those, only a fraction of one percent has been returned to secure custody due to new criminal conduct.

- **Increasing capacity and participation in evidence-based programming to reduce recidivism.**   The BOP's philosophy is that reentry preparation begins on the first day of an individual's incarceration, and it therefore takes seriously the need to regularly evaluate the effectiveness of Evidence Based Recidivism Reduction Programs (EBRR) and Productive Activities (PAs).  Within the last year, the BOP has added 15 new EBRRs and advanced many existing initiatives and efforts to expand the quality and quantity of services and program opportunities for BOP population.  In addition, the BOP has contracted with external social science researchers, and leveraged the resources of its Office of Research and Evaluation, to evaluate the outcomes of many of its existing reentry and treatment programs related to adjustment, recidivism reduction, and psychological symptoms and distress. The BOP has steadily expanded participation in EBRR programs and PAs, increasing participation by nearly 35% since February 2022.

- **Expanding mental health and substance use treatment programs**:  The mental and physical well-being of those in BOP custody is a priority.  As part of its effort to expand programming, the BOP continues to expand treatment opportunities for individuals with mental health and substance use disorders, including expansion of medication-assisted treatment (MAT) for opioid use disorder. Through the first five months of FY23, the BOP has been on track to double the number of individuals participating in MAT programming.  In addition, the BOP is developing life skills laboratories, as well as Bureau Rehabilitation and Values Enhancement (BRAVE) programs for youths with long sentences.

- **Enhance Reentry Programming.**  The BOP forged a variety of partnerships with external individuals and organizations, including individual volunteers, volunteer-based organizations that provide visitation, mentoring, and other services, and contractors that assist with programming and activities in all institutions. In FY22, the BOP and

5

Department of Labor (DOL) established a new grant initiative to provide targeted employment services to federally incarcerated individuals as they prepare for their return to the community.  In 2023, the BOP and DOL will continue to collaborate to expand the program, as well as leverage DOL's expertise to enhance some of BOP's programming.

- **Assessing and updating the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN):** In March 2023, the National Institute of Justice (NIJ), in consultation with the BOP, completed its second annual revalidation of the risk assessment tool, PATTERN.  This past year, the BOP has also successfully implemented the revised PATTERN version 1.3, including the new "cut points"— announced in the last Report—for PATTERN's risk level categories under the "general tool."   These new cut points have helped mitigate against various racial and ethnic disparities associated with prior risk level categories and enhance opportunities for eligible individuals to earn time credits that accrue towards prerelease custody and supervised release, while maintaining public safety.  Over the past year, NIJ and the Office for Access to Justice (ATJ) have engaged with stakeholders, including hosting two external engagement sessions to solicit feedback on PATTERN.  That input will inform the Department's continued efforts in the coming year to reduce racial disparities associated with PATTERN.

- **Improving Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13) needs assessment system:** The BOP took important steps toward improving SPARC-13 needs assessment system, including increasing the number of incarcerated individuals who participate in SPARC 13 (from 90% in January 2022 to 97% in March 2023) and increasing the speed with which assessments are scored and returned to the BOP's database.  Later this year, NIJ will publish a report detailing the annual review and validation of SPARC-13.

- **Develop Release ID Cards.**  The BOP continues to look for innovative ways to help individuals approaching reentry mitigate a significant obstacle: the lack of an updated official photo ID.  As part of this effort, the BOP, after consultations with the Government Publishing Office (GPO), the Transportation and Security Administration (TSA), and the U.S. Immigration and Customs Enforcement (ICE), has developed a Release ID Card that will help ensure all U.S. citizens leaving BOP custody have a temporary form of official identification containing sufficient security features to reduce the risk of counterfeiting. This ID also has some of the same security features established by the REAL ID Act.  This temporary form of identification does not replace the need for other critical reentry documents, such as Social Security Cards, Birth Certificates, or State IDs/Driver's Licenses, but it can aid the reentry process for returning U.S. citizens who are unable to obtain an identification while in secure custody.  It provides an identification that can be used when completing the Employment Eligibility Verification (I-9) form and can be exchanged for a permanent state-issued identification in participating states.

Additional information about the Department's implementation of the FSA can be found in the following reports and publications released since the enactment of the FSA.

October 2020 – Present

- The First Step Act Section 3634 Annual Report, published December 2020.
- 2020 Review and Revalidation of the First Step Act Risk Assessment Tool, published January 2021.

- Federal Prisoner Statistics Collected Under the First Step Act, 2020, published February 2021.
- First Step Act: Needs Assessment, published June 2021.
- First Step Act: Approved Programs Guide, published July 2021.
- First Step Act: Review and Revalidation of the Bureau of Prisons Needs Assessment System, Fiscal Year 2022, published October 2021.
- Federal Prisoner Statistics Collected under the First Step Act, 2021, published November 2021.
- 2021 Review and Revalidation of the First Step Act Risk Assessment Tool, published December 2021.
- FSA Time Credits Rule, published January 2022.
- Good Conduct Time Credit Under the First Step Act, published February 2022.
- First Step Act: Initial Review of the SPARC-13 Needs Assessment System, published March 2022.
- Federal Prisoner Statistics Collected under the First Step Act, 2022, published December 2022.
- 2022 Review and Revalidation of the First Step Act Risk Assessment Tool, published March 2023.

December 2018 – September 2020

- The First Step Act of 2018: Risk and Needs Assessment System, published July 2019.
- First Step Act: Best Practices for Academic and Vocational Education for Offenders, published July 2019.
- Stakeholder Statements Submitted in Response to NIJ's *First Step Act* Listening Sessions, published July 2019.
- Key Components of the Federal Bureau of Prisons' Current Needs Assessment System, published August 2019.
- Stakeholder Statements Submitted to NIJ's September Listening Sessions: Comments on the Department of Justice's Report, *The First Step Act of 2018: Risk and Needs Assessment System*, published September 2019.
- The First Step Act of 2018: Risk and Needs Assessment System – Update, published January 2020.
- Data Collected Under the First Step Act, 2019, published March 2020.
- First Step Act Implementation: Fiscal Year 2020 90-Day Report, published June 2020.
- Needs Assessment in the Federal Bureau of Prisons, published August 2020.

FSA Resources Online

In an effort to inform the public about FSA activities, the BOP has established an FSA Resource Page on its public website: https://www.bop.gov/inmates/fsa/index.jsp.

Reports and other pertinent FSA documents released by the Department in support of the implementation of the Act are also located on the NIJ's public website: https://nij.ojp.gov/topics/articles/nijs-role-under-first-step-act.

# I.  An Assessment of Bureau of Prisons' Implementation of the Risk and Needs Assessment System and Compliance with 18 U.S.C. § 3621(h)

## A. Implementation and Validation of Risk and Needs Assessment Tools

The Department continues to prioritize realizing the FSA's promise for incarcerated persons. Since the BOP first announced its risk and needs assessment tools in January 15, 2020,[2] it has continued to implement improvements both to the risk assessment tool, the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN), as well as its needs assessment tool, the Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13) system.  The Department aims to make the benefits of the FSA as widely available as possible without compromising predictive reliability. Each set of activities is discussed below.

### 1. Implementation of the Risk Assessment Tool (PATTERN) and Revalidation Efforts

The FSA requires the Department to review, validate, and release publicly its risk assessment tool – PATTERN – annually.[3] More specifically, 18 U.S.C. §§ 3631(b)(4)(D)-(E) requires that the risk assessment tool be assessed annually for (1) predictive validity, (2) dynamic validity, and (3) racial and ethnic neutrality.

Consistent with the FSA, the Department has continued to revalidate and refine PATTERN since it first developed the tool in July 2019.[4]  In May 2022, the Department adopted a new version of its risk assessment tool—PATTERN 1.3.  The Department made this switch following the first annual review of PATTERN, which revealed several discrepancies in its scoring, coding, and specification.[5]  PATTERN 1.3 adjusted the risk assessment items and weights based on the results of the updated data.

---

[2] *See* USDOJ, "Department of Justice Announces Enhancements to the Risk Assessment System and Updates on First Step Act Implementation" (Jan. 15, 2020),  https://www.justice.gov/opa/pr/department-justice-announces-enhancements-risk-assessment-system-and-updates-first-step-act; USDOJ, *The First Step Act of 2018: Risk and Needs Assessment System – Update* (Jan. 2020), https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

[3] For more information on the development of PATTERN, *see* USDOJ, *The First Step Act of 2018: Risk and Needs Assessment System* (July 2019), https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf. For more information about revisions made to PATTERN (i.e., version 1.2), *see The First Step Act of 2018: Risk and Needs Assessment System – Update*, *supra* note 6.

[4] U.S. Department of Justice (USDOJ). (2019, July). *The First Step Act of 2018: Risk and needs assessment system.* Office of the Attorney General.

[5] U.S. Department of Justice (USDOJ). (2021*a*, January). *2020 review and revalidation of the First Step Act risk assessment tool.* National Institute of Justice.  As a short-term solution, the item and scoring errors were promptly corrected by BOP, through an updated version of the tool known as "PATTERN 1.2-Revised" (or 1.2-R).  U.S. Department of Justice (USDOJ). (2021*b*, December). *2021 review and revalidation of the First Step Act risk assessment tool.* National Institute of Justice.

When PATTERN 1.3 was implemented in May 2022, the Department also implemented changes to the risk level category (RLC) cut points announced by the Attorney General in last year's Report.  As explained in detail in the April 2022 report, these changes were intended to (1) enhance opportunities for eligible individuals to earn additional time credits toward early release, (2) help mitigate the racial and ethnic disparities in the previous risk groupings, and (3) continue to ensure the risk level designations promote public safety.[6]

More recently, in March 2023, the Department published a new report revalidating PATTERN 1.3 with a subsequent cohort of FY18 BOP releasees ($N$ = 39,991).[7]  This investigation expanded upon prior analyses by including one-, two-, and three-year recidivism outcomes, assessing what proportion of change in risk scores and levels were influenced by an individual's age, and provided additional descriptive information on individual items, risk scores and levels, and outcomes by race and ethnic group.  This report found:

- **Predictive Validity**.  Study findings continue to demonstrate that PATTERN is a strong and valid predictor of both general and violent recidivism, with Area Under the Curve (AUC) statistics ranging from 0.76 to 0.78. PATTERN 1.3 also predicted both types of recidivism at the one-, two-, and three-year follow-up periods. Comparisons of recidivism rates by risk level category (RLC)—i.e., whether an individual has a minimum, low, medium or high PATTERN score—and predictive value analyses by that corresponding risk level group (RLG) also continue to indicate that PATTERN designations provide meaningful distinctions of recidivism risk.  In the general male recidivism tool, for instance, 10.5% of those rated as minimum-risk recidivated during the three-year follow-up period—a sharp difference compared to the 79.6% in the high-risk group.  Likewise, for the male violent recidivism tool, only 1.5% of those with a minimum risk levels score recidivated within 3 years, compared to 37.2% for those in the high-risk groups.

- **Dynamic Validity**. In addition, PATTERN 1.3 displays dynamic validity. The results continue to suggest that individuals can change their risk scores and levels during confinement.  Changes in risk were not driven exclusively by changes in the age item. Those who reduced their RLC from first to last assessment were shown to have the lowest recidivism rates, followed by those who maintained the same risk level and those with a higher risk level, respectively.

- **Racial and Ethnic Neutrality.** Racial and ethnic neutrality were assessed through the comparison of AUC values and differential prediction analyses.  While study findings continue to indicate that PATTERN is predictively accurate as a general matter, there remains evidence that the instrument overpredicts the risk of recidivism for some racial and ethnic groups relative to White individuals (*e.g.*, Black, Hispanic, and Asian individuals on the male and female general tools).  This disparity remains NIJ's leading concern related to PATTERN.

The Department remains committed to continued revisions to PATTERN that will improve its levels of equity, efficiency, and predictive validity. Throughout 2022, the Department took

---

[6] U.S. Department of Justice (USDOJ). (2022, April). *First Step Act annual report*. Office of the Attorney General.

[7] U.S. Department of Justice (USDOJ). (2023, March). *2022 review and revalidation of the First Step Act risk assessment tool.* National Institute of Justice.

several steps to address the tool's evident racial and ethnic biases. Following the April 2022 modifications to PATTERN, NIJ's consultants engaged with subject matter experts across various disciplines to develop potential strategies for mitigating these racial and ethnic disparities.

In September 2022, NIJ and ATJ hosted two such stakeholder engagement sessions to solicit feedback on PATTERN.  During these meetings, stakeholders expressed appreciation for the Department's commitment to improving PATTERN and ensuring that the tool is accurate and equitable.  They identified several areas for opportunity and improvement, including but not limited to:[8]

- the need for greater transparency regarding PATTERN, for example allowing incarcerated individuals to have access to a clear and simple process to request their risk scores and providing more information to the public about how PATTERN affects individuals across different racial and ethnic groups.

- the inclusion of additional dynamic factors to PATTERN, such as data on EBRRs, and refining the program variables to make the tool more responsive to changes an individual may experience during their term of incarceration.

- expanding and improving the BOP's data collection efforts beyond the vast, but more operationally oriented, current data collection.

- assessing the disciplinary infraction measures used in PATTERN, for example, ensuring the measures are not double counting infractions and correcting for disciplinary practices across facilities.

- having the criminal history component of the PATTERN score lapse or decay over time (i.e., have criminal history countless over time rather than anchoring the PATTERN calculation to the criminal history score at intake).

- Limiting the "lookback" period, or timeframe considered after release from BOP custody for purposes of measuring recidivism, to the first-year post-release.

Additionally, one core concern relates to the definition of recidivism used in PATTERN. Currently, PATTERN uses two definitions of recidivism: first, it defines general recidivism as a return to BOP custody or a rearrest within three years of release from BOP custody;[9] second, it defines violent recidivism as a rearrest for a suspected act of violence within three years of release from BOP custody.  Stakeholders raised concerns about the use of arrests, which they viewed as a potentially racially biased proxy for recidivism. To address that concern, several stakeholders recommended a narrower definition of recidivism, which would measure only convictions for a new crime and/or a significant violation of supervised release.

These stakeholder engagements have informed the Department's ongoing efforts to refine and improve PATTERN, including its considerations of how recidivism is defined and whether statistical modeling changes might reduce the racial and ethnic disparities in the tool.  The BOP

---

[8] For a comprehensive view of the recommendations made by the stakeholders, *see* https://www.ojp.gov/pdffiles1/nij/305432.pdf.
[9] This definition excludes all traffic offenses except driving under the influence and driving while intoxicated.

is actively working to increase transparency of and communication around PATTERN scores. The BOP now provides an individual's PATTERN score at an initial classification, and it regularly updates the score—and shares those updates with the individual in custody—during program reviews every 180 days.  The BOP is in the process of finalizing with its union a policy that would help staff to explain in detail the various components of the PATTERN score during those program reviews.  In addition, once data becomes available for the relevant release cohort, the Department will be able to consider augmenting PATTERN with additional EBRR program data with the goal of increasing the dynamic nature of the risk tool.

Unfortunately, multiple obstacles currently limit the Department's ability to implement other suggested changes in the short term. For example, the PATTERN revalidation currently relies on criminal history data from the National Law Enforcement Telecommunication System (NLETS) database, which provides relatively complete and reliable information on arrests as reported into the system from state and local jurisdictions.  Following a case downstream to capture disposition, however, poses challenges.  NLETS acquires arrest and case disposition information from all 50 states, but states report case outcomes differently and with different rates of detail, completeness, and reliability.  To capture arrest data, the Department engaged in a decade-long effort to establish, test, and utilize analytics to decipher arrest data, which is provided in narrative form, from all 50 states.  Until recent years, data beyond arrests suffered from vast amounts of missing information, and even today, data may be inconsistent and is entered with various levels of detail.

While these barriers have precluded the Department from immediately changing the definition of recidivism, the BOP is exploring whether text analytics techniques would allow it to use convictions for a new crime and/or a significant violation of supervised release as a sufficiently complete and reliable measure of recidivism rather than continuing to look to arrests.  As was true of its efforts over the past decade to use arrest data, the Department must develop computer code to translate the outcomes that each state enters, often in narrative form, in order to extract the data on case dispositions. Once the custom application is taught to read and standardize the different ways that states enter this information, the Department must validate the code for accuracy and usefulness.  This analysis is thus a significant initiative that likely will not be ready until the 2024 validation, but if successful, it would ultimately allow for a narrower definition of recidivism.

Further, the Department will continue to revisit the cut points for PATTERN's RLCs to allow the maximum number of individuals to qualify for FSA Earned Time Credits (FTCs) while balancing public safety requirements.  It will also continue its work with experts and stakeholders to address these, and other, important issues.

## 2. Implementation of the Needs Assessment Tool (SPARC-13) and Revalidation Efforts

The BOP has taken important steps to improve its system for assessing incarcerated individuals' critical reentry and criminogenic needs, as required by the FSA, *see* 18 U.S.C. § 3632(a)(3).

### a. Assessment and Measurement of Needs

In accordance with the FSA, the BOP has formalized and enhanced its longstanding process for assessing and addressing individuals' needs, collectively known SPARC-13.  As the name signals, SPARC-13 assesses every incarcerated individual across thirteen needs.  The BOP

identified twelve needs through extensive consultations with expert scholars and practitioners, including from the Independent Review Committee: Anger/Hostility; Antisocial Peers; Antisocial Cognitions; Education; Family/Parenting; Finance/Poverty; Medical; Mental Health; Recreation/Leisure/Fitness; Substance Use; Trauma; and Work. A thirteenth need, Dyslexia, was statutorily required by the FSA. Each need is assessed individually in a way that corresponds to its complexity and definition as described further below, as well as in a comprehensive report recently published by the BOP about its needs assessment system.[10]

The BOP has adopted or formalized measures and data sources for the assessment of each need. For needs that rely on historical data, the BOP draws information from the comprehensive legal and social history in the Presentence Investigation Report (PSR) completed by United States Probation Officers.  The PSR is a structured report conducted by a U.S. Probation Officer prior to a defendant's sentencing, as required by law. *See* 18 U.S.C. § 3552. The goal of the report is to enable the sentencing court to make "a fair sentencing decision and assist corrections and community corrections officials in managing offenders under their supervision."[11] This narrative document contains a wealth of information from numerous sources, including existing criminal history records, educational systems, hospitals and counseling centers, family members, associates, and others who corroborate records and reports.

Other needs require psychological or educational assessments, and the tools used to assess them are delineated below. The BOP has selected each of these tools based on a thorough review of the research literature and in consultation with both the BOP's internal experts and university-based external experts consulted in September 2019.  More specifically:

- **The Anger/Hostility need** is assessed by the Brief Anger-Aggression Questionnaire (BAAQ). The BAAQ is a six-item questionnaire that yields a score between 0 and 24. The reliability and validity of the BAAQ have been tested and confirmed through four studies completed on a clinical outpatient population and on a nonviolent control sample. Results from the four studies suggested an appropriate level of consistency over time, and the BAAQ was found to measure levels of overt anger and aggression as intended. The BAAQ is a useful screening tool because of its ability to rapidly provide an estimate of anger dysregulation.

- **The Antisocial Peers and Cognitions needs** are assessed by the Measures of Criminal Attitudes and Associates (MCAA) tool. The MCAA is a two-part self-report questionnaire designed to measure criminal thinking style and antisocial associates. Part A is a quantified self-report measure of antisocial associates. Part B contains four attitude scales: Violence, Entitlement, Antisocial Intent, and Associates. The MCAA has demonstrated significant associations with other measures of criminal thinking style and predictive validity for the outcomes of general and violent recidivism.

- **The Dyslexia need** must be assessed using measures that meet certain specifications required by the FSA. The BOP instituted a two-phase screening process to assess dyslexia. First, all adults in custody must complete a screening instrument to examine

---

[10] *See* BOP, *First Step Act:  Initial Review of the SPARC-13 Needs Assessment System* (March 2022), https://www.bop.gov/inmates/fsa/docs/bop_fsa_needs_validation_report_2021.pdf.

[11] Office of Probation and Pretrial Services, Administrative Office of the United States Courts, "The Presentence Investigation Report," Publication 107 (Mar. 2006), at I-1. http://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Horvath_presentence.pdf.

symptoms across statutorily defined functional domains. Individuals who reach the threshold for possible dyslexia are then administered the Woodcock-Johnson IV Tests of Achievement and Oral Language, a psychometrically robust test capable of a standardized, formal assessment of dyslexia.

- **The Education need** is assessed by first looking for the presence or absence of a high school diploma or its equivalent. Next, this need is assessed by measuring achievement on core content areas through the use of the Test of Adult Basic Education (TABE) and Comprehensive Adult Student Assessments System (CASAS), of which the latter is used exclusively for English as a Second Language learners.

- **The Family/Parenting need** is assessed by the Family Assessment Device (FAD-12). FAD-12 is a 12-item questionnaire on a Likert scale (from strongly agree to strongly disagree) that elicits the respondents' perception of their family relationships. This measure has been used in a variety of settings to determine individuals' beliefs about their families' reliability, supportiveness, and acceptance. FAD-12 is considered a dynamic measurement and can be re-administered at various points throughout the course of treatment to assess improvements in the nature of the individuals' family relationships and to evaluate the efficacy of selected interventions.

- **The Finance/Poverty need** is assessed through a series of questions on personal history and circumstances and information drawn from the PSR.

- **The Medical need** is assessed through completion of a medical history and a physical examination performed by a medical practitioner at a BOP institution. The intake screening serves as an assessment of acute medical concerns; the initial physical examination consists of, but is not limited to, the following components: medical and mental health, dental care, and ordering of appropriate laboratory and diagnostic tests.

- **The Mental Health need** is assessed in the course of mental health intake screening conducted by a psychologist.  Individuals complete the Psychology Services Inmate Questionnaire (PSIQ), which elicits information about mental health and substance use history and current psychological symptoms in support of effective triage and long-term care. Individuals are then interviewed, and a determination is made regarding a need for crisis care (*e.g.*, suicide ideation), acute care (*e.g.*, anxiety, distress), and specialized treatment programs.

- **The Recreation/Leisure/Fitness need** is assessed through participation in a Chronic Care Clinic (CCC), which is available agency wide.  CCCs function as a means for individuals with ongoing medical needs to be tracked and seen by a health care provider at clinically appropriate intervals. In this way, individuals can be assigned to recreational and leisure activities, which assist the individuals in managing their chronic conditions.

- **The Substance Use need** is assessed by a review of substance use information presented in the PSR. Substance use occupies its own section in the PSR, and that section provides an overview of an individual's lifelong substance use history up to the present, if any.

- **The Trauma need** is assessed by the Adverse Childhood Experiences Scale (ACES). ACES is a widely used and reliable tool that measures childhood exposure to different

13

types of trauma: psychological, physical, or sexual abuse; neglect; mental illness; domestic violence; divorce; and having an incarcerated parent. Adverse childhood experiences were found to be associated with significant increases in a number of negative social, behavioral health, and physical health outcomes.

- **The Work need** is assessed through a series of questions and information drawn from the PSR.

### b.   Needs Assessment Process

Over the past year, the BOP has focused on increasing the number of individuals who complete an initial needs assessment, and through these efforts, an average 97% of the population has completed assessment.  The BOP's policy on the FSA Needs Assessment (PS 5400.01) directs staff to follow the new needs assessment process, outlines staff responsibilities, and provides timeframes for initial needs assessment and reassessment.  Individuals in custody are initially reviewed at the BOP's Designation & Sentence Computation Center[12] and receive an institution designation that addresses their security level and basic needs. Once an individual arrives at their designated facility, they attend Admission & Orientation where they become acquainted with the programs the institution offers and the assessment processes.  They are also reminded of the initial needs assessments at intake with Psychology Services.

In many cases, BOP staff work directly with individuals in custody to complete needs assessments.  The Health Services Department is responsible for the assessment of the Medical and Recreation/Leisure/Fitness needs as part of the intake process. Education staff similarly assess Dyslexia, Education, and Work needs as part of the intake process. Unit Management assesses Substance Use needs during the initial intake and the Finance/Poverty need at the first team meeting. Psychology Services, which is responsible for Trauma and Mental Health, which are also administered as part of the intake process.

The remaining needs areas of completed through self-assessments, and the BOP has worked to increase completion rates for these needs assessments.  The BOP's inmate computer system (TRULINCS) has an electronic bulletin board which displays and details the availability of the assessments. Adults in custody complete the assessments for Anger/Hostility, Antisocial Peers, Cognitions, and Family/Parenting on TRULINCS.  Because the self-reporting measures have traditionally had the lowest assessment response rates, the BOP is implementing a variety of creative strategies to increase participation.  This past year, the BOP employed a memo, a video, and direct encouragement from employees to educate and motivate individuals to engage in the assessment process.  Likewise, the BOP is exploring the use of tablet computers as part of the intake process to increase participation for the self-reporting measures.

Once needs are assessed and entered into BOP systems, Unit Management staff, in consultation with other departments and the incarcerated individual, make targeted program recommendations for an individual's identified needs areas. The needs assessment process is standardized across incarcerated individuals and designed to be dynamic and flexible to incorporate individualized planning. To further promote standardization, the BOP has automated the SPARC-13 needs assessment system to ensure that recommended programming is tied to the assessed needs. Because such programs are identified to address the needs of incarcerated individuals, in accordance with the FSA, individuals are reassessed a minimum of

---

[12] *See* BOP, "Designations," https://www.bop.gov/inmates/custody_and_care/designations.jsp.

every 180 calendar days by Unit Management during the routine program review (team meeting) process to account for any change of circumstances, *e.g.*, receipt of an incident report or completion of an EBRR program or PA. Unit Management relays reassessment results to individuals during the team meeting; results of the reassessment are cataloged in the BOP's systems, including the individual's electronic central file.

c. Needs Assessment Revalidation

As with PATTERN, SPARC-13 must be revalidated on an ongoing basis. *See* 18 U.S.C. § 3631(b)(4). Revalidating SPARC-13 will provide helpful information about the assessment of the identified criminogenic and other needs and how assessment findings are used to refer incarcerated individuals to appropriate programs based on these results.

To fulfill this requirement, the NIJ released a competitive funding opportunity (a Statement of Work) in fall 2021, and sought responses from qualified external, independent consultants to support the annual review and revalidation of SPARC-13 for up to three years.[13]

Following an extensive peer review process, the Department selected three independent consultants as the top candidates to perform this work. Dr. Duwe, Director of Research and Evaluation for the Minnesota Department of Corrections, Dr. Hamilton, an Associate Professor in the School of Criminology and Criminal Justice at the University of Nebraska – Omaha, and Dr. Alex Kigerl, Research Associate for the School of Criminology and Criminal Justice at the University of Nebraska – Omaha, were selected because their submissions aligned with the Department's priorities by supporting research to reduce crime and ensure public safety.  Their submissions proposed innovative analytic strategies to review and revalidate SPARC-13 and they demonstrated expertise, capabilities, and competencies.

These efforts are ongoing, and the Department will release a report detailing findings from the assessment by summer 2023.

## B. Implementation of the Risk and Needs Assessment System Through Scoring, Referral to Programs and Ongoing Engagement, and Time Credits

As described above, the Department has undertaken numerous efforts over the past year to improve and automate both the risk assessment tool and the needs assessment tools, and it is continuing in efforts to revalidate each tool through external expert reviews. At the same time, the Department has worked to ensure that every individual has both an initial and periodically updated PATTERN score, ensure that every inmate is referred to programs after his or her needs are assessed, and ensure that every individual's participation in those programs is systematically tracked so that he or she can earn and apply time credits in accordance with the final FSA Time Credits (FTC) rule.

---

[13] The SOW opened Friday, October 1, 2021, and closed Thursday, December 30, 2021. The deadline was extended to Friday, February 18, 2022. *See* https://nij.ojp.gov/funding/NIJ-2022-FSA.pdf. A second competition was issued using the same SOW, and it was open from Wednesday, April 27, 2022, and Friday, May 27, 2022.

## 1. PATTERN Risk Assessments

On May 5, 2022, the BOP shifted to using PATTERN 1.3 and the revised cut points for the general tool, as explained above. The table below provides an overview of PATTERN risk levels across the BOP population as of January 31, 2023, and reflects PATTERN 1.3 and the revised cut points.

PATTERN Overall Risk Levels, as assessed on January 31, 2023 (using PATTERN 1.3 and revised cut points)

| Recidivism Risk Level | Frequency | Percent |
|---|---|---|
| Minimum | 14,126 | 10.76 |
| Low | 55,506 | 42.28 |
| Medium | 25,668 | 19.56 |
| High | 35,977 | 27.40 |
| Total | 131,277 | 100 |

## 2. Time Credits Eligibility by PATTERN classification

While all individuals in BOP custody are eligible to receive various in-prison incentives and rewards by successfully participating in EBRR programs and PAs, the First Step Act excludes certain categories of individuals from receiving time credits. Those categories are: (1) individuals serving a sentence for a conviction under one of the statutory provisions listed in 18 U.S.C. § 3632(d)(4)(D); or (2) individuals who are the subject of a final order of removal from the United States under U.S. immigration laws. 18 U.S.C. §§ 3632(d)(4)(B), (D), (E).[14]  Likewise, individuals who have a Medium or High PATTERN risk level may only apply time credits towards prerelease custody upon approval by their facility's warden.

Other than time credits, each individual who successfully participates in an EBRR program is entitled to receive certain additional phone or, if available, video conferencing privileges and may also receive additional visitation privileges upon the warden's discretion. 18 U.S.C. § 3632(d)(1). In addition, an individual who requests transfer to a facility closer to his or her residence upon release and is successfully participating in an EBRR program must be considered for requested placement, subject to bed availability, the individual's security designation, and a variety of factors including the current warden's recommendation. 18 U.S.C. § 3632(d)(2). All individuals who successfully participate and complete EBRR programming are also eligible to receive additional incentives that the BOP may establish, such as increased commissary spending limits and product offerings, extended email access opportunities, consideration for transfer to preferred housing units, and/or other incentives that the BOP may set. 18 U.S.C. § 3632(d)(3).

The data presented below shows, as of January 28, 2023, the number of individuals in BOP custody deemed eligible and ineligible for earning time credits, as well as those whose eligibility has not yet been determined. The percentages in parentheses show the relative share of the numbers of incarcerated individuals within each column.

---

[14]  Individuals are also not eligible to receive time credits for programs completed before the enactment of the FSA on December 21, 2018 or before the start of the individual's current imprisonment sentence as defined in 18 U.S.C. § 3585(a).

| Risk Recidivism Level | FTC Eligible | FTC Ineligible | FTC Unassigned | DC Code Offenders* |
|---|---|---|---|---|
| High | 21,844 (27.94%) | 15,215 (25.83%) | 86 (2.45%) | 1,131 (44.81%) |
| Medium | 15,849 (20.27%) | 10,859 (18.43%) | 82 (2.33%) | 557 (22.07%) |
| Low | 32,546 (41.62%) | 25,217 (42.81%) | 164 (4.66%) | 708 (28.05%) |
| Minimum | 7,595 (9.71%) | 7,444 (12.64%) | 16 (0.45%) | 61 (2.42%) |
| Unassigned | 358 (0.46%) | 176 (0.3%) | 3,169 (90.11%) | 67 (2.65%) |
| Total | 78,192 | 58,911 | 3,517 | 2,524 |

\* The number of District of Columbia (D.C.) Code offenders includes all who had either a concurrent or a consecutive D.C. Code conviction.

Note: The Unit Team has 28 days from the individual's arrival to determine his or her eligibility and risk score. Thus, in addition to including individuals who have not yet received a PATTERN classification, the "FTC Unassigned" column also shows the numbers of individuals who *have* received PATTERN classifications but had not been in BOP custody for 28 days, as of January 28, 2023, and thus had not received a determination whether they were FTC eligible.

### 3. Implementation of the Time Credits Rule

To encourage participation in evidence-based recidivism reduction (EBRR) programming, the FSA directs that all eligible individuals shall receive time credits for successful completion of EBRR programs and PAs. In particular, the FSA provides that an individual who successfully completes an EBRR program or PA assigned based on the individual's risk and needs assessment—and is determined to be eligible under the criteria set forth in 18 U.S.C. § 3632—shall earn time credits to be applied toward prerelease custody (i.e., transfer to a Residential Reentry Center or home confinement for service of a portion of the individual's sentence) or, at the BOP Director's discretion, toward supervised release (i.e., early satisfaction of the individual's term of imprisonment).[15]

On January 13, 2022, the Department published the final rule on FSA time credits, and the BOP began immediately implementing the Time Credits program consistent with that rule.[16] Implementation began with immediate releases for individuals who, as of the retroactive date of applicability, had earned time credits in an amount that exceeded their days remaining to serve, who were less than 12 months from release, and who had a supervised release term as part of their sentences, such that they could be moved directly to supervised release.[17]

---

[15] The FSA applies to a "prisoner," defined as "a person sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons." 18 U.S.C. § 3635(4).

[16] *See* FSA Time Credits Rule, https://www.federalregister.gov/documents/2022/01/19/2022-00918/fsa-time-credits.

[17] On February 11, 2022, the BOP published the final rule on GCT credit in the *Federal Register*. *See*

On November 18, 2022, the BOP adopted a new Program Statement (5410.10) to implement the new rule.[18] The policy included several significant changes from the calculation procedures that the BOP had employed on a transitional basis:

- First, the Bureau modified its prohibition on earning credit in restrictive housing, so that individuals will be able to earn credit while in administrative detention, consistent with the BOP's expectation that such individuals will continue to participate in programming.

- Second, the policy clarified that time credit could continue to be earned in community placements (*i.e.*, home confinement or RRC). Individuals will be able to continue earning credit while in the community, so long as they continue to successfully comply with all the rules and procedures of prerelease custody.

- Third, the policy included a provision to project and estimate the maximum amount of time credit an individual might earn during his or her sentence, so individuals can see and understand how earning time credits will impact their expected release date.

- Finally, the policy specifies that the BOP will calculate and award time credits for the full incarceration term.  Under the interim procedures, the BOP had stopped calculating earned time credits towards transfer to supervised release once an individual was within eighteen (18) months of his/her projected release date (based on release planning purposes).  The new policy removed this restriction.  Earned time credits are now calculated at the initial stages of the individual's sentence, with a presumption that the earned time credits will accrue throughout the term of incarceration.  The earned time credits are then adjusted if the individual does not earn credits through non-participation or for other reasons during their time in custody.

The BOP initially launched the auto-calculation application on August 31, 2022. Implementation of this system revealed that some individuals had not complied with the statutory requirement to complete a needs assessment to earn time credits. As a result, some individuals' balances of earned time credits decreased when the automatic calculation system launched. As described above, the BOP has enhanced its efforts to remind individuals in its care of this requirement.  At the same time, the BOP also took immediate action to ensure that the issue did not adversely affect those who had failed to complete their needs assessment or those who had initially refusing assigned programming. For those individuals in Residential Reentry Centers (RRCs) and home confinement (HC) that were impacted, the BOP restored their FSA time credits. The BOP also restored placement dates for those in institutions with RRC/HC placement dates.

On November 18, 2022, the Bureau informed all adults in custody that it would extend a grace period through December 31, 2022, which allowed individuals to complete their needs assessments and address any declined programs in order to remain in earning status under the automated system.  In January 2023, the Bureau recalculated earned time credits for all eligible individuals to account for the end of the grace period. The recalculations align the automated calculations with the Bureau's revised FSA earned time credits policy.

---

Good Conduct Time Credit Under the First Step Act,
https://www.federalregister.gov/documents/2022/02/11/2022-02876/good-conduct-time-credit-under-the-first-step-act.
[18] https://www.bop.gov/policy/progstat/5410_01.pdf.

As of January 28, 2023, 13,501 individuals have been released from RRCs, HC, and secure facilities under an FSA release code. An estimated 3,800 individuals have been placed in an RRC or HC and have a projected release method based the application of earned time credits. In addition, approximately 10,650 individuals currently in secured custody are expected to receive an earlier release date or transfer to prelease custody based on the application of earned time credits.

## 4.  FSA Audit Activities

The BOP offers programs across all sites, and local facilities match needs assessment results to programs designed to remediate the needs.  Thus, it is important that the BOP continue to monitor program participation by location. The BOP previously established a partnership with the Advanced Data Analysis and Mining (ADAM) Lab of the Department's Civil Division to develop dashboards to analyze and present BOP data using geospatial software. At the end of FY22, the BOP engaged engineering resources to establish a geospatial technology infrastructure to develop displays of relevant FSA dashboards.  Once complete, the dashboards will help assist local and central leadership gauge participation in programming and the availability of programs (EBRRs and PAs) across BOP facilities.  The BOP's subject matter experts will also receive training to maintain the dashboards, and make ongoing developments and improvements, on a continual basis.

The dashboards are scheduled to be available by July 2023.  The BOP also awarded a contract in FY 2022 to outside consultants to perform a review of the BOP's use of both PATTERN and SPARC-13. This audit will review the BOP's use of these tools for quality assurance purposes. The audit will be performed annually by appropriate external experts via an approved contracting process.

## II.   A Summary and Assessment of the Types and Effectiveness of the Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) in Prisons Operated by the Bureau of Prisons

### A. Approved EBRR Programs and Activities

Since the last Report issued, the Department has expanded its programming capacity by adding additional professional staff for program delivery and creating additional specialized programs. Additionally, the BOP has established clear procedures for adopting new programming for individuals in custody moving forward. As part of this process, the BOP's research consultant reviews all external proposals for new programming.[19] Proposals for programs by internal BOP staff are submitted to the BOP's Reentry Services Division (RSD) with supporting materials that include, at a minimum, a facilitator's guide, complete curriculum, supporting research, and any handouts that would be provided to inmates. All internal program proposals are evaluated for evidence of recidivism reduction – *i.e.*, whether the program meets or fails to meet the FSA's requirement that an EBRR program "has been shown by empirical evidence to reduce recidivism" or "is likely to be effective in reducing recidivism." 18 U.S.C. § 3635(3). RSD ultimately determines whether a program will be approved as an EBRR program for use within the BOP.

The BOP publishes the First Step Act Approved Programs Guide (FSA Programs Guide) on its public website, in accordance with the FSA requirement that the BOP develop a list of programs meeting the statutory definitions of EBRR programs and PAs. The FSA Programs Guide[20] is a collection of the BOP's reentry programs designed to ensure that all sentenced individuals have the skills necessary to succeed upon their return to the community. The programs listed in the guide are standardized across institutions, described in the BOP's national policies, implemented with dedicated resources, and reviewed on a regular basis to ensure program fidelity. The initial guide issued in January 2020 was comprised of 70 EBRR programs and PAs. Today, the BOP has more than 95 EBRR programs and PAs in the FSA Program Guide. Moreover, while structured EBRR programs and PAs with a facilitator-led curriculum are listed in the FSA Programs Guide, other activities, such as work assignments may also be recommended by staff to address individual needs as well as qualify for time credits for eligible individuals in custody.

---

[19] The external programs were reviewed for evidence demonstrating effectiveness in reducing recidivism and for use by an established framework, particularly in a correctional setting. Using the information from the independent reviews, the BOP assigned a final evidence rating to each proposal based on program design and outcome standards; after which summaries were created to help determine whether and how the proposed program would be used in BOP institutions. Of the five possible ratings, only the programs rated as "Effective" and "Promising" were considered for adoption and inclusion in the First Step Act Approved Programs Guide.

[20] *See* BOP, First Step Act Approved Programs Guide, https://www.bop.gov/inmates/fsa/docs/fsa_guide_eng_2023.pdf.

In addition to the efforts described above to expand the number of EBRRs and PAs, the BOP has also focused on building capacity in existing programs. The agency has successfully expanded capacity in significant part through the addition of full-time program delivery staff (see more information in Part III.E). Efforts to continue increasing programming opportunities for inmates in accordance with the FSA, even during the COVID-19 pandemic, remain a priority for the BOP.

As of September 2022, the BOP engaged an outside consultant to help enhance implementation of the FSA recidivism reduction efforts. First, the consulting group will establish and employ a methodical process whereby existing evidenced-based recidivism reduction correctional programs outside the BOP (*e.g.*, state departments of corrections, juvenile, and military prisons) are identified, reviewed, and evaluated based on whether they would add value to the BOP and evidence of empirical support. Additionally, the consulting group will conduct reviews of programs that are submitted from external sources to the BOP.  The BOP's goal is to better understand programs in other non-BOP correctional facilities and to continue to expand its own evidence-based recidivism reduction programming.

In November 2022, the Bureau also awarded a contract to conduct a literature review of all programs listed within the FSA Programs Guide. For each of the BOP's identified EBRR Programs and PAs, the contractor will review the research on the program's efficacy and summarize the findings in the written report. Outcomes of interest include symptom reduction, components likely to support institutional adjustment of participants, and misconduct/criminal recidivism.  This report is expected by the end of FY23.

# B. FSA Program Participation

Because the BOP believes that reentry preparation begins on the first day of an individual's incarceration, individuals in its custody are encouraged to begin preparing for reintegration into the community when they first arrive at their designated facility to serve their sentence.  This encouragement continues through the motivating actions of staff throughout their confinement. As detailed earlier, across its institutions the BOP offers a variety of programs to address criminogenic and reentry needs related to education, employment, substance use, and mental health to assist inmates' successful transition back to the community. Specialized treatment programs are offered for particular populations including, but not limited to, sex offenders, women, transgender offenders, aging offenders, and individuals with co-existing disorders. The BOP also provides accommodations to people with disabilities to ensure equitable access to FSA programs.

The Bureau has steadily expanded participation in EBRR programs and PAs since the last Report, particularly as more institutions have resumed programming in accordance with the BOP's COVID-19 Modified Operations Plan.  In particular:

- By the end of FY22, there were 240,849 program completions—an increase of more than 89,000 since the last Report.

- Additionally, as of February 28, 2023, there were 96,731 enrollments in EBRR programs and PAs, an increase of over 20,000 since the last Report.

- As of February 28, 2023, 77.79% of individuals eligible to earn time credits were taking part in any FSA activity.  Since February 2022, EBRR and PA participation has increased by 33.95%.[21]

Since the last Report, the BOP has added 15 new EBRRs and advanced many existing initiatives in efforts to expand the quality and quantity of services and program opportunities for the inmate population. These initiatives include:

- **Development of a new fully scripted recreational curriculum.**  The BOP awarded a contract for the evaluation of the BOP's current recreational programs and the development of a new recreational curriculum to be implemented Bureau-wide.  The curriculum is built upon the *Eight Dimensions of Wellness* and addresses five key areas identified by the BOP (assessment of needs, social inclusion, interaction, self-assessments and services upon release, and identified coping mechanisms). The curriculum is expected to be fully implemented in FY23.

- **Addition of a new assessment methodology for career interest and exploration.** A contract was awarded to a company that specializes in developing career guidance tools to assist inmates in determining their ideal job interests, abilities, knowledge, skills, and work styles. The career interest inventories are derived from the extensive research used in the U.S. Department of Labor's O*NET occupational database. The inventories offer metrics-driven research outcomes to empower inmates in their career exploration, selection of training, and job placement upon reentry.

- **Enhanced Vocational Counseling.**  The BOP awarded a contract to a consultancy group that specializes in vocational counseling, educational programming, social-emotional-behavioral assists related to learning, and development of accommodations to support academic achievement. The consultancy group is tasked with training and assisting BOP school counselors in the design and delivery of a comprehensive counseling program for their respective education departments that improves educational and career outcomes.

- **Addition of a doula training program for pregnant and post-partum women.** The BOP provides a doula training program for women, which will support the vocational opportunities for women upon release.  The doula program is expected to be fully implemented in FY23.

- **Addition of a Faith-Based Conflict Management program.** This program builds upon evidence-based practices and cognitive behavioral treatment including interactive journaling, motivational interviews, and the use of a therapeutic community.  Through active participation in ten one-hour sessions, students will strengthen their anger and conflict management, interpersonal communication, and conflict resolution techniques using spiritual principles and practices.  This non-residential program is open to individuals of all faiths and those with no specific religious affiliation.  Institutions are expected to begin offering this FSA EBRR program in FY 2023.

---

[21] At this time, the new FSA Time Credits Rule changed BOP policy to require individuals to opt out of—rather than opt into—relevant FSA programming.

- **Creation of the Community Reentry Network (CRN).** The CRN is an electronic informational clearinghouse of faith-based organizations used as reentry referrals and mentoring support for individuals upon their release. This exciting new initiative is dedicated to building relational bridges, nationwide, that ensure the spiritual values individuals have learned and utilized inside the walls are easily accessible upon their return to the community. The CRN will provide access to reentry information, agency-wide, where individuals, unit staff, mentor coordinators, and other BOP staff can begin planning for release by linking resources to concepts which are taught and reinforced by their EBRR/PA courses.

- **Expansion of higher education classes and programs.** The BOP contracted with two colleges to address a growing skill gap and establish a Mechatronics College Program. Students completing this program will receive an associate degree and/or certificates and develop skills in IT, robotics, and automation in high demand by manufacturing employers.

## C. FSA Program Capacities

BOP staff are the agency's greatest resource for delivering critical FSA programs. The BOP is one of the largest civilian employers of doctoral level psychologists in the United States and also employs chaplains and teachers among its complement of service-delivery professionals. These positions have long provided treatment, training, and self-improvement services across BOP facilities. Since the last Report, the BOP has allotted 79 new positions in program delivery disciplines to expand the capacity of its more than 95 EBRR programs and PAs. In addition to the aforementioned professionals, the BOP has:

- **Expanded the use of the Special Populations Coordinator (SPC).** The BOP now employs SPCs in all facilities and complexes, regardless of the population. SPCs deliver programs and services and work to ensure that the BOP's offerings are gender-responsive, trauma-informed, culturally sensitive, and address the unique needs of all special populations in the BOP. Over the past year, the number of SPCs in the BOP has doubled and hiring continues.

- **Added a new Vocational Counselor position.** Vocational Counselors are assigned to select institutions and are responsible for administering, scoring, and interpreting career interest inventories, which will assist individuals in selecting appropriate educational and career-technical options to prepare them for reentry. Additionally, Vocational Counselors will provide individual students with academic planning and goal setting and provide classroom lessons that focus on success standards for reentry purposes. Every new position adds capacity to the BOP's FSA programs portfolio. Currently, Vocational Counselors are being onboarded for these positions at eight institutions.[22]

- **Enhanced Career Technical Education programs.** The BOP is in the process of standardizing career technical education (CTE) programs to increase effectiveness and program capacity. The BOP allotted 54 positions specifically for CTE programs and has used those positions to establish new programs and replicate successful programs.

---

[22] Those institutions are FCC Allenwood, FCC Coleman, FCC Florence, FCC Hazelton, FCC Oakdale, FCC Tucson, FCC Terre Haute, and FMC Carswell.

Additionally, the BOP has encouraged a partnership where CTE programs support Federal Prison Industries (FPI) to effectively increase program capacity.

- **Added Special Education Teachers.** Additionally, the BOP allotted 23 additional positions for Special Education Teachers to assist with identifying students with special learning needs in all programs. These additional positions increase access and programming capacity by supporting students in ways that will increase their ability to pass the standardized assessments required for high school equivalence credentials and CTE credentials/licenses.

Ordinarily, each BOP institution monitors the needs assessed within its population to determine which programs to offer. Some large residential programs, such as the Residential Drug Abuse Program, target a subset of the population for intensive services. For programs such as these, the BOP monitors program completions and determines when and where staffing is needed. For most programs, however, the institutions have the ability to add cohorts and increase participant capacity, as needed. Thus, if a facility is already offering Anger Management but has a disproportionately large group of individuals with needs remediated by this program, the location could add an additional section of the program to meet the population needs.

## D. FSA Program Evaluations

The BOP continues to study and validate its programs in order to make sure that the programs are providing beneficial services to individuals in custody.  Through collaboration with external, credentialed social science researchers and the BOP's clinical researchers, the BOP continues independent as well as internal evaluation services to explore outcomes of some of its largest and most robust reentry programs. As noted previously, outcome studies are lengthy endeavors; to conduct the analysis, individuals in custody must first complete programs, and then be released from prison for a period of time. Additionally, while programs are designed to promote successful reentry, many of these programs have other priorities, such as symptom reduction or behavioral modification. Evaluation studies for the following programs are currently in progress:

- **Drug Treatment Programs:** The BOP has contracted for a five-year evaluation of its suite of drug treatment programs.  Texas Christian University (TCU) is conducting studies on the BOP's drug programs, which consist of a residential unit-based program, a non-residential program, a psychoeducational drug program, and a medication-assisted program. The project is in its second year of a five-year contract. The retrospective study is estimated to be completed in Fall 2024. A follow-up prospective study is planned upon completion of the retrospective study.

- **Anger Management:** The BOP has contracted with TCU for a three-year evaluation of its Anger Management program. TCU has completed the second year of that contract. Currently, as part of its work, TCU is reviewing the data provided by the BOP as part of a retrospective study. The BOP estimates that the retrospective study will be complete within the next 6-12 months. A follow-up prospective study is planned upon its completion.

- **BRAVE:** The BOP has contracted with RSG CJ Analytics for a five-year evaluation of its Bureau Rehabilitation and Values Enhancement (BRAVE) program, an intensive cognitive-behavioral program targeting younger offenders.  The project is in its second

year of a five-year contract. The completion date for the retrospective study is estimated to be Fall 2023. A follow-up prospective study is planned upon completion of the retrospective study.

- **Resolve Program:**  The BOP's Office of Research and Evaluation is collaborating with the Psychology Services Branch to conduct an outcome evaluation of the Resolve Program, which is the BOP's cognitive-behavioral program designed to address the trauma-related mental health needs of inmates. Analysis of the retrospective data is currently underway and preliminary results are expected by July 1, 2023.

Moreover, in another independent program evaluation effort, the BOP provided almost $11.5 million to the NIJ for evaluation of seven additional BOP EBRR programs. Through a competitive solicitation process, the NIJ has awarded funds to qualified researchers to study outcomes (*e.g.*, symptom reduction, institutional adjustment, recidivism).  The researchers have met with program coordinators in each area and are preparing proposals for the BOP's institutional review board for each of these seven programs:

- **Steps Toward Awareness, Growth, and Personal Strength (STAGES) Program:**  The STAGES Program is a cognitive-behavioral residential treatment program for incarcerated individuals with significant mental health and self-harm histories.

- **Skills Program:**  The Skills Program is a residential treatment program designed to improve the institutional adjustment for incarcerated individuals with intellectual and social impairments.

- **Non-Residential Sex Offender Treatment Program:**  The program is a moderate intensity cognitive-behavioral treatment program designed for sex offenders determined to be a low to moderate risk of re-offending.

- **Female Integrated Treatment (FIT) Program:**  The FIT Program is a residential gender-responsive program designed to meet the vocational, mental health, trauma, and substance use treatment needs of women in BOP custody.

- **Foundation Program:**  The Foundation Program is a strengths-based program designed to help women in BOP custody identify their treatment and reentry needs.

- **Threshold Program:**  The Threshold Program is a non-residential spiritual and values-based program facilitated by Religious Services staff with assistance from community volunteers designed to support incarcerated individuals in their spiritual development and formation.

- **Life Connections Program (LCP):**  LCP is a faith-based residential program designed to assist participants in developing their personal/spiritual transformation and learning practical life skills for successful transition back to the community.

Finally, as part of this overall evaluative effort, the BOP will contract with criminal justice consultants experienced in correctional program delivery to conduct a review of available research related to the BOP's EBRR programs to determine the strength of the evidentiary basis of the programs, in ways comparable to non-BOP programs with research-supported evidentiary basis.

## E. Partnerships with Volunteers

Community partners play a vital role in providing mentorship, support, and educational opportunities to incarcerated persons. The BOP has a long history of working with external organizations to recruit community volunteers. The BOP engages in both paid and non-paid partnerships to instill hope, help individuals in custody make meaningful connections, and provide encouragement to individuals that assists in their personal growth and in their ability to return to their communities as law-abiding citizens. The BOP defines a paid partnership as a contract between the government and an external organization that delivers programming and services for compensation. A non-paid partnership provides programming and services on a voluntary basis. These partnerships have included such areas as faith-based, academic, vocational, wellness, mental health, and interpersonal skills services.

Throughout FY22, operational levels at institutions continued to fluctuate due to the COVID-19 pandemic. Despite the challenges this inconsistency caused, 1,559 volunteers and contractors were able to assist with programming and provided 111,902 hours of service to the BOP institutions. This growth was an increase from the previous year. To fulfill the goals of the FSA, the BOP took steps to transform the volunteer recruitment and application process to increase the number of skilled volunteers for the agency and to ensure the availability of essential reentry programming at all BOP institutions. The goals of this initiative are:

- **Recruit Skilled Volunteers:** Through digital marketing, the BOP finds volunteers who have the right skills, in the right locations, and at the right volume to support priority initiatives.

- **Make Volunteer Management Simple:** As the volunteer pool grows, so does the need for an intuitive tracking system. The new technology system allows BOP Reentry Affairs Coordinators (RACs) to easily post volunteer opportunities and track applications.

- **Report Progress with Data:** The new technological system enables automatic generation of reports to allow RACs and the BOP's Community Reentry Branch to make data-driven decisions that influence volunteer programs.

To support these goals, the BOP has developed a multi-pronged solution that involves a digital marketing campaign, an online public portal, and a volunteer recruitment management system. Together, these strategies engage a new generation of BOP volunteers and encourage them to apply to support the institution's most critical programming needs. To date, the implementation strategy has included the following:

- **Digital Marketing Campaign (the Inside Influence Campaign):** An initial awareness campaign launched on July 27, 2021, directing public users to a new volunteer page on the BOP's public website.[23] This initial campaign was designed to direct users to the "Inside Influence" portal for volunteer resources and applications. Each week of the awareness campaign saw a steady increase in public interest.

- **Public Volunteer Portal (the Inside Influence Portal):** The public volunteer portal of the BOP's website allows prospective volunteers to navigate and learn more about the BOP, view "Day in the Life" stories from current volunteers, review FAQs and initiate

---

[23] BOP, "Leave a Legacy of Good—Volunteer," https://www.bop.gov/jobs/volunteer.jsp.

contact through a "Contact Us" feature. More importantly, for the first time in BOP history, community members are able to search for volunteer opportunities by reviewing relevant postings near them and submit a digital application to express their interest.

- **Volunteers Influencing Inmate Outcomes System (VIIOS):** By using the VIIOS, BOP staff can complete digital Annual Needs Assessments, run statistical reports to determine recruitment status and institution needs, and enter postings to advertise their volunteer vacancies. Once a prospective volunteer applies to a posting, the RAC of the institution that posted the vacancy is able to review and manage the application and engage with applicants through VIIOS.  The VIIOS system is currently deployed nationwide, and as a result, over 50 volunteers are currently providing services to individuals in BOP custody.

  In 2022, the BOP extended the VIIOS to improve management capabilities. The new features deployed in February 2023 and allow RACs to manage a prospective volunteer through their entire lifecycle with BOP. This journey starts when an individual expresses their interest in volunteering, continues through their application process, and ends when their volunteer services are no longer provided to incarcerated individuals. In addition, a Talent Pool feature debuted. The feature allows prospective volunteers to submit a form indicating their location and program interest if an opportunity that aligns with their skills and interest is not available.

Because visitation plays such a critical role in enabling incarcerated individuals to maintain community ties, the BOP maintains ongoing partnerships with two organizations that provide visitation services to individuals who normally do not have connections with family and friends outside prison. The first and largest visitation volunteer organization of its kind is the Prisoner Visitation and Support (PVS) program. During normal operations, PVS volunteers visit incarcerated individuals who need friendship and mentoring. Their mission is to "provide prisoners with regular face-to-face contact from the world outside of prison to help them cope with prison life and prepare for a successful reentry into society." PVS provides supportive service to federal and military prisoners. A second BOP-partner organization is Aleph Visitation Circle, which provides similar services to individuals.

Additionally, in October 2022, the launched the Community Reentry Network (CRN), an electronic clearinghouse of faith-based organizations (FBOs) that the Bureau developed for reentry referrals and mentoring support upon release. The CRN seeks to be a centralized rallying point for wider faith communities to meet the needs of returning citizens. The CRN's guiding principles include reliability of the FBOs; accessibility to individuals, Bureau staff, returning citizens, and stakeholders; sustainability to meet reentry needs now and in the future; inclusion of the diversity of religious affiliations and the variety of needed community services offered returning citizens; unity in vision and cooperative spirit; and being grounded in data and research. As of September 2022, 1,537 FBOs had been added into the CRN listing, and new ones are being added every day. The next steps for the CRN include a landing page on the agency public website and an interactive map.

# F. Partnerships with Federal, State, Local, and Tribal Agencies

The BOP's Federal, State, local, and Tribal partners also play a central role in facilitating reentry for incarcerated individuals.  Since the last Report, the Bureau has continued to foster and expand these partnerships:

**Federal partnerships**

The BOP continues its work with the Executive Office for United States Attorney's Offices, the Court Services and Offender Supervision Agency (CSOSA), and United States Probation Offices (USPO) to host virtual reentry resource fairs and workshops. These events educate incarcerated individuals on community resources and services readily available post-release. Both United States Attorneys' Offices and USPOs participate in annual mock job fairs, reentry resource fairs, Release Preparation Programs/Release Orientation Programs, and other reentry related events.  To help ensure individuals are aware of services available upon release, the BOP partnered with CSOSA to hold quarterly virtual resource events in March, June, September, and December of 2022. Approximately 228 individuals participated in CSOSA's virtual community resource day event.

In addition, the BOP hosted a reentry simulation on January 25, 2023, for external stakeholders. The U.S. Health and Human Services (HHS), the Department of Veterans Affairs, and Bureau of Justice Assistance, the Army Clemency and Parole Board, the D.C. Board of Elections, the D.C. Mayor's Office of Returning Citizens, and CSOSA participated. Also, the BOP is scheduled to facilitate reentry simulations for HHS in April 2023 and the Air Force Clemency and Parole Board in July 2023. The simulation depicts the many challenges and struggles justice involved individuals face upon their return to the community. The goal is for participants to gain an understanding of the significant challenges faced by justice involved individuals attempting to navigate the system upon their release. Hosting the event is an educational experience, as well as an opportunity to expand partnerships with various agencies.

**State and local partnerships**

BOP institutions maintain local partnerships with child support agencies, motor vehicle departments, libraries, local colleges and universities, tribal communities, workforce development agencies, Veterans Administration offices, faith-based organizations, and other stakeholders to help further assist inmates with successful reentry into their communities.  For example:

- Over the past year, the BOP has contacted Driver License Centers (DLCs) across the country to express interest in establishing a national memorandum of understanding (MOU) with the DLC's to assist offenders with obtaining a government issued identification. Currently, 15 states expressed interest in creating a national partnership.

- The BOP continues to partner with the D.C. Board of Elections, which led to a wider effort to educate inmates on their voting rights. The District of Columbia passed legislation in 2020 allowing incarcerated citizens to vote. The partnership provided registration and voting material to the BOP's D.C.-citizen inmates enabling absentee voting. As a result, the BOP initiated similar efforts in Maine, Vermont, and Puerto Rico where incarcerated residents are also allowed to vote while serving their sentences. To facilitate voter awareness throughout its inmate population, the BOP updated its Admissions and Orientation program and its Release Preparation Programs/Release Orientation Programs to educate inmates on their voting rights.

- The BOP has partnered with the D.C. Department of Corrections' READY (Resources to Empower and Develop You) Center and the Prince George's County, MD Health Department Bridge Center to assist incarcerated individuals returning to those areas with release planning. These partnering agencies provide resources for the population in custody, including the completion and collection of intake forms before their release.

**Tribal partnerships**

The BOP collaborates with Native American and Alaskan Native communities to provide reentry services.  The BOP has presented information at Tribal Intergovernmental Reentry Workshops in February 2019 and April 2021 to provide an overview of the inmate intake process, reentry programs, and reentry initiatives. The BOP also works with the National Indian Council on Aging and the U.S. Department of Labor to direct reentry resources for the aging Native American population and to help secure post-release employment. In addition, the BOP presented at the Bureau of Justice Assistance Tribal Intergovernmental Reentry Workshop in May 2022.

# III.   BOP's Additional FSA Implementation Activities

## A. BOP Efforts to Assist with Identification

Individuals leaving incarceration should not need to navigate the administrative hurdles to securing identification on their own. The BOP continues to help individuals obtain identification prior to release. Since the last Report, the BOP consulted with the Transportation Security Administration (TSA) and the U.S Immigration and Customs Enforcement (ICE) to provide all individuals upon release to the community the option to receive a BOP-issued photo identification that complies with Real ID requirements for domestic air travel. BOP, in consultation with other agencies, conducted market research to explore manufacturing options to enhance the security measures of the Release ID card.  Based on that research, the BOP has also partnered with the Government Publishing Office (GPO) to produce the BOP release IDs, which will be used for interstate travel upon release, for employment eligibility verification, and for obtaining state and local photo IDs.  GPO and the BOP will launch field trials in April of 2023, which will continue through May at one institution in each region.  At the conclusion of the testing phase, deployments throughout the BOP will begin.   Fifteen states have already agreed to honor this ID for a one-to-one exchange with state issued IDs.  The BOP, in collaboration with other relevant Federal agencies, continues to engage with states to encourage others to honor this ID for this purpose.

Additionally, the BOP is in the process of finalizing an interagency agreement with the U.S. Marshal Service (USMS) to request agreement for USMS personnel and contractors transporting individuals to and from BOP facilities to provide the BOP with any government-issued identification in an individual's possession for inclusion in the inmate central file.



## B. Transfers Closer to Home

Individuals in custody benefit from maintaining ties with their families and communities during their terms of imprisonment. Incarcerating individuals close to home can help promote that connection. Prior to the passage of the FSA, the BOP sought to place inmates within 500 miles of their release residence, as available and appropriate. As of January 29, 2023, 80,901 individuals (68% of those in typical institutions with release residences within the continental United States) were placed within 500 miles of their residence. The following table shows the number of individuals within 500 miles of their release residence, as of January 28, 2023.

| Facility Security Level | Within 500 Miles of Legal Residence | Greater Than 500 Miles from Legal Residence | Inmate's Legal Residence Unavailable | Total |
|---|---|---|---|---|
| Administrative | 8,561 | 3,615 | 224 | 12,400 |
| High | 8,925 | 9,944 | 227 | 19,096 |
| Medium | 38,549 | 14,053 | 548 | 53,150 |
| Low | 22,415 | 8,783 | 356 | 31,554 |
| Minimum | 2,451 | 728 | 26 | 3,205 |
| Total | 80,901 (68%) | 37,123 (31%) | 1,381 (1%) | 119,405 |

The FSA further refined this effort by requiring nearer release transfers, even if the inmate is already within 500 miles of their release residence if another facility is closer.[24]

From January 1, 2019 through December 2022, the BOP approved 7,356 nearer release transfers to place inmates in facilities nearer to their intended communities of release. The following table shows the number of releases each year, along with the average number of releases per month.

| Calendar Year | # Nearer Release Transfers | Average # Each Month |
|---|---|---|
| 2019 | 2,073 | 173 |
| 2020 | 1,410 | 118 |
| 2021 | 2,525 | 210 |
| 2022 | 1,348 | 112 |

While the BOP temporarily paused its nearer release transfers in response to the COVID-19 pandemic to mitigate potential disease transmission, it has now resumed these transfers with the advent of additional mitigation strategies including vaccinations, while continuing efforts to evenly disperse the inmate population across its facilities based on security levels.

## C. Elderly and Terminally Ill Pilot Program

The BOP has continued to implement this Second Chance Act[25] program to release to home confinement eligible elderly and terminally ill individuals in custody. Section 603(a) of the FSA reauthorized and modified the Pilot Program for Eligible Elderly Offenders and Terminally Ill Offenders conducted under the Second Chance Act, 34 U.S.C. § 60541. Section 603(a) allows offenders who are over 60 years of age, have served two-thirds of their sentence, are not convicted of a crime of violence, and do not have a history of escape to be placed on home confinement for the remaining portion of their sentence. To meet this standard, the BOP instituted a process in which each institution case manager conducted an initial caseload review for inmates who were 60 years of age or older and met the established criteria. Once inmates

---

[24] The BOP considers a variety of factors in designating inmates to specific institutions, including the inmate's security designation, programmatic needs, mental and medical health needs, faith-based needs, and recommendations of the sentencing court. The BOP's decision-making as to designations is not judicially reviewable. *See* 18 U.S.C. § 3621(b).

[25] First passed in 2008, the Second Chance Act was reauthorized and expanded in 2018 to provide federal grants to state, local, and tribal governments and nonprofit organizations for programs and systems reform aimed at improving reentry outcomes. It also included the expansion of a pilot program in the Bureau of Prisons to place elderly and terminally ill individuals on home confinement.

were determined to be eligible, they were submitted for placement on home confinement. Case managers are continuing to review their caseload and to identify for home confinement once they meet the criteria. Eligible inmates are then processed by Residential Reentry Management staff and, if approved, moved to their home communities on the appropriate date.

The population fluctuates daily as individuals are released into home confinement or complete their sentences. From January 2022 through December 2022, there were 52 individuals placed in the program. The BOP has placed approximately 1,219 individuals in this program since April 2019.

## D. Home Confinement

The BOP is committed to reintroducing individuals into the community commensurate with their needs and public safety. As of January 28, 2023, the BOP has increased the use of home-confinement ten-fold, transferring 56,976 inmates to home confinement through all authorities since March 26, 2020.

The BOP's home confinement program has expanded in part due to the application of time credits, discussed above. The FSA provides the BOP discretion as to the appropriate type of prerelease custody, including home confinement.  This authority has resulted in individuals transitioning to home confinement sooner and for longer period times than under the Second Chance Act, which had limited credit to 10 percent of an individual's sentence or less than six months.

The Bureau has also increased the use of home confinement pursuant to the CARES Act. Since March 2020, the BOP has transferred more than 12,000 individuals to home confinement pursuant to CARES Act authority, which along with the increased authority given to the BOP by the FSA, has led to individuals being placed in home confinement for longer durations.

The following graph and table show the number of BOP individuals transferred to home confinement each month under the "traditional" program (based on existing prerelease custody policies), CARES Act authority, and the Pilot Program for Eligible Elderly Offenders and Terminally Ill Offenders from February 2022 through January 2023.



Note: The number of Elderly Offender Home Confinement placements for the months in the above graph is not zero but rather shows an average of 4 per month. Since the inception of the Elderly Offender pilot program in 2007, the BOP has made a total of 1,185 placements.

Number of Placements from October 1, 2020 to January 28, 2023

| | CARES Act | Elderly Offender Pilot | Other ("Traditional") |
|---|---|---|---|
| October 2020 | 331 | 12 | 1,669 |
| November 2020 | 233 | 6 | 1,480 |
| December 2020 | 291 | 6 | 1,651 |
| January 2021 | 202 | 7 | 1,745 |
| February 2021 | 141 | 9 | 1,455 |
| March 2021 | 191 | 3 | 1,802 |
| April 2021 | 145 | 2 | 1,660 |
| May 2021 | 193 | 8 | 1,656 |
| June 2021 | 437 | 7 | 2,040 |
| July 2021 | 374 | 9 | 1,691 |
| August 2021 | 363 | 6 | 1,701 |
| September 2021 | 319 | 3 | 1,695 |
| October 2021 | 272 | 8 | 1,759 |
| November 2021 | 266 | 7 | 1,828 |
| December 2021 | 301 | 7 | 1,816 |
| January 2022 | 220 | 9 | 1,586 |
| February 2022 | 259 | 4 | 2,097 |
| March 2022 | 312 | 4 | 2,170 |
| April 2022 | 233 | 4 | 1,823 |
| May 2022 | 218 | 7 | 1,896 |
| June 2022 | 248 | 4 | 1,912 |
| July 2022 | 232 | 3 | 1,661 |
| August 2022 | 237 | 2 | 2,128 |
| September 2022 | 194 | 3 | 1,822 |
| October 2022 | 196 | 3 | 1,787 |
| November 2022 | 199 | 4 | 1,886 |

| | | | |
|---|---|---|---|
| December 2022 | 219 | 5 | 1,607 |
| January 2023 | 225 | 0 | 1,727 |
| Grand Total | 7,051 | 152 | 49,773 |

The CARES Act authorized the BOP Director to lengthen the amount of time a prisoner may be placed in home confinement beyond the statutory maximum normally allowed under 18 U.S.C. § 3624(c)(2), as the Director deems appropriate. That authority exists during and for 30 days after the national emergency caused by the COVID-19 pandemic, provided that the Attorney General has made a finding that the emergency conditions materially affect the functioning of the BOP. The President declared the COVID-19 outbreak a national emergency beginning March 1, 2020, prior to enactment of the CARES Act, and extended the national emergency on February 24, 2021. On April 3, 2020, after the passage of the CARES Act, the Attorney General found that COVID-19 emergency conditions materially affected BOP functioning. The President's declaration and the Attorney General's finding are still in effect as of the date of the publication of this Report. Based on current COVID-19 trends, the BOP is planning for the federal Public Health Emergency (PHE) for COVID-19, declared under Section 319 of the Public Health Service (PHS) Act, to expire in May 2023. The BOP is developing plans to ensure continued availability of testing, pharmaceuticals, and vaccines after the conclusion of the PHE and is revising guidance and clinical expectations to transition to a state of endemic disease management.

Following guidance from the Attorney General, the BOP Director has exercised her discretion under the CARES Act to place thousands of incarcerated individuals in home confinement during the pandemic emergency. These actions removed vulnerable individuals from congregate settings where COVID-19 spreads easily and quickly and reduced crowding in BOP correctional facilities. Individuals placed in home confinement remain in BOP custody and are subject to ongoing supervision, including monitoring, drug and alcohol testing, and check-in requirements. They are not permitted to leave their residences except for work or other pre-approved activities such as counseling or medical appointments. Individuals who violate these conditions or commit new crimes while in home confinement may be disciplined and returned to secure custody.

On April 4, 2023, the Department issued a final rule granting discretion to the Director of the Bureau of Prisons to allow individuals placed in home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act to remain in home confinement after the expiration of the covered emergency period. The final rule provides the Bureau the discretion and flexibility to impose proportional and escalating sanctions for individuals who commit infractions, including returning them to prison. Consistent with that final rule, the Bureau's Director also instructed that any individual placed on home confinement under the CARES Act will remain on home confinement under the CARES Act for the remainder of their sentence, provided that they are compliant with the rules and regulations of community placement. Since the enactment of the CARES Act on March 26, 2020, the Bureau has placed more than 12,000 individuals in home confinement under CARES Act authority. Of those, only a fraction of one percent has been returned to secure custody due to new criminal conduct.

# E. Drug Treatment

The BOP has a robust drug treatment strategy and offers a variety of research-based drug treatment programs with demonstrated efficacy. Individuals who have identified drug treatment needs receive an individualized treatment plan to address those needs. One of the most valuable programs for individuals with diagnosed substance use disorders is the Residential Drug Abuse Program, the BOP's most intensive treatment program that typically lasts nine months in duration.

During FY22, more than 55,900 individuals participated in institution-based drug treatment—more than 12,000 more individuals than the previous year.  They participated in programs such as:

- Drug Education: 23,954 participants

- Non-Residential Drug Abuse Program: 20,163 participants

- Residential Drug Abuse Program: 11,817 participants

An additional 14,118 individuals participated in community-based treatment during calendar year 2022, and 6,314 individuals participated in Substance Use Disorder Treatment, while 6,046 participated in Mental Health Treatment.  Moreover, 1,214 participated in Medication-Assisted Treatment in the community.

Consistent with the FSA, the BOP has expanded access to Medication-Assisted Treatment (MAT).  In the wake of the opioid crisis, this program is an important treatment option for people with opioid use disorder. The BOP provides all three FDA-approved medications in conjunction with individualized psychosocial interventions for offenders with opioid use disorder.  MAT participation has increased over 120% since the last report, dated April 2022. In FY22, counting both those who received treatment in BOP's institution and those receiving treatment in community custody, 3,208 individuals participated in the MAT program.  These individuals were engaged in psychosocial treatment and services to address individual treatment needs, including referrals to other programs such as vocational training and trauma treatment.  In the first five months of FY23, 2,824 individuals have participated in MAT, with more individuals expected to join in the coming months.  The BOP anticipates continued growth of the MAT program moving forward.

As individuals transfer to RRCs located throughout the nation, the BOP's community-based treatment service providers ensure continuity of care during that critical time. Oversight of inmates at RRCs is conducted collaboratively between the BOP and its treatment and residential contractors who work together to ensure early identification of drug treatment issues, needed referrals, and continued access to needed counseling services and psychotropic medications. To that end, the BOP works to ensure that any individual who initiates or has an identified need for MAT services while incarcerated continues or begins treatment upon transfer to community custody. Those who may not have started the MAT screening process while incarcerated may also choose to be evaluated for MAT in the community with contracted treatment providers.

The BOP is working with the Substance Abuse and Mental Health Services Administration (SAMHSA) and the Drug Enforcement Administration to establish Opioid Treatment Programs (OTP) within all BOP institutions, thereby avoiding the need to rely on community resources for the provision of methadone. Upon OTP certification, all BOP-managed institutions will provide

all three U.S. Food and Drug Administration-approved medications for opioid use disorder (methadone, buprenorphine, and naltrexone). Currently, all BOP Medical Referral Centers (MRCs) have provisional OTP certification, and all other BOP facilities will obtain provisional certification FY23.

A hub-spoke model is used to provide clinical and logistical support through the BOP's HSD Central Office and regionally assigned health services staff. In FY23, the BOP HSD will hire an addictionologist and identify clinical consultants to further support this hub-spoke model. Until provisionally certified, incarcerated individuals requiring methadone for opioid use disorder receive medication through community Opioid Treatment Program (OTP) clinics with which their BOP institution contracts/partners. Buprenorphine is prescribed by BOP practitioners with approved training. As the BOP continues training staff on the treatment of opioid use disorder, BOP technical and clinical guidance is available for health care providers. This guidance standardizes treatment approaches on an individualized basis.

## F.   FSA Staffing Resources

Both the Department and the BOP are committed to fully staffing BOP institutions. Appropriate staffing, along with training and funding, is key to full implementation of the FSA. In the last three years, the BOP has made progress in hiring for correctional services positions as well as for positions designed to prioritize FSA program delivery, including sometimes difficult to find professionals in education, physical and mental health, and religious services. For example, as of early November 2021, the BOP had filled dedicated positions in several fields that directly support FSA implementation, including appointing Mental Health Treatment Coordinators.

The BOP continues to fill positions that support FSA implementation.  The BOP is currently authorized for 440 FSA-funded positions. This includes more than 100 positions to expand capacity in FSA programs. As of February 25, 2023, BOP had filled 298 (68 percent) of dedicated FSA positions.

The hiring of dedicated FSA positions that directly support FSA implementation is displayed further below.



In addition, as of February 25, 2023 the BOP had:

- Made tentative offers or given entry on duty dates to an additional 28 individuals. This group represents another 6 percent of the 440 funded FSA positions;
- Of positions with posted vacancy announcements, 52 interviews were being conducted, or had candidates in the background check process.
- 60 vacancy announcements that remained to be posted. This reflects, in part, vacancies requiring a second posting due to lack of qualified applicants after the first announcement.

The BOP will continue to make a sustained and focused effort to fill these positions. The current goal is to fill 100 percent of the 440 positions with dedicated FSA funding by the end of FY 2023.

Finally, the Department and the BOP are dedicated to identifying hiring and staffing strategies to reduce overreliance on augmentation and overtime. The BOP is using several approaches to address over reliance on augmentation and overtime, including:

- **Staffing Assessment**: In June 2021, the BOP awarded a contract to an independent, external organization, NTT Data Services, and its work is ongoing. The contractor is assisting the BOP in identifying quantifiable risks associated with current staffing levels, including overtime use and staff schedule augmentation. It is helping the BOP assess the risks associated with overtime and augmentation and is providing overtime usage recommendations. With the understanding that overtime is sometimes inevitable, the BOP will use employed analytical strategies developed by the vendor, including thresholds to determine when overtime can become significantly riskier and produce negative outcomes. This initiative will provide the BOP with additional tools that will help identify early indications of staffing risks and allow the agency to make informed staffing decisions.  In addition, the contractor is scheduled to complete the first phase of implementation of an automated staffing tool for Correctional Services staffing in July 2023.

- **Psychologist hiring**: The recruitment of staff in certain BOP locations is always challenging, but the recruitment and hiring of professional staff (*e.g.*, clinical psychologists, teachers, and chaplains) is even more difficult due to competing industries and employers. The role of a psychologist in the BOP requires not only the interest to work in a challenging prison environment, but also requires stringent age, background, and educational requirements. Research indicates that only 34% of active psychologists are eligible for BOP employment due to age. Because of the highly specialized nature of the work performed by psychologists, the BOP is utilizing the services of Accenture, a consulting firm, to improve hiring strategies for treatment specialists, psychology doctoral interns, and psychologists. Accenture is assisting in streamlining information including increased social media and web-based presence, rebranding ad campaigns, enhancing user experience of BOP webpages, and marketing to targeted audiences through increased presence in academic and professional communities. Additionally, through consultation, analytics, research, and focus groups, Accenture is working in tandem with the Psychology Services Branch to understand and then reduce barriers and increase the efficiency of hiring processes. The initial marketing campaign began in April 2022 with continued improvements released since launch.

- **Targeted hiring campaigns**: The BOP has also engaged Accenture to conduct innovative and targeted marketing and recruitment campaigns to attract new staff in all

positions. These general recruitment campaigns involve the extensive and expansive use of social media, job fairs (both in-person and virtual), and industry associations. In FY 2021 and FY 2022, these campaigns included focused efforts to hire a variety of positions, including corrections officers, nurses, teachers, clinical psychologists, drug abuse program coordinators, social workers, vocational training instructors, and others. In FY 2023, the BOP is continuing to work with Accenture to recruit for BOP positions, including those dedicated to FSA implementation, correctional officers, and hard to fill positions as well as all positions in hard to fill locations. This campaign has been successful, resulting in some of the staffing increases described above.

- **Incentives**: The BOP has used recruitment incentives to hire good candidates, and retention incentives to encourage experienced staff to remain with the agency. For example, the BOP has offered a 10 percent recruitment incentive at thirty-two locations which are under 85 percent staffing in Correctional Services. By hiring and retaining correctional services staff, the BOP relies less upon augmentation by programs staff.

## G. Retroactive Application of the FSA to Crack-Cocaine Offenders

The Department has continued its work to fulfill the FSA's promise of ameliorating the unjustified disparity in the treatment of crack and powder cocaine in federal sentencing and eliminating statutory minimum sentences that Congress has come to view as overly harsh and ensuring the availability of compassionate release in appropriate circumstances.

The Department supports enactment of the Eliminating a Quantifiably Unjust Application of the Law Act (EQUAL Act), H.R. 1062, which would eliminate the powder-to-crack sentencing disparity in 21 U.S.C. §§ 841 and 960.  As set forth in the Department's June 22, 2021, testimony in support of the EQUAL Act of 2021, the Department believes it is long past time to end the disparity in federal sentencing between offenses involving crack cocaine and those involving powder cocaine.

In furtherance of that goal, on December 16, 2022, the Attorney General issued a memorandum reiterating the Department's view that statutory sentencing disparities between offenses involving cocaine base (including crack cocaine) and other forms of cocaine are "not supported by science, as there are no significant pharmacological differences between the drugs," and should therefore be eliminated.  The Attorney General, accordingly, instructed prosecutors that, "[i]f charging a mandatory minimum term of imprisonment under Title 21 for a drug offense involving crack cocaine is deemed warranted," prosecutors "should charge the pertinent statutory quantities that apply to powder cocaine offenses."[26]

The Department has also taken steps to ensure the full implementation of Section 404 of the First Step Act.  In that section, Congress authorized district courts to reduce certain defendants' sentences as if the provisions of the Fair Sentencing Act of 2010, which increased the threshold quantities of crack cocaine triggering enhanced statutory penalties for certain drug-trafficking offenses and eliminated mandatory penalties for simple possession of crack cocaine, had been in effect when the defendants committed their offenses.  Last term, in *Concepcion v. United States*, No. 20-1650, the United States Supreme Court considered the question whether, when

---

[26] *See* Merrick B. Garland, *Additional Department Policies Regarding Charging, Pleas, and Sentencing in Drug Cases* 4 (Dec. 16, 2022) (quotation marks omitted), available at https://www.justice.gov/media/1265321/dl?inline.

considering a motion pursuant to Section 404, a district court is required to consider all legal and factual developments occurring after an offender's original sentencing.

The government took the position that although Section 404 does not authorize a plenary resentencing, and therefore does not mandate that courts consider factual or legal developments unrelated to the Fair Sentencing Act, a district court considering a Section 404 motion nevertheless may, in its discretion, consider such post-sentencing developments.[27]  The Supreme Court adopted that position.  Although the Court explained that a district court cannot "recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act," the Court held that a district court adjudicating a motion under Section 404 "may consider other intervening changes" in law or fact, when considering both whether to grant a reduced sentence for an eligible covered offense and the extent of any such reduction.[28]  Nevertheless, the Court reiterated that the First Step Act does not compel courts to exercise their discretion to reduce any sentence.[29]

## H.  Compassionate Release

Section 603(b) of the First Step Act amended 18 U.S.C. § 3582(c)(1)(A), commonly referred to as the "compassionate release" provision, permits district courts to reduce a defendant's sentence when "extraordinary and compelling" reasons warrant such a reduction.  Section 603(b) amended the provision to permit inmates to file motions in court seeking such relief.

Section 3582(c)(1)(A) provides that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission."  The United States Sentencing Commission has publicly posted new amendments to Sentencing Guidelines § 1B1.13, the policy statement applicable to compassionate release, for the guidelines amendment cycle ending May 1, 2023.

As the Department explained in its comments to the Commission, it welcomed the Commission's decision to prioritize this issue for amendment. The Department supported many of the Commission's proposals to expand the availability of compassionate release. The Department agreed, for instance, that compassionate release may be warranted, in appropriate cases, in response to a public health emergency. Likewise, the Department believes that in appropriate cases, compassionate release should be available for victims of sexual misconduct in prison, so long as that misconduct has been established by an administrative or legal proceeding.  As stated previously in litigation, however, the Department's position is that Section 3582(c) does not authorize courts to reduce sentences based on a nonretroactive development in sentencing law.

Since the enactment of the First Step Act, the BOP's Director has approved 112 requests for compassionate release on the basis of terminal illness, 33 requests for individuals with a "debilitated medical condition," and 2 requests from "elderly inmates with medical conditions." BOP Program Statement No. 5050.50, <u>Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)</u>, sets forth the BOP's compassionate release criteria.   The BOP will continue to evaluate this Program Statement, including whether changes are necessary in light of the U.S. Sentencing Commission's recently announced amendments.

---

[27] *See* Brief for the United States at 20-42, *Concepcion v. United States*, No. 20-1650 (Dec. 15, 2021).
[28] *Concepcion v. United States*, 142 S. Ct. 2389, 2396, 2402 n.6 (2022).
[29] *Id.* at 2396.

# IV. The Rates of Recidivism Among Individuals Who Have Been Released from Federal Prisons

The FSA's report requirements include a request for information about recidivism among persons released after the passage of the Act. 18 U.S.C. § 3634(3).

The BOP collects information on specific categories of inmates released from federal prison under the FSA. As of January 28, 2023, the five non-mutually exclusive categories of incarcerated individuals released to U.S. communities under the FSA total 29,946 and include:

a) Individuals released due to a reduced sentence under the Fair Sentencing Act;

b) Individuals who receive a compassionate release, also known as a Reduction in Sentence, based on a diagnosis of a terminal illness, or based on age and completion of a qualifying percentage of the sentence;

c) Individuals who were released because of the expansion of good conduct time under the FSA as of July 19, 2019, when the BOP applied the new good conduct time calculation retroactively;

d) Individuals transferred to community custody under the FSA's reauthorization of the Elderly Offender pilot program; and

e) Individuals released to supervised release, without first being placed in prerelease custody, based on accrual of TC from successful participation in EBRR programs and/or PAs. The BOP is monitoring individual time credit accruals and referring individuals to prerelease custody accordingly. As of January 15, 2022, the BOP began releasing incarcerated individuals directly to supervised release based solely on time credit accrual. Any recidivism of such individuals will be monitored monthly using the National Law Enforcement Telecommunications System via a cooperative agreement with the International Public Safety and Justice Network. The FSA grants the BOP Director full discretion to place individuals either in prerelease custody or supervised release based the application of TC. *See* 18 U.S.C. § 3624(g)(3).

Recidivism is defined as either a return to BOP custody or an arrest by federal, state, or local authorities. Recidivism rates presented in this aspect of the Report are lower than average rates in the United States, though higher than the rates in last year's Report.

Traditionally, the observation period for BOP recidivism studies begins when the individual has satisfied the sentence and is released from BOP custody. It is not unusual for individuals to be in community custody (RRCs or home confinement) when they have satisfied their sentences. Typically, if an individual commits a crime while in community custody, the BOP does not treat the conduct as recidivism because the individual has not yet fully satisfied the sentence or been released from BOP custody. If authorities do pursue the criminal conduct that occurred during community custody, then the BOP records it as recidivism. The BOP does not believe this method of calculating recidivism impacts the BOP's overall recidivism rates because (1) community custody placements are relatively brief for most individuals and (2) the individual's release from the BOP is imminent. While this approach has worked well for the BOP in the past, individuals released via the Elderly Offender pilot program may remain in community custody for many years before they satisfy their sentences. Therefore, for that group, the BOP uses the date they arrive in community custody as the release date for measuring recidivism.

## A. Recidivism Data Tables

1. Recidivism by Primary Offense of Conviction for 29,944* FSA Individuals Released from BOP Custody

| Primary Offense of Conviction | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Drugs | 87.2% | 12.8% | 17,341 |
| Weapons/Explosives | 76.4% | 23.6% | 2,581 |
| Homicide/Aggravated Assault | 76.2% | 23.8% | 277 |
| Burglary/Larceny | 91.3% | 8.7% | 1,600 |
| Counterfeit/Embezzlement | 94.5% | 5.5% | 182 |
| Court/Corrections | 89.7% | 10.3% | 146 |
| Immigration | 83.5% | 16.5% | 654 |
| Fraud/Bribery/Extortion | 96.1% | 3.9% | 5,673 |
| Sex Offenses | 75.2% | 24.8% | 652 |
| National Security | 93.8% | 6.2% | 16 |
| Robbery | 72.8% | 27.2% | 536 |
| Miscellaneous | 91.3% | 8.7% | 229 |
| Continuing Criminal Enterprise | 94.7% | 5.3% | 57 |
| Number of Inmates | 26,222 (87.6%) | 3,722 (12.4%) | 29,944 |

* Two individuals are missing an offense category.

2. Recidivism by Length of Sentence Imposed for 29,917* FSA Individuals Released from BOP Custody

| Length of Sentence Imposed | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Up to 5 Years | 90.3% | 9.7% | 14,317 |
| 6-10 Years | 88.4% | 11.6% | 7,213 |
| 11-15 Years | 80.7% | 19.3% | 4,050 |
| More Than 15 Years | 83.7% | 16.3% | 4,337 |
| Number of Inmates | 26,201 (87.6%) | 3,716 (12.4%) | 29,917 |

* 29 individuals are missing a length of sentence imposed.

3. Recidivism by Length of Sentence Served for 29,917* FSA Individuals Released from BOP Custody

| Length of Sentence Served | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Up to 5 Years | 90.5% | 9.5% | 17,228 |
| 6-10 Years | 87.0% | 13.0% | 6,295 |
| 11-15 Years | 77.7% | 22.3% | 3,719 |
| More Than 15 Years | 84.0% | 16.0% | 2,675 |
| Number of Inmates | 26,201 (87.6%) | 3,716 (12.4%) | 29,917 |

* 29 individuals are missing a length of sentence imposed.

4. Recidivism by BOP Facility for 29,917[a] FSA Inmates Released from BOP Custody[b]

| Institution Classified Security Level | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Minimum | 94.6% | 5.4% | 17,659 |
| Low | 84.6% | 15.4% | 8,003 |
| Medium | 66.0% | 34.0% | 3,611 |
| High | 55.0% | 45.0% | 644 |
| Number of Inmates | 26,204 (87.6%) | 3,713 (12.4%) | 29,917 |

[b] The FSA requires recidivism data by the BOP per "facility or facilities in which the prisoner's sentence was served." 18 U.S.C. § 3634(3)(C). Because inmates often transfer between different BOP facilities, the BOP has not been able to establish facility-specific recidivism rates. The BOP has thus fulfilled this requirement with the above table presenting recidivism by the inmate's security classification, predicting risk of violent and other serious misbehavior in prison.

5. Recidivism by EBRR Programs Completed for 29,946 FSA Individuals Released from BOP Custody

| Number of Completed EBRR Programs | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| 0* | 88.0% | 12.0% | 14,016 |
| 1 | 87.7% | 12.3% | 7,555 |
| 2 | 88.4% | 11.6% | 3,990 |
| 3 | 85.4% | 14.6% | 2,096 |
| 4 | 84.7% | 15.3% | 1,029 |
| 5-6 | 86.4% | 13.6% | 897 |
| 7-9 | 83.7% | 16.3% | 276 |
| 10+ | 86.2% | 13.8% | 87 |
| Number of Inmates | 26,224 (87.6%) | 3,722 (12.4%) | 29,946 |

* Note that many inmates with 0 completed programs were in fact inmates with very short-term sentences who were never designated to a BOP institution but rather served their sentence at a jail or pre-trial facility or were released due to time-served sentences. Thus, those inmates did not have the time or opportunity to participate in programs but were minimum security and low-risk offenders.

6. Recidivism by PATTERN Level for 24,917* FSA Individuals Released from BOP Custody

| Most Recent PATTERN Assessment (before Release) | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| Minimum | 96.8% | 3.2% | 9,322 |
| Low | 92.0% | 8.0% | 12,678 |
| Medium | 79.0% | 21.0% | 1,455 |
| High | 65.6% | 34.4% | 1,462 |
| Number of Inmates | 22,790 (91.5%) | 2,217 (8.5%) | 24,917 |

\* This included 5,029 individuals with no PATTERN risk level; many of these inmates were released before the development of PATTERN.

7.  Recidivism by PAs Completed for 29,946 FSA Individuals Released from BOP Custody

| Number of Completed PAs | Percent Not Recidivating | Percent Recidivating | Inmates |
|---|---|---|---|
| 0 | 88.9% | 11.1% | 14,244 |
| 1 | 84.5% | 15.5% | 12,476 |
| 2 | 92.9% | 7.1% | 2,154 |
| 3+ | 95.0% | 5.0% | 1,072 |
| Number of Inmates | 26,224 (87.6%) | 3,722 (12.4%) | 29,946 |

# V. The Status of Prison Work Programs at Facilities Operated by the Bureau of Prisons

Per BOP Program Statement 5251.06, *Inmate Work and Performance Pay*, each sentenced person in custody who is physically and mentally able to work is assigned to an institutional, industrial, or commissary work program. In making work and/or program assignments, staff consider the individual's learning capacity, interests, needs, eligibility, and availability of assignments. The specific assignment is made with consideration of the institution's security and operational needs. Each assignment must be consistent with the safe and humane treatment of the individual, as well as the protection of the public.

Exceptions from work assignments are made to allow for individuals to participate in an education, vocational, or drug abuse treatment program, on either a full- or part-time basis, consistent with BOP policy and statutory requirements. Where such participation is not required by either policy or statute, exceptions may be made to allow an individual to participate in an education, vocational, or drug abuse treatment program, rather than to work full-time, upon the request of the person in custody and approval of the Warden or designee.

Available job assignments vary from institution to institution based on the specific security and operational needs of each facility. As a result, no national listing of job assignments exists. However, many assignments are common to every institution, consistent with the necessary day-to-day operations and services. Examples of these types of job assignments include, but are not limited to, orderlies and positions in food service, commissary, education, recreation, religious services, health services, safety and sanitation, and other services. Vocational training courses and apprenticeship opportunities are available at all BOP facilities and placement is based on needs assessments. Some of these programs may have specific eligibility prerequisites.

Beyond job assignments, the BOP has three levels of work or vocational programs (also known as Career Technical Education (CTE)): Apprenticeship Training, Certification Course Training, and Vocational Training. Apprenticeship Training prepares the inmate for employment in various fields through structured programs; under this program, inmates are overseen by journeymen and may be paid. Certification Course Training is a series of shorter course sessions (typically 99 hours or less) which lead to an industry-recognized certification. Examples of these certification courses include Quality Inspector Certification, ServSafe Certification, and OSHA 30 Certification. Vocational Training (VT) is a certification program that leads to, at a minimum, an entry-level position in a particular field. The training sessions are instructor-led and consist of both hands-on skill building training and live work projects to teach specific in-demand skills that prepare the inmate for an industry-recognized certification, credential, or degree. Examples of vocational training programs include welding, building trades, HVAC, and wind turbine technology.

The BOP also provides work programs designed to identify and address the needs of women inmates. The BOP has observed that women inmates frequently participate in VT programming focused on culinary arts, cosmetology, and building trades. Among the programming opportunities designed to assist women in the workplace are assertiveness training; balancing career, relationships, and family obligations; and meeting the challenges of the 21st century workforce for women.

Through an agreement with the DOL, the BOP offers 115 nationally standardized DOL Apprenticeships, 60 of which are supported by approximately 50 marketable programs

44

operating in BOP institutions. During FY23, the BOP intends to work in collaboration with DOL to continue improving the apprenticeship program.

Additionally, during FY22, the BOP partnered with DOL's Employment and Training Administration to develop and implement the Partners for Reentry Opportunities in Workforce Development (PROWD) grant program. PROWD will increase reentry services to individuals in minimum and low security federal prisons, residential reentry centers, and the community. These programs are designed to help incarcerated individuals prepare for and find employment after their release from federal correctional facilities thus improving employment outcomes, increasing justice and workforce system partnerships, and strengthening communities.  In September 2022, grant awards were given to seven states, including Arizona, California, Illinois, Michigan, Minnesota, North Carolina, and Pennsylvania. These states will partner with community organizations to provide services at facilities located within their state.  The BOP will continue to work with DOL to implement this program in FY23.  It will base future expansion of the program on an upcoming study regarding its effectiveness.

In addition to the CTE programs described above, the BOP provides job training and work experience through Federal Prison Industries (FPI).[30] The FPI provides a program of constructive work, at no cost to taxpayers, through which inmates can acquire job skills and good work habits, thereby reducing the likelihood of recidivism upon release. FPI employment helps encourage inmate activity by providing a diversified work program that improves prison safety and security. The FPI strives to attain the goal of 30 percent of the FPI inmate workforce consisting of inmates within 36 months of their release date.

In FY22, 17,699 individuals in custody worked in 69 different FPI operations. From FY22 through FY24, the FPI projects that it will employ 12,644 incarcerated individuals. FPI factories manufacture such items as furniture, clothing, electronics, and metal products, and provide such services as vehicle retrofit, printing, data processing, call centers, laundry, farming, and electronics recycling. These diverse types of employment enable inmates to seek and obtain employment in relevant fields after their release into the community.

While in the FPI program, inmate workers obtain certifications and skills in a variety of areas such as:

- garment construction, laundering, dry cleaning, and repair
- drafting and interpreting specifications
- carpentry
- upholstery
- metal working
- computer-aided design
- soldering
- electronics testing
- supply chain management
- warehousing and inventory operations
- forklift operations
- hazardous materials recognition
- truck driving
- welding
- vehicular upfit, repair, maintenance, bodywork, and painting

---

[30] https://www.bop.gov/about/agency/org_fpi.jsp.

- telephonic customer service
- telephonic sales to include opening, lead generation, schedule adherence, and closing
- optical laboratory administration, operation, and maintenance
- SAP (Systems Applications and Products) certifications, materials tracking, production monitoring, and transactions monitoring
- recycling
- Lean Six Sigma certification
- Microsoft software
- ISO (International Organization for Standardization) and AQL (Acceptance Quality Limit)

Pursuant to the FSA, the Department is to conduct ongoing research and data analysis on products purchased by Federal agencies that are manufactured overseas and could be manufactured by prisoners participating in a prison work program without reducing job opportunities for other workers in the United States. The FPI has solicited for an external contractor to conduct the required research, and the procurement was finalized in September 2022.

# VI. The Operational Policies and Guidance Issued

In order to implement the FSA successfully, the BOP has issued the following policies and guidance since the Act became law:

- Policy guidance regarding Compassionate Release (Reduction in Sentence). [PS 5050.50: Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), published 1.17.2019]

- Policy guidance to enable the BOP's employees to carry and store personal weapons under 18 U.S.C. § 4050. [*PS 5575.01 Change Notice ("CN")-1: Staff Personal Weapons Storage, published 1.18.2019*]

- The BOP and USMS policies complying with the FSA's requirements that prohibit certain room confinement for juvenile offenders. (The BOP does not house juveniles in its facilities.) [*BOP PS 5216.06 Juvenile Delinquents, published 4.26.2019 to reflect FSA language.*]

- Guidance to Wardens about entering into partnerships with nonprofits and other private organizations, including faith-based, art, and community-based organizations; institutions of higher education; private vocational training entities; and industry-sponsored organizations. These partnerships enable the BOP to expand the opportunities for EBRR programs and PAs. *[Issued 6.25.2019]*

- Policy guidance regarding release preparation and assisting inmates with obtaining identification. [*PS 5325.07 CN-1: Release Preparation Program, published 8.15.2019*]

- Guidance on inmate security designation documenting changes in the law with regard to placing individuals in custody within 500 driving miles of their release residence, as well as processing nearer release transfers, where appropriate. [*PS 5100.08 CN-1: Inmate Security Designation and Custody Classification, published 9.4.2019*]

- Procedures implementing the dyslexia-screening requirement, which will enable the BOP to identify those individuals within the BOP inmate population who have this learning disorder. The BOP also developed specific tracking codes for dyslexia to ensure that required reporting can occur. [*PS 5200.06: Management of Inmates with Disabilities, published 11.22.2019*]

- Policy guidance and contracting initiatives that provide sanitary products and ensure that they are available and accessible to women in custody. [*OM 003-2019: Provision of Feminine Hygiene Products, published 7.29.2020*] Incorporated into PS 5200.07: Female Offender Manual, published 5.12.2021.

- Policy guidance on harm reduction strategies. [PS 1610.01: Naloxone Procedures and Protocol for Reversal of Opioid Overdose, published 12.17.2020]

- Policy guidance on provision of controlled substances for substance use disorders [PS 6360.02: Pharmacy Services, published 10.24.2022]

- Policy guidance for the Elderly Offender Home Confinement Pilot. [OM 001-2019: Home Confinement under the First Step Act, published 5.3.2021]

- Policy guidance on federal prison facilities housing women in custody, regarding the Act's requirements prohibiting the use of restraints on pregnant individuals absent extreme circumstances. (The BOP has prohibited this conduct since August 2014.) In concert, the USMS issued similar updated procedures and forms for the USMS and its contracted private detention facilities. [*PS 5200.07: Female Offender Manual, published 5.12.2021*]

- Policy guidance regarding SPARC-13 Needs Assessment. [PS 5400.01: First Step Act Needs Assessment, published 6.25.2021]

- Policy guidance on First Step Act Program Incentives. [PS 5220.01: First Step Act Program Incentives, published 7.14.2021]
- OM 001-2022 First Step Act Incentives Procedures under the CARES Act Covered Period, published 14.1.2022
- PS 5355.04 Parenting, Children, and Families, published 4.14.2022
- PS 5242.01 Management of Inmate Veterans, published 4.14.2022
- PS 5241.01 Management of Aging Offenders, published 4.14.2022
- PS 5240.01 Female Integrated Treatment (FIT), published 8.11.2022
- PS 5335.01 Secure Mental Health Units, published 1.23.2023
- PS 5410.01 First Step Act of 2018-Time Credits:  Procedures for the Implementation of 18 U.S.C. § 3632 (d) (4), published 11.18.2022.  Updated 2.6.2023.

In addition,

- Specialized and comprehensive de-escalation training was provided to BOP employees and officers in accordance with Section 606 of the FSA (including mental health awareness training regarding inmates with psychiatric disorders), and more than 31,000 BOP employees have already received the updated training.

The following FSA-related policies and guidance have been negotiated with the Council of Prison Locals of the American Federal of Government Employees, the BOP employees' union, and are being prepared for promulgations as Program Statements:

- Unit Management and Program Review (PATTERN)

The following FSA-related policies and guidance are awaiting negotiation with the Council of Prison Locals before they are promulgated as Program Statements:

- Release Orientation Program
- Medication Assisted Treatment Program: Psychology Services
- Suicide Prevention Program (restraint of pregnant and post-partum inmates)

The following FSA-related policies and guidance are currently in negotiations with the Council of Prison Locals:

- Prisoner Transportation Manual (restraint of pregnant and post-partum inmates)
- Escorted Trips (restraint of pregnant and post-partum inmates)
- Use of Force and Application of Restraints (restraint of pregnant and post-partum inmates)


While these Program Statements await finalization, the BOP's efforts to implement FSA programs and services have not been hampered or impeded, as BOP has provided guidance on these issues through operations memos. Program Statements, however, are the preferred method of providing guidance because, unlike operations memos that typically expire in a year, Program Statements permanently memorialize guidance and directives for BOP staff, inmates, and stakeholders.

The following FSA-related policy and guidance are awaiting Rules action:

- Work Programs for Inmates, FPI (deferred compensation)

- Inmate Work and Performance Pay (deferred compensation)

- Community Based Programs, Utilization and Transfer Procedures (RRC placement, monitoring, home confinement)

The following FSA-related policies and guidance are currently under review as part of the BOP's normal review process to ensure they are consistent with the FSA and receive any necessary minor edits to address and cross-reference FSA-related topics (which are noted in the parentheticals below):

- Sentence Computation Manual (CCA of 1984) (GCT)
- Policy pertaining to inmate risk for prison misconduct, Program Statement 5100.08, Inmate Security Designation and Custody Classification, which significantly informed the development of PATTERN. The BOP Inmate Classification Workgroup is currently reviewing an updated draft policy to replace PS 5100.08. The draft policy improves the predictive accuracy of the BOP's Risk and Verification Observation (BRAVO) tool for the assessment of the risk of serious misconduct and introduces FSA needs-based program participation measures into the serious prison misconduct risk assessment. Due to its complexity, a final policy is not expected for internal review until late 2023.

While these policies are being reviewed, the review is not hampering or impeding the BOP's efforts to implement FSA programs and services, as needed guidance is provided through the BOP's operational memos.

# VII. An Assessment of Progress Made Towards Carrying Out the Purposes of the FSA, Including Any Savings

Since the passage of the FSA in December 2018, the BOP has worked to carry out the purposes of FSA. Progress made since the last Report includes the following:

- **Implemented and improved the Needs Assessment System:** The BOP continues to improve upon the Needs Assessment System. Automation was expanded in FY22 such that scores from the Needs Assessment entered individuals' records more quickly. Additionally, the number of people in custody opting out of FSA dropped by 15% in the last half of FY22. These changes will dramatically improve the impact of the FSA and were achieved at no cost.

- **Increased delivery of FSA Programs across disciplines** The BOP continues to expand participation in EBRR programs and PAs, particularly as more institutions resumed programming in accordance with the Bureau's COVID-19 Modified Operations Plan. As of February 28, 2023, 77.79% of inmates eligible to earn time credits were taking part in FSA activities. Since the opt-out model was implemented in February 2022, EBRR and PA participation has increased by 33.95%.

  The BOP also continues to advance existing initiatives and implement new initiatives in efforts to expand the quality and quantity of services and program opportunities for the inmate population. New procurements during this time focused on increasing EBRR and PA program offerings and established innovative practices.

- **Leveraged needs assessments to determine programming:** From January 2022 to March 2023, BOP increased the number of individuals who completed the needs assessment from approximately 90% to approximately 97%, providing for better direction to program participants. By doing so, the BOP has reduced waste on unnecessary programming and directed resources toward areas that have the potential to reduce recidivism.

- **Developed a divisional research plan:** The BOP has developed a research plan that is guided by the Department's Learning Agenda and First Step Act Legislation. The BOP is working to evaluate all EBRRs regarding their effectiveness at meeting short term goals (*e.g.*, reduction in symptoms, attainment of a GED, better mood management) and long-term goals (*i.e.*, reduction in recidivism). The BOP currently has 14 research projects underway and plans to initiate two additional studies. Research is in the early stages, but identifying and implementing evidence-based practices have the potential to generate future cost savings.

- **Updated policy to reflect current practices and changes in legislation:** Upon the passage of the FSA, the BOP quickly began revising policies significantly impacted by the FSA (*e.g.*, on compassionate release) and developed new policies requiring immediate action (*e.g.*, on elderly offender home confinement, MAT, provision of feminine hygiene products, and FSA Time Credits). The BOP continues to prioritize updating existing policies for consistency with FSA provisions, including its recently released policy implementing the FSA's Time Credit program.

- **Enhanced staffing for FSA initiatives and programs:**  The BOP has prioritized filling authorized FSA positions to expand programming opportunities and FSA initiatives in all institutions.  In FY22, the Bureau received an additional 111 positions dedicated to First Step Act compliance and enhancing programmatic needs for inmates.  Positions such as: residential reentry specialists, psychology interns, and vocational training instructors provide the needed additional support to increasing our programming.  The BOP has made steady progress to fill the 440 dedicated FSA positions, and of February 25, 2023, the BOP had filled 298.

- **FSA Reporting:** The BOP is actively engaged in providing quarterly and annual reports to the Department and Congress including reports about FSA program participation, capacity planning, expenditures, and partnerships.

- **Enhanced collaboration on FSA Initiatives:**  As explained in Part III.F above, the BOP partners with federal, state, local, Tribal, and community partners to better provide reentry services.

# VIII. An Assessment of Budgetary Savings

The FSA directs the BOP to determine how much, if any, savings have resulted from the First Step Act including

> (a) savings resulting from the transfer of incarcerated persons into prerelease custody or supervised release under section 3624(g), including savings resulting from the avoidance or deferral of future construction, acquisition, or operations costs;

> (b) savings resulting from any decrease in recidivism that may be attributed to the implementation of the risk and needs assessment system or the increase in EBRR programs and PAs;

> (c) a strategy to reinvest the savings in law enforcement activities; and expansions of EBRR programs and PAs; and

> (d) how any reduced expenditures are currently being used and will be used for various law enforcement and crime reduction efforts.

<u>Cost avoidance due to early transfers to prerelease custody and supervised release:</u>

As was the case in the last Report, it is too soon to assess cost savings resulting from the implementation of the FSA. The BOP began releasing individuals from BOP custody to supervised release because of the application of time credits in January 2022, and it significantly updated its policy for calculating time credits in November 2022.  The Bureau performed new time credit calculations for every individual in its custody in January 2023.

Because the Bureau's population rose over the past year, there was no reduction in its overall expenditures, but implementation of the FSA may still have lowered costs relative to the baseline.  The BOP is responsible for the costs for individuals being moved from an institution to home confinement or an RRC, and it is, therefore, most likely to realize cost savings when an individual transfers from an institution—like a medical center—with high marginal costs per individual.  The BOP has no cost savings to report based on early transfer to prerelease custody at this time.  For those released from custody, the BOP is no longer responsible for the costs specific to an individual inmate such as individual medical care, food, clothing, and other amenities, and it therefore expects to realize significant cost savings from the transfer of individuals to supervised release.  That said, since the BOP has not yet closed any institutions as a result of the First Step Act, it is still responsible for certain fixed costs necessary to operate our institutions. Any budgetary savings that occur in future years will be addressed in a subsequent Annual Report.

<u>Savings resulting from any decrease in recidivism</u>:

The BOP's most recent Second Chance Act report, which requires the BOP to determine recidivism for individuals released from 2015 to 2017, the recidivism rate is 45%.  This rate is not markedly different than the prior year's report, but this rate is still tied to a population released before the First Step Act of 2018.  A true recidivism analysis should reflect full implementation of revised PATTERN 1.3 and SPARC-13, which would indicate review of the inmate release cohort for 2023 and tracking those individuals after release for three years in 2026.  It will take years to collect applicable and appropriate data to perform a comprehensive assessment of recidivism rate impacts.  In the interim, based on the data available, we have seen no appreciable savings.

# IX. Statistics on Incarcerated Individuals with Dyslexia

As part of the needs assessment system, all incarcerated individuals are required to complete screening for dyslexia. As of February 24, 2023, 129,366 incarcerated individuals currently in custody have been screened to determine if they need further assessment for the characteristics of dyslexia.

Based on the results of the screenings, nearly 2,700 individuals in custody were referred to Special Education Teachers for further assessment, which includes the administration of standardized, norm-referenced assessments.

As of February 24, 2023, 518 incarcerated individuals have been determined to display characteristics of dyslexia and referred for intensive, individualized instruction in a reading and spelling program.

| Dyslexia Needs Assessment | Total Incarcerated Individuals | Male | Female | White | Black | Native American | Asian | Hispanic |
|---|---|---|---|---|---|---|---|---|
| Dyslexia **Yes** | 895 | 837 | 58 | 505 | 530 | 37 | 3 | 290 |
| Dyslexia **No** | 128,297 | 120,139 | 8,158 | 74,268 | 48,967 | 3,297 | 1,765 | 38,536 |
| Dyslexia **Refused** | 174 | 165 | 9 | 106 | 60 | 6 | 2 | 71 |

Note: Incarcerated individuals who refused either the screening or standardized testing are designated as "Dyslexia Refused."